# 26-959

## In the United States Court of Appeals for the Second Circuit

ROBERT FEEMAN, GUSTAVO GILLY, AND MICHAEL COLLINS, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

*Plaintiffs-Appellees,*

v.

BRIDGE IT, INC. D/B/A BRIGIT,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, NO. 1:25-CV-03806 HON. LEWIS J. LIMAN

### BRIEF & SPECIAL APPENDIX OF DEFENDANT-APPELLANT BRIGIT

| | |
|---|---|
| JAMES KIM | EPHRAIM A. MCDOWELL |
| KAITLAND KENNELLY | *Counsel of Record* |
| HUGH HAMILTON | COOLEY LLP |
| COOLEY LLP | 1299 Pennsylvania Avenue NW |
| 55 Hudson Yards | Suite 700 |
| New York, NY 10001 | Washington, DC 20004 |
| (212) 479-6256 | (202) 842-7800 |
| | emcdowell@cooley.com |

*Counsel for Defendant-Appellant*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Bridge IT, Inc. d/b/a Brigit states as follows:

Bridge IT, Inc. d/b/a Brigit is a wholly owned subsidiary of Upbound Group, Inc., which is a publicly traded company. BlackRock, Inc., through BlackRock Fund Advisors, owns 10% or more of Upbound Group, Inc.'s stock.

Dated: June 12, 2026                    Respectfully submitted,

*/s/ Ephraim A. McDowell*
Ephraim A. McDowell

*Counsel for Defendant-Appellant*

i

## TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT.............................................i

TABLE OF AUTHORITIES.................................................................v

STATEMENT REGARDING ORAL ARGUMENT...............................xii

INTRODUCTION ...............................................................................1

STATEMENT OF JURISDICTION.....................................................5

STATEMENT OF ADDENDUM..........................................................5

ISSUES PRESENTED .......................................................................5

STATEMENT OF THE CASE ............................................................6

    A.    Legal Background .............................................................6

    B.    Factual Background...........................................................8

        1.    Earned Wage Access......................................8

        2.    Brigit and Instant Cash Advances............................10

        3.    Plaintiffs' Agreements with Brigit .............................12

    C.    Procedural History...............................................................13

SUMMARY OF ARGUMENT...............................................................16

STANDARD OF REVIEW....................................................................19

ARGUMENT........................................................................................19

I.    Plaintiffs' Claims Are Arbitrable Because They Do Not Involve The Extension Of Credit...................................................20

    A.    "Debt" Requires A Legal Or Contractual Obligation To Pay. ...................................................................................21

    B.    Instant Cash Users Incur No Debt Because They Have No Obligation To Repay Advances. ......................................26

    C.    The District Court's Contrary Conclusion Lacks Merit. ......28

        1.    The district court failed to read the Terms as a coherent whole. ..........................................................28

ii

# TABLE OF CONTENTS
## (continued)

**Page**

2.    The district court improperly analogized to transactions involving recourse. ...................................31

3.    The district court's reliance on contract-formation principles was misplaced. ..............................................34

4.    The district court had no answer for the CFPB's Advisory Opinion. ........................................................40

II.    Plaintiffs' Claims Are Also Arbitrable Because Instant Cash Advances Are Not Subject To A Finance Charge .........................43

A.    Optional Express Delivery Fees Are Not Finance Charges.................................................................................43

1.    Optional express delivery fees are not "imposed" by Brigit on users.........................................................44

2.    Optional express delivery fees are not "incident to" Advances....................................................................47

3.    Judicial decisions and administrative interpretations reinforce that optional express delivery fees are not finance charges. .........................48

4.    Brigit's interpretation accords with the statutory structure. .....................................................................50

B.    The District Court's Contrary Reasoning Lacks Merit. ........51

1.    The district court misconstrued the term "imposed." ..................................................................51

2.    The district court erred in adopting a boundless reading of "incident to." ...............................................55

3.    The district court conflated the speed of delivery with the substance of the Instant Cash product. ........57

4.    The district court erred in analogizing to inapposite fees and distinct products...........................61

CONCLUSION .................................................................................64

iii

# TABLE OF CONTENTS
## (continued)

Page

CERTIFICATE OF COMPLIANCE ....................................................... 65

CERTIFICATE OF SERVICE............................................................... 66

iv

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adar Bays, LLC v. GeneSYS ID, Inc.*,
179 N.E.3d 612 (N.Y. 2021) ...................................................... 37

*Aetna Life Ins. Co. v. Town of Middleport*,
124 U.S. 534 (1888) ................................................................... 25

*In re AgriProcessors, Inc.*,
859 F.3d 599 (8th Cir. 2017) ..................................................... 24

*Am. Exp. Co. v. Italian Colors Rest.*,
570 U.S. 228 (2013) ..................................................................... 6

*Analytical Survs., Inc. v. Tonga Partners, L.P.*,
684 F.3d 36 (2d Cir. 2012) ........................................................ 24

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011) ..................................................................... 6

*Beal Sav. Bank v. Sommer*,
865 N.E.2d 1210 (N.Y. 2007) .............................................. 4, 29

*Busch Props., Inc. v. Nat'l Union Fire Ins. Co.*,
815 F.3d 1123 (8th Cir. 2016) ................................................... 45

*CFPB v. MoneyLion Techs. Inc.*,
799 F. Supp. 3d 152 (S.D.N.Y. 2025) ....................................... 45

*CM, Inc. v. Canadian Indem. Co.*,
635 F.2d 703 (8th Cir. 1980) ..................................................... 45

*In re Davis*,
194 F.3d 570 (5th Cir. 1999) ............................................... 25, 38

*DiPizio Constr. Co. v. Erie Canal Harbor Dev. Corp.*,
120 A.D.3d 905 (N.Y. App. Div. 2014) ..................................... 30

v

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Edmundson v. Klarna, Inc.*,
85 F.4th 695 (2d Cir. 2023) ................................................................ 19

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018) ............................................................................ 6

*FCC v. AT&T Inc.*,
562 U.S. 397 (2011) ........................................................................... 21

*Feeman v. Bridge IT, Inc.*,
2026 WL 880508 (S.D.N.Y. Mar. 30, 2026) ................................. 13-14

*Fin. Freedom Acquisition, LLC v. Std. Bank & Tr. Co*,
43 N.E.3d 911 (Ill. 2015) .................................................................. 33

*Fischer v. United States*,
603 U.S. 480 (2024) .......................................................................... 53

*Gold v. Deutsche Aktiengesellschaft*,
365 F.3d 144 (2d Cir. 2004) .............................................................. 38

*Goodwin v. Mass. Mut. Life Ins. Co.*,
73 N.Y. 480 (1878) ............................................................................ 39

*Gustafson v. Alloyd Co.*,
513 U.S. 561 (1995) ........................................................................... 62

*Hamilton v. York*,
987 F. Supp. 953 (E.D. Ky. 1997) .................................................... 34

*Household Credit Servs., Inc. v. Pfennig*,
541 U.S. 232 (2004) ............................................... 18, 47-48, 50-51, 55

*Koch Indus., Inc. v. United States*,
603 F.3d 816 (10th Cir. 2010) .......................................................... 56

*Lazo v. Sodexo, Inc.*,
931 F.3d 29 (1st Cir. 2019) ............................................................... 45

vi

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Levy v. McClellan,*
  89 N.E. 569 (N.Y. 1909) ....................................................................39

*Loper Bright Enterprises v. Raimondo,*
  603 U.S. 369 (2024) ..........................................................................54

*McNally v. United States,*
  483 U.S. 350 (1987) ..........................................................................56

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,*
  460 U.S. 1 (1983) ................................................................................6

*N.C. ex rel. Cooper v. Tenn. Valley Auth.,*
  515 F.3d 344 (4th Cir. 2008)............................................................52

*N.Y. Legal Assistance Grp. v. BIA,*
  987 F.3d 207 (2d Cir. 2021) .............................................................55

*Orubo v. Activehours, Inc.,*
  780 F. Supp. 3d 927 (N.D. Cal. 2025)..............................................33

*Powell v. Ocwen Fin. Corp.,*
  173 F.4th 386 (2d Cir. 2026).............................................................24

*Rodash v. AIB Mortgage Co.,*
  16 F.3d 1142 (11th Cir. 1994)......................................................58-59

*Ruiz v. Bally Total Fitness Holding Corp.,*
  496 F.3d 1 (1st Cir. 2007) ................................................................51

*Schron v. Troutman Sanders LLP,*
  986 N.E.2d 430 (N.Y. 2013) .............................................................61

*Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.,*
  999 F.3d 828 (2d Cir. 2021) ...............................................................8

*In re Taberna Preferred Funding IV, Ltd.,*
  594 B.R. 576 (Bankr. S.D.N.Y. 2018)...........................................32-33

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Turner v. E-Z Check Cashing of Cookeville, TN, Inc.*,
  35 F. Supp. 2d 1042 (M.D. Tenn. 1999) ..............................................34

*United States v. Brow*,
  62 F.4th 114 (3d Cir. 2023)...............................................................44

*United States v. Fort Scott*,
  99 U.S. 152 (1879).............................................................................25

*United States v. Hansen*,
  599 U.S. 762 (2023) ..........................................................................21

*United States v. Martin*,
  974 F.3d 124 (2d Cir. 2020) ...............................................44-45, 47, 52

*United States v. Mead Corp.*,
  533 U.S. 218 (2001) ..........................................................................54

*United States v. Olano*,
  507 U.S. 725 (1993)...........................................................................56

*United States v. Sineneng-Smith*,
  590 U.S. 371 (2020) ..........................................................................39

*Util. Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014) ..........................................................................56

*Veale v. Citibank, F.S.B.*,
  85 F.3d 577 (11th Cir. 1996)....................................................48-49, 58

*Vickery v. Empower Fin., Inc.*,
  2025 WL 2841686 (N.D. Cal. Oct. 7, 2025) ....................................34-35

# TABLE OF AUTHORITIES
## (continued)

**Page**

**Statutes**

9 U.S.C.
  § 2.................................................................................. 6, 16
  § 16(a)(1) ............................................................................ 5

10 U.S.C.
  § 987(a) ............................................................................... 6
  § 987(b) ............................................................................... 6
  § 987(c)................................................................................ 6
  § 987(c)(1)(B) ..................................................................... 50
  § 987(f)(4)........................................................... 2, 6, 16, 19
  § 987(h)(2)(D)....................................................................... 7
  § 987(i)(6)............................................................................. 7

11 U.S.C.
  § 101(5)(A) ......................................................................... 23
  § 101(12) ............................................................................ 23

15 U.S.C.
  § 1601(a) ....................................................................... 8, 50
  § 1602(f) ............................................................................ 21
  § 1604(a) ............................................................................ 25
  § 1605(a) ............................................ 3, 17, 47, 50, 55-56
  § 1638................................................................................... 8
  § 1638(a)(2)(a) .................................................................. 54
  § 1692a(5) .......................................................................... 23
  Pub. L. No. 90-321, 82 Stat. 146 (1968) ............................. 8

28 U.S.C. § 1331...................................................................... 5

ix

## TABLE OF AUTHORITIES
### (continued)

Page

**Rules & Regulations**

12 C.F.R.
    pt. 1026, Supp. I, Para. 4(d) (2026) ................................................. 63
    § 1026.4.................................................................................................. 50
    § 1026.4(a) ........................................................................ 7, 43, 51, 56
    § 1026.2(a)(13) ..................................................................................... 23
    § 1026.2(a)(14) ..................................................................................... 21
    § 1026.4(b) ...................................................................................... 50, 55
    § 1026.4(d)(1) ....................................................................................... 63
    § 1026.4(d)(1)(i) ................................................................................... 63
    § 1026.17(b) .......................................................................................... 23
    § 1026.17(c)(1) ...................................................................................... 24

32 C.F.R.
    § 232.3(f)(1).......................................................................... 7, 16, 19, 43
    § 232.3(f)(1)(i) ................................................................. 3, 7, 17, 19, 43
    § 232.3(g)(1) ......................................................................................... 24
    § 232.3(h) .............................................................................. 2, 7, 16, 21
    § 232.3(n) ......................................................................................... 7, 43
    § 232.3(s)............................................................................................... 23

**Federal Register**
    60 Fed. Reg. 66179 (Dec. 21, 1995) ..............................................53-54
    61 Fed. Reg. 49237 (Sept. 19, 1996) ................................................ 62
    68 Fed. Reg. 16185 (Apr. 3, 2003) .................................................... 49
    90 Fed. Reg. 60069 (Dec. 23, 2025) ...... 8-9, 25-26, 40-42, 46, 49, 59-60

**Other Authorities**

Bd. of Governors of Fed. Rsrv. Sys., *Report to Congress: Finance Charges for Consumer Credit Under the Truth in Lending Act* (Apr. 1996).................................................................................. 53

x

# TABLE OF AUTHORITIES
## (continued)

**Page**

Black's Law Dictionary (4th rev. ed. 1968)
*Debt* .......................................................................... 22, 28
*Impose* ............................................................................ 44
*Necessary* ...................................................................... 48
*Obligation* ..................................................................... 23

FDIC, *FDIC Knowledge Center*: *How Do I Stop An Automatic
Payment From Being Deducted From My Checking Account?*,
https://tinyurl.com/y37u3zre ......................................... 38

Merriam-Webster (last visited June 10, 2026)
*Due* ................................................................................ 31

Payments Innovation Alliance, *How ACH Works*,
https://perma.cc/6Y3W-QTRY ...................................... 38

Random House Dictionary of the English Language (1969)
*Debt*, 342 ...................................................................... 22
*Impose*, 668 .................................................................. 44
*Necessary*, 955 ............................................................. 48
*Obligation*, 916 ............................................................ 22

Webster's New Twentieth Century Dictionary (1965)
*Charge*, 288 .................................................................. 53
*Debt*, 443 ...................................................................... 22

Webster's Seventh New Collegiate Dictionary (1967)
*Obligation*, 582 ............................................................ 22
*Impose*, 420 .................................................................. 44

## STATEMENT REGARDING ORAL ARGUMENT

In accordance with Fed. R. App. P. 34(a)(1), defendant-appellant Bridge IT, Inc. d/b/a Brigit (Brigit) respectfully requests oral argument. Brigit submits that the Court will be aided by oral argument given that the appeal raises a complex question of first impression regarding the interpretation of the Military Lending Act, 10 U.S.C. § 987, and its interaction with the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*

## INTRODUCTION

This appeal arises from an erroneous denial of a motion to compel arbitration. Rather than enforcing the parties' arbitration agreement by its terms in accordance with the Federal Arbitration Act (FAA), the district court held that another statute—the Military Lending Act (MLA)—overrode the FAA. That holding rests on multiple legal errors and warrants reversal.

Defendant-appellant Bridge IT, Inc. (Brigit) offers an innovative financial service called Instant Cash, which is a form of earned wage access (EWA). Instant Cash provides users a portion of their earned wages ahead of the typical two-week payroll schedule, so they can use those funds to cover regular expenses and other costs. But critically, Instant Cash users have no obligation to repay advances, and Brigit has no right to seek recovery of unpaid advances. Nor can it impose late fees, charge interest, or refer unpaid sums to debt collectors. Instead, if a user declines to repay an advance, the only effect is that he cannot obtain further advances until he repays the current one.

Plaintiffs-appellees created Brigit accounts and obtained Instant Cash advances while they were active-duty servicemembers. They also

1

agreed to arbitrate all disputes with Brigit and to adhere to Brigit's Terms of Service (Terms). Those Terms made clear that plaintiffs had no obligation to repay Instant Cash advances and that Brigit had no recourse against them if they decided not to repay. The Terms also gave plaintiffs the option of receiving their funds through free standard delivery in 1-3 days or same-day express delivery for a small fee.

After obtaining Instant Cash advances, plaintiffs sued Brigit, asserting violations of the MLA and Truth in Lending Act (TILA). Brigit promptly moved to compel arbitration. But the court denied the motion because, in its view, the MLA applies and displaces the FAA. Specifically, the court cited 10 U.S.C. § 987(f)(4), which states that "[n]otwithstanding" the FAA, "no agreement to arbitrate any dispute involving the extension of consumer credit shall be enforceable against any covered" servicemember. The court's reliance on Section 987(f)(4) was wrong twice over.

*First*, Instant Cash advances are not "extension[s] of consumer credit" because they do not extend "credit" at all. Under the MLA and its implementing regulations, a putative creditor extends consumer credit only if the consumer incurs "debt." 32 C.F.R. § 232.3(h). The *sine qua*

2

*non* of "debt" is an obligation to pay a sum of money. Here, Instant Cash users incur no "debt" because they have no obligation to repay advances; instead, they may walk away with an advance with no strings attached.

*Second*, even if Instant Cash advances were "credit," they would not be "extension[s] of consumer credit" because they are not "[s]ubject to a finance charge." 32 C.F.R. § 232.3(f)(1)(i). A "finance charge" is a charge "*imposed* . . . by the creditor as an incident to the extension of credit." 15 U.S.C. § 1605(a) (emphasis added). Plaintiffs assert that express delivery fees are "finance charges." But such fees are not "imposed" by Brigit on users because they are entirely optional. Users can obtain Instant Cash advances at no cost—and such advances arrive significantly faster (within a few days) than waiting until the user's next payday (two weeks). Thus, Brigit does not "impose" express delivery fees on users. Instead, certain users voluntarily choose to pay express delivery fees to obtain faster access to advances, while other users select standard delivery. That is precisely why the Consumer Financial Protection Bureau (CFPB) recently concluded that optional express delivery fees— just like the fees at issue here—are not "finance charges."

3

In denying Brigit's motion to compel arbitration, the district court made a litany of legal errors. On the "credit" issue, the court inferred an obligation to repay from certain isolated words in Brigit's Terms—thus violating the cardinal interpretive rule that "a contract should be 'read as a whole.'" *Beal Sav. Bank v. Sommer*, 865 N.E.2d 1210, 1213-14 (N.Y. 2007) (citation omitted). The Terms are unambiguous: Brigit has "No Recourse In the Event of Non-Payment" and "warrants that it has no legal or contractual claim against [a user] based on a failure to repay an Advance." JA177. No reasonable user would read that language to create a legal or contractual obligation to repay an advance. And beyond that, the district court relied on inapposite analogies and contract-formation principles—that neither party had briefed—to support its finding of "credit."

The district court's reasoning on the "finance charge" issue was equally flawed. The court refused to give the term "imposed" its ordinary meaning and instead denied it any operative effect. And at the same time, the court gave the phrase "incident to" an implausibly broad sweep, such that it would encompass *any* fee even remotely related to an extension of credit.

4

In sum, the district court's decision contravenes the statutory and regulatory text—as well as Brigit's Terms. This Court should reverse.

## STATEMENT OF JURISDICTION

The district court had federal-question jurisdiction under 28 U.S.C. § 1331. The district court denied Brigit's motion to compel arbitration in an order entered on March 31, 2026, SPA1, and Brigit filed a timely notice of appeal on April 13, 2026, JA199. This Court has jurisdiction under 9 U.S.C. § 16(a)(1).

## STATEMENT OF ADDENDUM

Pursuant to Fed. R. App. P. 28(f) and Local Rule 32.1(c), an addendum containing pertinent statutes and regulations is filed concurrently with this brief as part of the Special Appendix.

## ISSUES PRESENTED

1. Whether Instant Cash advances qualify as extensions of "credit," even though users have no obligation to repay the funds.

2. Whether optional express delivery fees constitute "finance charges," even though users may obtain the same advances without paying such fees.

5

## STATEMENT OF THE CASE

### A.    Legal Background

1. The interpretive issues in this case turn on the intersection of the FAA and the MLA.  Over a century ago, Congress enacted the FAA in response to "widespread judicial hostility to arbitration agreements." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011).  The statute reflects a "liberal federal policy favoring arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).  And it effectuates that policy by requiring courts to "'rigorously enforce' arbitration agreements according to their terms." *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013) (citation omitted); *see* 9 U.S.C. § 2.

Parties seeking to establish that Congress overrode the FAA "face[] a stout uphill climb." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018). They must "bear[] the heavy burden of showing" a "clear and manifest congressional command to displace the Arbitration Act and outlaw [arbitration] agreements" of a particular character.  *Id.* at 510–11.

2. The MLA regulates lenders that "extend[] consumer credit" to active-duty servicemembers and their dependents.   10 U.S.C. § 987(a). The statute prescribes a maximum 36% annual percentage rate of interest and certain mandatory disclosures.  *See id.* §§ 987(b), (c).  And it

6

also bars arbitration of certain types of disputes. Specifically, 10 U.S.C. § 987(f)(4) states that "[n]otwithstanding" the FAA, "no agreement to arbitrate any dispute involving the extension of consumer credit shall be enforceable against any covered member or dependent."

The MLA delegates authority to the Secretary of Defense to define "consumer credit." *Id.* § 987(h)(2)(D), (i)(6). The Secretary's regulation (the MLA Rule) defines "[c]onsumer credit" as "credit offered or extended to a covered borrower primarily for personal, family, or household purposes," and that is, among other things, "subject to a finance charge." 32 C.F.R. § 232.3(f)(1), (f)(1)(i). The MLA Rule further defines "credit" as "the right granted to a consumer by a creditor to defer payment of debt or to incur debt and defer its payment." *Id.* § 232.3(h). Neither the MLA Rule nor TILA defines "debt." Meanwhile, the MLA Rule defines "finance charge" to have "the same meaning as 'finance charge' in Regulation Z." *Id.* § 232.3(n). In turn, Regulation Z provides that a "finance charge" "includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit." 12 C.F.R. § 1026.4(a).

7

Regulation Z implements TILA—a 1968 statute designed to facilitate the "informed use of credit" by consumers. 15 U.S.C. § 1601(a); *see* Pub. L. No. 90-321, § 102, 82 Stat. 146 (1968). To accomplish that goal, TILA requires creditors to disclose certain product information to enable consumers to "compare more readily" the credit options available. 15 U.S.C. § 1601(a); *see id.* § 1638.

### B. Factual Background

#### 1. Earned Wage Access

Brigit offers an EWA service called Instant Cash.[1] EWA services are a recent, market-driven solution to help "address the lag between consumers' hours worked and receipt of their paychecks." 90 Fed. Reg. 60069, 60069-70 (Dec. 23, 2025). Using technology, EWA providers can measure a person's already-earned wages and advance a portion of those wages to them at no or low cost. EWA thus enables users to cover "short-term liquidity needs" while they wait for their next paycheck. *Id.* at 60069.

---

[1] Because this appeal arises from the denial of a motion to compel arbitration, these facts are drawn from "relevant, admissible evidence" submitted by the parties below. *Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*, 999 F.3d 828, 833 (2d Cir. 2021) (citation omitted).

EWA also carries significant advantages for consumers over short-term extensions of credit—like credit cards, overdraft fees, and payday loans. Most EWA providers, including Brigit, do not require users to repay advances and expressly disclaim any right to collect if a user chooses not to repay an advance. *See id.* at 60072. Bona fide EWA providers also do not run credit checks, engage in debt collection, or furnish information to consumer-reporting agencies. *Id.* Instead, if a consumer does not repay an advance, the provider typically declines to offer additional advances. That framework distinguishes EWA from extensions of credit—which carry risks of negative credit reporting, accruing interest charges, rolling over balances, debt collection, and lawsuits. And unlike creditors, EWA providers bear all the risk of loss if a consumer declines to repay—the consumer bears none.

As a result of these advantages, EWA services are now widely used in the United States. The CFPB has recognized that, as of 2022, more than ten million consumers used EWA-facilitated earned wage transfers, totaling $31.9 billion. *Id.* at 60070 & n.10. The numbers have only grown since.

9

### 2. Brigit and Instant Cash Advances

Brigit is a financial-technology company focused on helping customers improve their financial wellbeing. To that end, Brigit offers a suite of services to users, one of which is an EWA service called Instant Cash. *See* JA172. Instant Cash helps users "cover that unexpected bill or have some extra cash on hand when [they] need it most," instead of resorting to costlier options like bank overdrafts. D. Ct. Dkt. No. 80 at 9.

To become eligible for Instant Cash, users must connect their bank account through the Brigit app and have "at least three recurring deposits from the same source." *Id.* at 3. Eligible users may request an advance through the app, along with their preferred delivery method. JA177. Users pre-authorize Brigit to electronically debit their payment method to repay the advance. JA173. But users may always withdraw that authorization by simply "notify[ing] Brigit that [they] wish to revoke [the] authorization by emailing info@hellobrigit.com." *Id.*

Critically, Instant Cash users have no obligation to repay any advance. Brigit's Terms provide that it has "**No Recourse In the Event of Non-Payment**" and "warrants that it has no legal or contractual claim against [a user] based on a failure to repay an Advance." JA177.

10

Thus, after receiving an advance, the user can choose to keep the funds and walk away without repaying.

If the user declines to repay, Brigit warrants that it "will not engage in any debt collection activities," such as coordinating with a third-party debt collector or reporting the user to a consumer-reporting agency. *Id.* The only effect of nonpayment is that "Brigit will suspend [the user's] access to future Advances until [he] repay[s] the outstanding Advance." *Id.*

Instant Cash is a free service. Any user can receive an advance "without additional cost." JA178. A standard delivery advance is delivered "within three (3) business days depending on processing times" for Automated Clearing House (ACH) transactions. *Id.* That three-day period is substantially faster than the ordinary two-week payroll cycle.

If users prefer advances sooner, they "may request that Brigit expedite disbursement of [their] Advance by paying an optional fee," so that the advance arrives "within 20 minutes." *Id.* The express delivery fee is "payable at the time [the user] repay[s] the Advance," if the user chooses to repay at all. *Id.* The Terms make clear that "[e]xpedited delivery of an Advance and Express Fees are optional," and "[t]he

11

decision whether to request expedited delivery and pay an Express Fee is entirely up to" the user. *Id.* During the relevant time period for this case, the express delivery fee ranged between $0.99 to $3.99. *Id.*[2]

Thus, Instant Cash works for both consumers and Brigit. Through technology, Brigit can detect users' recurring income, allowing it to tailor advance amounts to each user and limit its risk of loss to one advance per user. In turn, users may receive no-cost, non-recourse advances of their earned wages—without assuming the risks of payday loans. And because most customers want to continue using the service, they are incentivized to repay advances.

### 3. Plaintiffs' Agreements with Brigit

All Brigit customers, including plaintiffs, agree to Brigit's Terms upon creating a Brigit account. JA56. During the time period relevant here, the Terms included an Arbitration Agreement providing for arbitration of "any and all disputes, claims, actions, legal proceedings and controversies between [the user] and Brigit, whether preexisting, present or future, that arise from and/or relate, directly or indirectly, to . . .

---

[2] Brigit also offers two tiers of an optional subscription service that unlocks access to additional Brigit offerings. JA172. A subscription is not required to obtain an advance. JA179.

Brigit's products and services." JA157, JA188.[3] The Arbitration Agreement permitted users to "opt out of" arbitration by emailing Brigit within 30 days of agreeing to the Terms. JA134, JA159, JA190.

Plaintiffs used Instant Cash and agreed to the Terms and Arbitration Agreement. JA58. They allege that they were active-duty servicemembers as of the filing of the Amended Complaint. JA14-15. They further allege that they each obtained multiple advances and paid express delivery fees. JA37-38. No plaintiff opted out of the Arbitration Agreement. JA62.

## C. Procedural History

Plaintiffs sued Brigit on behalf of themselves and putative classes, alleging that Brigit violated the MLA and TILA by, *inter alia*, failing to make certain disclosures and charging interest rates above the MLA's statutory threshold. JA45-46.[4] Brigit moved to compel arbitration or, alternatively, to dismiss the Amended Complaint. The district court (Liman, J.) denied the motion in full. *See Feeman v. Bridge IT, Inc.*, 2026

---

[3] Plaintiff Gustavo Gilly entered a more recent Arbitration Agreement, which was similarly broad. *See* JA134.

[4] The Amended Complaint also asserted claims under the Georgia Payday Lending Act and Illinois Predatory Loan Prevention Act, which plaintiffs later voluntarily dismissed. JA8.

13

WL 880508 (S.D.N.Y. Mar. 30, 2026). It held that "[b]ecause Plaintiffs are covered borrowers and have plausibly alleged that Instant Cash extends consumer credit under the MLA, the arbitration clause is unenforceable." SPA42.

The district court first concluded that Instant Cash involves an extension of credit because it "creates a debt." SPA14. The court acknowledged that "debt" means "a state of being under obligation to pay or repay someone." SPA15 (citation omitted). The court found that requirement satisfied because users "agree that Brigit may debit their bank accounts at a later date for repayment of the amount of the advance." SPA15. While the court recognized that a user may decline to repay by "rescind[ing] payment authorization," the court determined that the "ability to rescind" did "not defeat the debt that is created when she seeks and receives an advance." SPA16.

Nor did it matter to the district court that "Brigit has disclaimed legal and contractual claims against a [user] who fails to repay." SPA16. The court noted that "Brigit forswears any right of recourse against the consumer directly." SPA21. But it stated that "[r]ecourse against the individual is not an essential feature of debt." SPA17. And in the court's

14

view, Brigit has recourse "against the consumer's bank account," even though the user has an undisputed "right to revoke" the authorization to debit that account. SPA22.

The district court next held that Instant Cash advances are "subject to 'a finance charge'" in the form of optional express delivery fees. SPA33. The court accepted that a finance charge must be "imposed . . . by the creditor" and that "impose" means "to levy or exact as by authority." SPA33-34 (citations omitted). Despite that definition, the court concluded that the term "[i]mposed" merely "identifies the party conducting the charging." SPA35. And it concluded that Brigit "imposed" optional express delivery fees because it "designed the fee," "set its price," and "collect[ed] it directly" from users who voluntarily selected express delivery. SPA37.

The district court also determined that express delivery fees are "incident to" an extension of credit. SPA34. The court cited the Supreme Court's determination that "incident to" in TILA "implies some *necessary* connection between the antecedent and its object." SPA34 (quoting *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 241 (2004)). And the court found that express delivery fees "bear[] a 'necessary connection'

15

to the extension of credit," SPA37, even though a user need not pay a fee to obtain an Instant Cash advance.

## SUMMARY OF ARGUMENT

The FAA compels arbitration of plaintiffs' claims. *See* 9 U.S.C. § 2. The MLA's arbitration bar does not apply because the dispute here does not "involv[e] the extension of consumer credit." 10 U.S.C. § 987(f)(4).

I.  Instant Cash advances are not extensions of "credit." 32 C.F.R. § 232.3(f)(1). "Credit" means "the right granted to a consumer by a creditor . . . to incur debt and defer its payment." *Id.* § 232.3(h). In turn, "debt" entails a legal or contractual obligation to pay a sum of money. That meaning is confirmed by dictionaries, federal law, state law, case law, and administrative guidance.

Under that meaning, Instant Cash users are not in "debt" to Brigit. Brigit "warrants that it has no legal or contractual claim against [a user] based on a failure to repay an Advance." JA177. And Brigit allows users to revoke their debit authorization simply by emailing Brigit. JA173. Thus, a user can obtain an Instant Cash advance, choose not to repay, and walk away with the funds while facing no adverse financial consequences.

16

The district court nonetheless held that Instant Cash users incur "debt." That holding is flawed in multiple ways. First, the court read isolated words in the Terms out of context to infer a contractual obligation to repay, even though the Terms provide the right to cancel the repayment and state that nonpayment does not breach the contract. Second, the court erroneously analogized Instant Cash to secured transactions with recourse against the borrower's property, even though the Terms disclaim recourse against users and their bank accounts. Finally, the court focused on whether Brigit and its users formed binding contracts—which Brigit has never disputed—rather than on whether the terms of that contract include an obligation to repay advances. The court's detour into contract formation was thus beside the point.

II. Separately, even if Instant Cash advances involved "credit," they would not be extensions of "consumer credit" covered by the MLA Rule because they are not "[s]ubject to a finance charge." 32 C.F.R. § 232.3(f)(1)(i). A "finance charge" is a charge "imposed directly or indirectly by the creditor as an incident to the extension of credit." 15 U.S.C. § 1605(a).

17

Here, optional express delivery fees are not finance charges because they are not "imposed" by Brigit "as an incident to" an extension of credit. Only mandatory fees are "imposed" by a creditor on a consumer. In contrast, optional fees (like express delivery fees) are not "imposed" by the creditor, but rather voluntarily chosen by the consumer. Nor are optional fees "incident to" an extension of credit, because that phrase "implies some *necessary* connection between the antecedent and its object." *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 241 (2004). There is no "necessary connection" between an express delivery fee and an advance, because a user can obtain the same advance in the same amount without paying the fee. Recognizing as much, the CFPB recently concluded that EWA providers' optional express delivery fees do not qualify as "finance charges."

In holding that express delivery fees are finance charges, the district court stretched the term "imposed" beyond its plain meaning to encompass fees not required by the putative creditor. And it misconstrued *Pfennig*'s "necessary connection" requirement to encompass any fee remotely related to the extension of credit. That boundless reading of "finance charge" is foreclosed by *Pfennig* itself and

18

would render superfluous the enumerated examples of finance charges in TILA and Regulation Z.

## STANDARD OF REVIEW

This Court "review[s] *de novo* a district court's denial of a motion to compel arbitration" and reviews for clear error "factual findings upon which [a district court's] legal determination is based." *Edmundson v. Klarna, Inc.*, 85 F.4th 695, 702 (2d Cir. 2023).

## ARGUMENT

Plaintiffs and Brigit agreed to arbitration, and the district court should have enforced the terms of their bargain. Contrary to the decision below, Section 987(f)(4) does not preclude arbitration of plaintiffs' claims. As noted above, Section 987(f)(4) states that "[n]otwithstanding" the FAA, "no agreement to arbitrate any dispute involving the extension of consumer credit shall be enforceable against any covered" servicemember. 10 U.S.C. § 987(f)(4). That provision thus applies only to disputes "involving the extension of consumer credit." *Id.* The MLA Rule defines consumer credit as "credit offered or extended to a covered borrower primarily for personal, family, or household purposes," and that is, among other things, "[s]ubject to a finance charge." 32 C.F.R. § 232.3(f)(1), (f)(1)(i). Here, Instant Cash advances do not involve the

19

extension of consumer credit because they are neither "credit" nor subject to a "finance charge." The district court thus erred in holding that the MLA precludes arbitration of plaintiffs' claims.

## I. PLAINTIFFS' CLAIMS ARE ARBITRABLE BECAUSE THEY DO NOT INVOLVE THE EXTENSION OF CREDIT

Instant Cash advances are not subject to the MLA because they do not extend "credit." An extension of credit necessarily requires that the consumer incur a "debt"—*i.e.*, a legal or contractual obligation to pay—a creditor. But Instant Cash advances carry no such obligation. To the contrary, Brigit makes clear that users can decline to repay; that it has no claim against users who decline; and that users are never subject to debt collection, interest charges, late fees, or adverse credit reporting. Thus, users face no risk of adverse financial consequences if they choose not to repay—Brigit assumes all the risk of nonpayment.

The decision below misconstrues Brigit's Terms and relies on inapposite analogies to different products and distinct principles. Ultimately, the district court never persuasively explained how a no-obligation, no-recourse service can give rise to a "debt." This Court should reject the decision below.

20

### A. "Debt" Requires A Legal Or Contractual Obligation To Pay.

The MLA Rule defines "credit" as "the right granted to a consumer by a creditor to defer payment of debt or to incur debt and defer its payment." 32 C.F.R. § 232.3(h). TILA and Regulation Z define "credit" in substantially the same manner. *See* 15 U.S.C. § 1602(f); 12 C.F.R. § 1026.2(a)(14). Accordingly, an extension of "credit" occurs only if a consumer incurs a "debt." Because the term "debt" is not defined by the relevant statutes or regulations, courts must look to its "ordinary meaning." *FCC v. AT&T Inc.*, 562 U.S. 397, 403 (2011) (citation omitted). And when determining that ordinary meaning, courts must consider the "context of the[] word[]—the water in which [it] swim[s]." *United States v. Hansen*, 599 U.S. 762, 775 (2023).

Here, in the context of consumer contracts, the ordinary meaning of "debt" is clear: a legal or contractual obligation to pay a sum of money. If consumers owe a debt, they have no option but to pay it, or else face consequences—like debt collection, lawsuits to recover the funds, and dings to their credit scores. Conversely, a suggestion—or even an expectation—that they pay does not create a debt. Dictionaries, federal

21

law, state law, case law, and recent administrative guidance all point to the same conclusion.

Common dictionaries from the time of TILA's enactment (and Regulation Z's promulgation) define "debt" as "[t]he condition of being under obligation to pay money to, or perform services for, another." *Debt*, Webster's New Twentieth Century Dictionary 443 (1965); *see Debt*, Random House Dictionary of the English Language 342 (1969) ("something that one person is bound to pay to or to perform for another" or "the condition of being under such an obligation"). And an "obligation" means "something that one is bound to do," *Obligation*, Webster's Seventh New Collegiate Dictionary 582 (1967), or "an agreement enforceable by law," *Obligation*, Random House, *supra*, at 916.

Legal dictionaries likewise define "debt" as "a legal liability to pay a specific sum of money" or an "obligation of [a] debtor to pay . . . a specified sum of money." *Debt*, Black's Law Dictionary (4th rev. ed. 1968) (hereinafter Black's); *see id.* ("The word 'debt' carries with it the requirement of certainty, the foundation of promise by express contract, and necessarily implies legality."). And when used as a "legal term," the word "obligation" means "any certain written promise to pay money or do

22

a specific thing," or "[a] formal and binding agreement or acknowledgement of a liability to pay a certain sum." *Obligation*, Black's, *supra*. Thus, a person does not incur "debt" unless he assumes a legally binding commitment to pay a sum of money.

Federal statutes and regulations reinforce that understanding of "debt." *See* 32 C.F.R. § 232.3(s) (words not defined in the MLA Rule or Regulation Z "have the meanings given to them by State or Federal law"). The Fair Debt Collection Practices Act (FDCPA) defines "debt" as "any *obligation* or alleged *obligation* of a consumer to pay money arising" from certain personal or household transactions. 15 U.S.C. § 1692a(5) (emphases added). And the Bankruptcy Code defines "debt" as "liability on a claim," 11 U.S.C. § 101(12), and then defines "claim" to mean a "right to payment," *id.* § 101(5)(A). These statutory definitions make clear that a legal or contractual obligation to pay is an essential feature of "debt."

TILA and the MLA also invoke that meaning of "debt." TILA and Regulation Z require lenders to provide disclosures "before consummation of the transaction," 12 C.F.R. § 1026.17(b), with "consummation" defined as "the time that a consumer becomes contractually *obligated* on a credit transaction," *id.* § 1026.2(a)(13)

23

(emphasis added). Likewise, the content of the "disclosures shall reflect the terms of the *legal obligation* between the parties." *Id.* § 1026.17(c)(1) (emphasis added). And the MLA's protections apply to "[c]overed borrowers," which "means a consumer who . . . becomes *obligated* on a consumer credit transaction." 32 C.F.R. § 232.3(g)(1) (emphasis added).

Case law embraces this ordinary meaning of "debt" as well. This Court recently described "[t]he classic debt" as "an unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest." *Powell v. Ocwen Fin. Corp.*, 173 F.4th 386, 394 (2d Cir. 2026) (quoting *Gilbert v. Commissioner*, 248 F.2d 399, 402 (2d Cir. 1957)). And it found that the notes at issue "reflect[ed] a traditional debt structure" because they "entitle[d] the noteholders to receive fixed payments of interest and principal at regular intervals." *Id.* at 395. Similarly, this Court has explained that "to qualify for the debt exception" under the Exchange Act, "the debt at issue must constitute 'an obligation to pay a fixed sum certainly and at all events.'" *Analytical Survs., Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 43 (2d Cir. 2012) (quoting *Rheem Mfg. Co. v. Rheem*, 295 F.2d 473, 476 (9th Cir. 1961)); *see also In re AgriProcessors, Inc.*, 859 F.3d 599, 605 (8th Cir. 2017) ("The

24

test for when a debt is incurred is whether the debtor is legally obligated to pay." (citation omitted)).

In addition, "[t]he Supreme Court has held that the plain meaning of a 'debt' . . . is 'nothing more or less than an enforceable obligation.'" *In re Davis*, 194 F.3d 570, 577 (5th Cir. 1999) (quoting *Pa. Pub. Welfare Dep't v. Davenport*, 495 U.S. 552, 559 (1990)). It thus emphasized nearly 150 years ago that "[a]ny one who is under no legal obligation or liability to pay [a] debt is a stranger [to the debt]." *Aetna Life Ins. Co. v. Town of Middleport*, 124 U.S. 534, 551 (1888) (citation omitted). And even before that, it recognized that certain bonds were "debts" because a city was "under a statutory and legal obligation to provide for" them. *United States v. Fort Scott*, 99 U.S. 152, 158 (1879).

Finally, recent administrative guidance endorses this understanding of "debt." In December 2025, the CFPB—the agency tasked with implementing TILA and Regulation Z, *see* 15 U.S.C. § 1604(a)—issued an Advisory Opinion determining that TILA ordinarily does not apply to EWA services. 90 Fed. Reg. 60069 (Dec. 23, 2025). In so doing, the CFPB observed that "the common meaning of debt is 'a sum of money due by certain and express agreement' or 'a financial liability

or obligation owed by one person, the debtor, to another, the creditor.'" *Id.* at 60071 (quoting *Debt*, Black's Law Dictionary (4th ed. 1968)). And it indicated that where a user "incurs no such liability or obligation," no "debt" arises for purposes of TILA and Regulation Z. *Id.*

### B. Instant Cash Users Incur No Debt Because They Have No Obligation To Repay Advances.

Applying the ordinary meaning of "debt" here, Instant Cash is not an extension of credit because users have no legal or contractual obligation to repay any advance. Brigit's Terms make clear that Brigit "has no legal or contractual claim" if a user declines to repay an advance. JA177. That is, the user has a contractual right to choose *not* to repay— and exercising that right is squarely within the contract, not a breach of it. Moreover, Brigit promises not to "engage in any debt collection activities," not to refer an unpaid advance to any "third party," and not to report the user to "a consumer reporting agency." *Id.* The only effect of nonpayment is that Brigit "will suspend [the user's] access to future Advances until [they] repay the outstanding Advance." *Id.*

Although Brigit's Terms establish procedures to govern repayment, those procedures do not create an obligation to repay. To use Instant Cash, users must link their bank account. *See* JA173. Brigit will then

26

"charge [the user's] Payment Method in accordance with the Credit and Debit Authorization above" if the user opts to repay an advance. JA177.

Critically, a user's payment authorization is freely revocable without consequence: Instant Cash users may "notify Brigit that [they] wish to revoke this authorization by emailing info@hellobrigit.com." JA173. To decline repayment, the user need only revoke payment authorization three business days before the scheduled repayment date to account for ACH processing times. *Id.* And as already explained, a user's choice to revoke payment authorization and refrain from repayment is fully consistent with—not a breach of—the parties' contract. Indeed, in that scenario, Brigit affirms that it "has no legal or *contractual* claim against [the user]." JA177 (emphasis added).

Ultimately, Brigit's business model works because users want to continue using Instant Cash and are thus incentivized to repay advances. But they are not legally or contractually bound to repay—and no financial consequences will flow from a decision to walk away. That feature of Brigit's EWA service makes it fundamentally distinct from payday loans, which can lead to debt cycles and compounding interest. And that feature of the service is also dispositive of the "debt" inquiry.

27

Because Brigit users face no "legal liability" if they decline to repay, they incur no "debt." *Debt*, Black's, *supra*.

## C. The District Court's Contrary Conclusion Lacks Merit.

Despite the plain meaning of "debt" and Brigit's unambiguous Terms, the district court concluded that Instant Cash is an extension of credit. That conclusion rests on multiple legal errors. The court plucked isolated words from Brigit's Terms to infer an obligation to repay; analogized to inapposite credit transactions involving recourse against property; relied on inapplicable contract-law principles that neither party briefed; and misconstrued the CFPB's recent Advisory Opinion. The court's analysis is untenable.[5]

### 1. The district court failed to read the Terms as a coherent whole.

The district court recognized that the "ordinary meaning" of "debt" is "a state of being under obligation to pay or repay someone." SPA15 (citation omitted). Yet the court erred in concluding that Brigit users

---

[5] The district court noted that other district courts have held that "similar products" to Brigit's are extensions of consumer credit. SPA11. Those decisions are neither binding nor persuasive. Like the decision here, those decisions contravene the ordinary meaning of "debt" in the context of consumer contracts, rely on inapposite and superseded regulatory interpretations, and create an atextual and unworkable framework for courts, creditors, and consumers.

"have an 'obligation to . . . repay'" Instant Cash advances. SPA15. The court reached that conclusion by selectively reading isolated provisions of the Terms divorced from their context. In so doing, the court violated the principle that "a contract should be 'read as a whole, and every part will be interpreted with reference to the whole.'" *Beal Sav. Bank v. Sommer*, 865 N.E.2d 1210, 1213-14 (N.Y. 2007) (citation omitted).

The district court emphasized the provision entitled "Electronic Payment Authorization," which states in part that users must authorize Brigit to debit their bank account if they "use Instant Cash, Credit Builder, Line of Credit, or use any of the Services for which payment to Brigit is required, including use of the Advance Service." JA173; *see* SPA15. But the court stopped reading the provision immediately after that sentence. The provision goes on to state that users may "revoke this authorization by emailing" Brigit "at least three (3) business days before the scheduled debit date in order to cancel this authorization." JA173. Thus, when "read as a whole," the provision makes clear that users may rescind payment authorization before their accounts are debited. *Beal Sav. Bank*, 865 N.E.2d at 1213-14. And a revocable payment authorization does not create a debt—if it did, then consumers would be

29

indebted to every business with whom they have authorized autopay, from video subscription services to gyms.

Moreover, the district court ignored that the "Electronic Payment Authorization" provision addresses multiple Brigit services—including those (such as Credit Builder loans) that are indisputably extensions of credit. That general provision cannot override the specific terms of the "Advance Service" provision governing Instant Cash. JA176-77; *see, e.g.*, *DiPizio Constr. Co. v. Erie Canal Harbor Dev. Corp.*, 120 A.D.3d 905, 907 (N.Y. App. Div. 2014) ("[I]t is a well-established principle of contract interpretation that specific provisions concerning an issue are controlling over general provisions." (citation omitted)). And the "Advance Service" provision is crystal clear about Instant Cash: there is "No Recourse in the Event of Non-Payment," and "Brigit warrants that it has no legal or contractual claim against [the user] based on a failure to repay an Advance." JA177.

The district court also fixated on the phrase "due date" in the "Advance Service" provision. JA177-78; *see* SPA16. In full, the relevant sentence reads: "It is your responsibility to contact Brigit if you are unable to repay your Advance on the scheduled due date." JA178. In

30

this context, "due" simply means "scheduled." *Due,* Merriam-Webster ("required or expected in the prescribed, normal, or logical course of events: scheduled"), https://tinyurl.com/2cfx7xrs (last visited June 10, 2026). That is, users expect to repay "on the scheduled due date," JA178, unless they opt to revoke their debit authorization and walk away from the transaction. The court nonetheless asserted that "due" "connotes a sum 'owed or owing as a debt.'" SPA16 (citation omitted). But while that is one possible definition of "due" in the abstract, it makes no sense in the context here. Where "due" appears in the phrase "scheduled due date"— alongside a provision stating that Brigit has "no legal or contractual claim" against users who decline to repay—"due" plainly means "scheduled," rather than "owing as a debt." SPA16.

> ### 2. The district court improperly analogized to transactions involving recourse.

The district court next fundamentally misconstrued the provision entitled "No Recourse In the Event of Non-Payment." JA177. That provision means what it says: Brigit "has no legal or contractual claim" against a user who declines to repay and "will not engage in any debt collection activities"—full stop. *Id.*

The district court refused to accept the plain meaning of the "No Recourse" provision. The court acknowledged that Brigit does not have "legal recourse against the individual" user. SPA16 (capitalization omitted). But it maintained that Brigit has recourse against "the funds on deposit in the [user's] bank account." SPA20. That is wrong. If a user revokes payment authorization and walks away, Brigit has no recourse whatsoever—against the user, their property, or their bank account. Instead, the *only* action Brigit can take is "suspend[ing] [the user's] access to future Advances." JA177. Plaintiffs do not (and could not) contend that Brigit deviates from those binding contractual commitments.

The no-obligation, no-recourse structure of Instant Cash distinguishes it from the credit products to which the district court analogized. The court noted that many "extensions of credit involve debts secured by property," such as "[r]everse mortgages" and "vehicle title loan[s]." SPA17. But those secured transactions create a repayment obligation backed by recourse, because the lender can enforce the obligation by seizing the collateral provided as security. *See In re Taberna Preferred Funding IV, Ltd.*, 594 B.R. 576, 586 (Bankr. S.D.N.Y.

32

2018) (explaining that a secured transaction involves "an obligation that can be satisfied only out of the collateral securing the obligation and not out of the debtor's other assets") (quoting Black's Law Dictionary (10th ed. 2014)).  That is why, upon a borrower's default, a mortgagee can foreclose on a home, a pawnbroker can sell the pawned item, and a title lender can retain the vehicle.  *See, e.g.*, *Fin. Freedom Acquisition, LLC v. Std. Bank & Tr. Co*, 43 N.E.3d 911, 918 (Ill. 2015) (discussing a "consumer credit transaction, secured by the consumer's principal dwelling" where "the only recourse is against the property itself").  Here, by contrast, Brigit has no right "to execute against property" *or* "against the borrower personally."  SPA17.

The district court's analogy to "'deferred presentment' transactions" is likewise misplaced.  SPA19; *see Orubo v. Activehours, Inc.*, 780 F. Supp. 3d 927, 935 (N.D. Cal. 2025) (relying on same erroneous analogy).  In those transactions, a borrower gives a lender a postdated check in exchange for upfront cash.  At the end of the loan period, the borrower must "(1) repay the principal amount and service fee and retrieve his uncashed check, (2) pay only the service fee and write a new check for the principal amount and service fee, or (3) allow the business to deposit the

33

original check." *Turner v. E-Z Check Cashing of Cookeville, TN, Inc.*, 35 F. Supp. 2d 1042, 1045 (M.D. Tenn. 1999); *see Hamilton v. York*, 987 F. Supp. 953, 955 (E.D. Ky. 1997). If the borrower's check bounces, the lender may seek to collect the debt and service fee—including through coercive means. *See Turner*, 35 F. Supp. 2d at 1046 (when borrower's "check was dishonored because her bank account had been closed," lender "threaten[ed] her with criminal prosecution" unless she repaid); *Hamilton*, 987 F. Supp. at 958 (same). Thus, in a deferred presentment transaction, the borrower has no right to revoke the check and avoid repaying—the repayment obligation is absolute, and recourse is available in the event of nonpayment. Conversely, here, an Instant Cash user can revoke his debit authorization, refrain from repaying an advance, and walk away with no adverse financial consequence. The difference could not be starker.

### 3. The district court's reliance on contract-formation principles was misplaced.

The district court also posited that Instant Cash users have a "binding legal obligation" to repay advances, even while acknowledging that they have a contractual right to "withdraw ACH authorization" and decline repayment. SPA21; *see Vickery v. Empower Fin., Inc.*, 2025 WL

34

2841686, at *5 (N.D. Cal. Oct. 7, 2025), *appeal filed*, No. 25-6377 (9th Cir.) (employing similarly flawed reasoning). That contention defies logic. In fact, the Terms simply require users to *initially* authorize Brigit to debit funds from their bank accounts in order to make scheduled payments. JA173-74. But the user may then "revoke this authorization" at any time to avoid repaying an advance. JA173. And as noted, doing so does not give rise to a "legal or contractual claim," JA177—which confirms that such revocation is fully consistent with, and not a breach of, the parties' contract. So even if revocation in some sense involves "taking back what has already been given," the Terms empower the user to do precisely that. SPA22.

To avoid that straightforward logic, the district court rested on a "distinction from contract law"—that neither party briefed or argued— "between contracts that are void and ones that are voidable." SPA22. The court emphasized that, under contract-formation principles, "the fact that a consumer may with three days' notice withdraw ACH authorization does not deprive the transaction between the consumer and Brigit of legal effect." SPA23. But Brigit does not contend that its agreements with Instant Cash users lack "legal effect." To the contrary,

35

both parties to those Terms have binding rights and obligations unrelated to the debit authorization, including, *inter alia*, a mutual agreement to arbitrate, JA187-91; users' promise to provide truthful account information, JA171; and Brigit's promise not to store credit monitoring information, JA174. The key point is that those rights and obligations do not include the obligation of users to repay advances or the right of Brigit to collect unpaid advances.

The district court also noted that "a consumer's obligation to repay the advance" is not "render[ed] illusory" by the right to "withdraw ACH authorization." SPA23. But Brigit's argument is *not* that users have an obligation to repay that is then rendered illusory. Instead, users have no obligation to repay in the first place because they may always withdraw the debit authorization without consequence. After all, when users sign up for Instant Cash, authorize account debits, and request advances, they do so against the backdrop of the *entire* Terms. And the Terms empower users to rescind the debit authorization whenever they "wish," decline to repay, and face no "contractual claim" or other recourse for doing so. JA173, JA177. Thus, when construed as a whole, the Terms make clear that Instant Cash users never "promise" to repay anything—so whether

36

such a promise would be "void" or "voidable" is beside the point. SPA22 (citation omitted).

The district court's hypothetical only confirms Brigit's position. SPA25. The court observed that if revoking payment authorization required a borrower to "travel[] to the lender's faraway offices and arrive[] between 12:30 and 1:00 PM on the Wednesday before" the scheduled payment date, then the borrower would have an obligation to repay. SPA25. But that is because the revocation option would be so impracticable as to become a sham. *See Adar Bays, LLC v. GeneSYS ID, Inc.*, 179 N.E.3d 612, 621-22 (N.Y. 2021) ("When determining whether a transaction is a loan, substance—not form—controls.").

Here, by contrast, "the method of revocation" is far "more convenient for the consumer," as the district court itself recognized. SPA26. All Instant Cash users must do to revoke payment authorization is email Brigit three days before their scheduled payment date. JA173. Contrary to the district court's implication, Brigit did not itself design that three-day window to make revocation less convenient. The three-day window is necessary because of the lag time between initiation of an

ACH transaction and settlement of the funds.[6]  As a result, the three-day window is nearly universal and consistent with the advance notice that consumers must provide to banks to revoke a payment authorization.[7] Because the revocation option here is plainly "a genuine one," SPA26, Instant Cash users have no obligation to repay an advance.[8]

Yet even if the district court's conception of a voidable promise to repay were correct (and it is not), Instant Cash users would *still* not be in "debt" to Brigit.  As noted above, the term "debt" ordinarily connotes "an enforceable obligation" to repay.  *In re Davis*, 194 F.3d at 577 (quoting *Davenport*, 495 U.S. at 559).  Here, to the extent Instant Cash users make a voidable promise to repay, that promise is entirely unenforceable.  After

---

[6] *See* Payments Innovation Alliance, *How ACH Works*, https://perma.cc/6Y3W-QTRY.

[7] FDIC, *FDIC Knowledge Center*: *How Do I Stop An Automatic Payment From Being Deducted From My Checking Account?*, https://tinyurl.com/y37u3zre.

[8] The district court implied that consumers might not be aware of the revocation provision because it appears in the Terms rather than the app interface.  SPA24-25.  But under New York law, "in the absence of fraud or other wrongful act on the part of another contracting party, 'a party who signs or accepts a written contract . . . is conclusively presumed to know its contents and to assent to them.'"  *Gold v. Deutsche Aktiengesellschaft*, 365 F.3d 144, 149 (2d Cir. 2004) (quoting *Metzger v. Aetna Ins. Co.*, 227 N.Y. 411, 416 (1920)).

all, Brigit has no recourse if users renege on their supposed promise by revoking debit authorization. That absence of recourse alone is sufficient to take Instant Cash outside the category of "credit"—and the district court identified no example of a fully non-recourse credit product.

The district court therefore had no basis for analyzing the "debt" issue in terms of "void" and "voidable" contractual obligations. Tellingly, plaintiffs never invoked that framing in their briefs or at oral argument— and no other district court to address this legal issue has approached it in that manner. The decision below is a quintessential example of a court impermissibly "sally[ing] forth" to generate new arguments not "presented by the parties." *United States v. Sineneng-Smith*, 590 U.S. 371, 376 (2020) (citation omitted). Under the proper framing, the question is not whether Brigit and its users have formed a valid and binding contract—they clearly have. Instead, the question is one of contract interpretation: does the agreement give rise to a "debt"? And a separate body of New York law—that the district court never cited, much less analyzed—holds that a contract creates a debt only if it imposes an "unqualified[] and absolute[]" obligation to pay. *Goodwin v. Mass. Mut. Life Ins. Co.*, 73 N.Y. 480, 487 (1878); *see Levy v. McClellan*, 89 N.E. 569,

39

574 (N.Y. 1909). Because the Terms impose no such obligation, Instant Cash users incur no debt to Brigit.

### 4. The district court had no answer for the CFPB's Advisory Opinion.

The district court also misunderstood the CFPB's recent Advisory Opinion. As explained above, the CFPB concluded that "Covered EWA is not credit" because it "does not provide workers with the right to defer payment of debt." 90 Fed. Reg. at 60071. The court noted that the Advisory Opinion defines "Covered EWA" to encompass only EWA services that "use a payroll process deduction in connection with the worker's next payroll event." *Id.*; *see* SPA31. And because "Instant Cash does not operate in conjunction with the consumer's employer or through a payroll processor," the court concluded that the Advisory Opinion "only reinforces the Court's conclusion" that Instant Cash is credit. SPA31-32.

The district court's reading of the Advisory Opinion is unavailing. As an initial matter, the Advisory Opinion makes clear that it "does not state, and nothing in it should be understood to state, that EWA products that are *not* Covered EWA are credit." 90 Fed. Reg. at 60071. And the opinion explains that "[t]he CFPB continues to seek stakeholder feedback and evaluate whether it should take further legal steps with respect to

40

EWA products, including steps that might encompass non-Covered EWA." *Id.* The court disregarded those unambiguous statements when maintaining that the Advisory Opinion "reinforce[d] the Court's conclusion." SPA31.

More fundamentally, the district court ignored key aspects of the CFPB's reasoning that fully apply to direct-to-consumer EWA services like Brigit's Instant Cash. Indeed, the CFPB explained that "[t]he primary reason" why Covered EWA is not credit "is that the common meaning of debt is 'a sum of money due by certain and express agreement' or 'a financial liability or obligation owed by one person, the debtor, to another, the creditor.'" 90 Fed. Reg. at 60071 (quoting *Debt*, Black's Law Dictionary (4th ed. 1968)). Here, Instant Cash users "incur[] no such liability or obligation" because they need not repay any advance. *Id.*

Similarly, the CFPB reasoned that "Covered EWA Programs lack typical substantive indicia of credit" because they "reserve no recourse against" a user who does not repay. *Id.* at 60072. And it emphasized that "[a] Covered EWA provider also cannot engage in debt collection, report to consumer reporting agencies, or sell or place the transaction as a debt with any third party." *Id.* Again, Instant Cash shares all those

41

characteristics—and thus likewise "lack[s] typical substantive indicia of credit." *Id.*

Rather than recognizing these similarities between Instant Cash and Covered EWA, the district court focused myopically on the one distinction: Covered EWA providers "function[] as an adjunct to the payroll system." SPA31. But it never persuasively explained why that distinction should be dispositive—especially when "[the] primary reason" for Covered EWA's non-credit status is *not* that it connects to payroll systems, but instead that it creates no "financial liability" or "obligation" to repay. 90 Fed. Reg. at 60071.

In all events, the Advisory Opinion "does not have the force or effect of law," *id.* at 60076, so it does not resolve the interpretive issue here in either direction. Instead, the opinion simply reaffirms "the common meaning of debt" described above, *id.* at 60071: a legal or contractual obligation to pay. And because Instant Cash users have no obligation to repay advances, they are not in "debt" to Brigit.

42

## II. PLAINTIFFS' CLAIMS ARE ALSO ARBITRABLE BECAUSE INSTANT CASH ADVANCES ARE NOT SUBJECT TO A FINANCE CHARGE

The MLA's arbitration bar does not apply for an additional, independent reason:  Instant Cash advances are not "[s]ubject to a finance charge."  32 C.F.R. § 232.3(f)(1).

The MLA Rule specifies that "[c]onsumer credit means credit offered or extended" that is "[s]ubject to a finance charge."  32 C.F.R. § 232.3(f)(1)(i).  And the Rule defines finance charge to "ha[ve] the same meaning as 'finance charge' in Regulation Z."  *Id.* § 232.3(n).  In turn, Regulation Z provides that a "finance charge" "includes any charge payable directly or indirectly by the consumer and *imposed* directly or indirectly by the creditor as an incident to or a condition of the extension of credit."  12 C.F.R. § 1026.4(a) (emphasis added).  That definition does not cover the optional fees that users may choose to pay for faster delivery of advances.  The district court erred in holding otherwise.

### A. Optional Express Delivery Fees Are Not Finance Charges.

Express delivery fees do not fall within Regulation Z's definition of "finance charge" because they are entirely optional.  They are therefore

43

not "imposed" by Brigit "as an incident to or a condition of the extension of credit."

### 1. Optional express delivery fees are not "imposed" by Brigit on users.

A charge must be mandatory to be "imposed" by a creditor on a consumer. The plain meaning of "imposed" is clear: "to establish or apply as compulsory," or "to put upon." *Impose*, Webster's Seventh, *supra*, at 420; *see Impose*, Random House, *supra*, at 668 ("to put or set by or as by authority"). Legal dictionaries mirror that definition. *See Impose*, Black's, *supra* ("[t]o levy or exact as by authority"). A charge is thus "imposed" by a creditor on a consumer only if the creditor requires the consumer to pay it to obtain the credit—*i.e.*, in a manner that is "compulsory" or "by authority."

This Court and others have specifically recognized this ordinary meaning of the term "impose." In *United States v. Martin*, 974 F.3d 124 (2d Cir. 2020), the Court observed that "[t]he act of imposing something means 'to levy or exact,' [or] to 'establish or apply by authority,' or 'bring about as if by force.'" *Id.* at 138 (quoting various dictionaries); *see United States v. Brow*, 62 F.4th 114, 120 (3d Cir. 2023) (similar). Thus, "[t]he act of imposing connotes the affirmative placement of a burden or a

44

restriction." *Martin*, 974 F.3d at 138; *see CM, Inc. v. Canadian Indem. Co.*, 635 F.2d 703, 708 (8th Cir. 1980) (explaining that "impose" means "apply as compulsory" (citation omitted)). And correspondingly, an undertaking is not "imposed" if it is assumed "by assent" or "voluntarily." *Busch Props., Inc. v. Nat'l Union Fire Ins. Co.*, 815 F.3d 1123, 1127-28 (8th Cir. 2016). In the financial services context, then, "the term 'impose'" refers to "a requirement under a credit agreement that obligates the consumer to pay the relevant fee." *CFPB v. MoneyLion Techs. Inc.*, 799 F. Supp. 3d 152, 185 (S.D.N.Y. 2025); *see Lazo v. Sodexo, Inc.*, 931 F.3d 29, 33 (1st Cir. 2019) (concluding that an administrative "fee" is not "imposed" where a patron "does not *have to pay* [the] charge") (emphasis added).

An example illustrates this ordinary meaning of "impose." Suppose a mortgage lender requires home buyers to pay numerous fees, including an origination fee, a credit reporting fee, an appraisal fee, and a recording fee. And suppose the lender also gives home buyers the option to pay an extra sum to rush the underwriting process. No ordinary speaker would say that the lender has "imposed" this rush fee on the home buyer. That

45

is because the fee is optional—the home buyer can still obtain the same product, the mortgage, without paying it.

Relying on this common meaning of "imposed," the CFPB's recent Advisory Opinion concludes that optional express delivery fees for EWA transactions are not finance charges. *See* 90 Fed. Reg. at 60074-76. The agency explained that, so long as express delivery fees are "triggered by the consumer's opting for expedited delivery[,] they are not 'directly or indirectly imposed' by the provider," and so cannot qualify as a "finance charge" for purposes of Regulation Z. *Id.* at 60075.

Here, Brigit's Terms make clear that express delivery is "optional": "The decision whether to request expedited delivery and pay an Express Fee is entirely up to [the user]." JA178. The Terms state that users "can always receive an Advance" via standard ACH delivery "without additional cost." *Id.* They further explain that for an "*optional* fee," the user "may request that Brigit expedite disbursement" of the advance, which will typically be delivered "within 20 minutes." *Id.* (emphasis added). And they provide that "the Express Fee is payable at the time [the user] repay[s] the Advance." *Id.*

46

Users therefore have full control over whether to choose standard delivery—which is still much faster than the ordinary two-week payroll cycle—or express delivery. And if users choose express delivery, the associated fee is not debited immediately. Instead, it is debited simultaneously with repayment of an advance if users decide to repay at all—meaning that if users revoke the debit authorization, they will not repay *either* the advance or the express delivery fee. Such an optional fee is not "imposed" on users because it is not "a burden" that is "affirmative[ly] place[d]" on them, but instead is an option voluntarily chosen by them. *Martin*, 974 F.3d at 138.

### 2. Optional express delivery fees are not "incident to" Advances.

The phrase "incident to the extension of credit" solidifies the point. 15 U.S.C. § 1605(a). In *Household Credit Services, Inc. v. Pfennig*, 541 U.S. 232 (2004), the Supreme Court held that the Federal Reserve Board had reasonably determined that "fees imposed for exceeding a credit limit (over-limit fees)" were not finance charges because they were not clearly imposed "incident to" an extension of credit. *Id.* at 235, 241. In so holding, the Court explained that "incident to" "implies some *necessary* connection between the antecedent and its object." *Id.* at 241.

47

"[N]ecessary" often means "essential" or "requisite." *Necessary*, Random House, *supra*, at 955; *see Necessary*, Black's, *supra* ("indispensable or an absolute physical necessity"). Because over-limit fees were not essential to obtaining an extension of credit, they were not "unambiguously included" in the definition of "finance charge." *Pfennig*, 541 U.S. at 242.

Here, there is no "necessary connection," *id.* at 241, between an express delivery fee and an advance. Users can obtain the same advance in the same amount by selecting free standard delivery. And even if users choose express delivery, they can still receive the advance on an expedited timeframe without paying any fee by revoking the debit authorization and cancelling the entire repayment (including both the advance and the express delivery fee). JA178, JA180. The express delivery fee is therefore not necessary to obtaining the advance, and so it is not "imposed" on a user "incident to" an extension of credit.

> **3. Judicial decisions and administrative interpretations reinforce that optional express delivery fees are not finance charges.**

Judicial decisions and longstanding administrative interpretations support the same conclusion. In *Veale v. Citibank, F.S.B.*, 85 F.3d 577 (11th Cir. 1996), the Eleventh Circuit held that a fee paid by borrowers

48

to "expedit[e] the [lender's] pay outs to . . . other financial institutions" via Federal Express was not a finance charge because the borrowers could have "avoid[ed]" the "fee by having the documents sent via regular mail" instead. *Id.* at 579. "Since the [borrowers] could have chosen not to pay the Federal Express fee and the bank did not require it," the court explained, the "fee was not imposed as an incident to the extension of credit." *Id.*

The Federal Reserve Board's guidance on credit cards—upon which the CFPB's Advisory Opinion relies—is likewise instructive. In a 2003 rulemaking, the Board considered whether a fee for expedited delivery of a credit card constitutes a finance charge. *See* 68 Fed. Reg. 16185, 16186 (Apr. 3, 2003). The Board answered that question in the negative: "[A] fee for expedited delivery of a credit card is not incidental to the extension of credit and thus is not a finance charge where the consumer requests the service and the card is also available by standard mail service . . . without a fee." *Id.* at 16187; *accord* 90 Fed. Reg. at 60075 (relying on this rule). Just as an optional express delivery fee for a credit card is not a finance charge where the same card "is also available by standard mail," 68 Fed. Reg. at 16187, an optional express delivery fee for an advance is

49

not a finance charge where the same advance is also available through standard ACH transfer.

### 4. Brigit's interpretation accords with the statutory structure.

The statutory structure likewise points in the same direction. TILA and Regulation Z list several examples of charges that qualify as "finance charges." *See* 15 U.S.C. § 1605(a); 12 C.F.R. § 1026.4(b). None of the enumerated examples resembles an optional fee that is paid simply for faster delivery of credit. *See* 15 U.S.C. § 1605(a) (listing, *e.g.*, "interest," "[l]oan fee," "finder's fee," and "[f]ee for an investigation or credit report" as examples of "finance charge[s]"); 12 C.F.R. § 1026.4 (similar); *see also Pfennig*, 541 U.S. at 241 (emphasizing that "none of § 1605's specific examples of charges" resemble "over-limit or comparable fees"). That makes sense because "finance charge" ultimately means "the cost of consumer credit." 12 C.F.R. § 1026.4(a). And a fee that a consumer does not need to pay to obtain credit is not naturally viewed as part of "the true cost of [that] credit." *Pfennig*, 541 U.S. at 243.

Classifying optional fees as "finance charges" would also undermine a key aim of TILA and the MLA: facilitating the "informed use of credit." 15 U.S.C. § 1601(a); *see* 10 U.S.C. § 987(c)(1)(B). Indeed, requiring

the disclosure of optional fees as part of the "cost of consumer credit," 12 C.F.R. § 1026.4(a), risks confusing consumers—who may mistakenly think that those fees must be paid to obtain the credit. Conversely, restricting the meaning of "finance charge" to required fees would create "a clear, easy to apply (and easy to enforce) rule" that accords with reasonable consumer expectations. *Pfennig*, 541 U.S. at 245.

## B. The District Court's Contrary Reasoning Lacks Merit.

The district court nonetheless held that Brigit "impose[s] a finance charge" through its express delivery fees. SPA33. In so holding, the court misconstrued the terms "impose" and "incident to" and conflated the method of service (express delivery) with the substance of the product.

### 1. The district court misconstrued the term "imposed."

At the outset, the district court erroneously interpreted the key term in the finance charge definition: "imposed." SPA34. While acknowledging that "impose" means "to levy or exact *as by authority*," *id.* (quoting Black's Law Dictionary (4th ed. 1968)) (emphasis added), the court emphasized that Congress did not use the term "require," *id.* But as an initial matter, the term "impose" *is* often synonymous with "require." *See, e.g.*, *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d

51

1, 8 (1st Cir. 2007) ("'[R]equire' typically means to demand, to compel, or to impose an obligation."); *N.C. ex rel. Cooper v. Tenn. Valley Auth.*, 515 F.3d 344, 351 (4th Cir. 2008) ("'Require,' . . . means '[t]o impose an obligation on; compel.'" (quoting Am. Heritage Dictionary 1050 (2d coll. ed. 1991)). Indeed, the definition of "impose" refers to required payments: a "levy," "exaction," "tax," or "duty." *Impose*, Black's, *supra*. And even if "impose" can sometimes have a "broader meaning than 'require,'" SPA34, this Court has squarely interpreted "impose" as to "bring about as if by force'" and to "affirmative[ly] place[] . . . a burden or a restriction," *Martin*, 974 F.3d at 138 (citations omitted). The district court never explained how Brigit brings about optional express delivery fees "as if by force" or affirmatively "burden[s]" users with them.

Taking a different tack, the district court stated that "[t]he 'finance charge' definition directly contrasts" fees "*payable*" by the consumer with fees "*imposed*" by the putative creditor. SPA34-35 (quoting 15 U.S.C. § 1605(a)). Given that contrast, the court interpreted the term "imposed" to merely "identif[y] the party conducting the charge." SPA35. But even assuming that Congress used "imposed" in part to identify the party levying the charge, that would not authorize courts to ignore the ordinary

52

meaning of that word. That is particularly true because Congress could have identified the party using a different term—such as "charged"—that would have clearly encompassed optional fees. *See Charge*, Webster's New Twentieth, *supra*, at 288 ("[t]o make *or ask* as a price" (emphasis added)). Or it could have simply referred to "any charge payable directly or indirectly by the consumer as an incident to the extension of credit," without mentioning the creditor at all. Instead, Congress used the phrase "imposed . . . by the creditor"—and this Court has an "obligation to give meaning" to that phrase, *Fischer v. United States*, 603 U.S. 480, 493 (2024).

The district court also embraced a passing statement in a 1995 Federal Reserve Board "request[ for] comments on how the definition of . . . finance charge could be modified." 60 Fed. Reg. 66179, 66180 (Dec. 21, 1995); *see* SPA35. The Board ultimately took no action based on the comments it received.[9] In the request, the Board noted—without citing any dictionary or authority—that "[t]he term 'imposed' is interpreted

---

[9] *See* Bd. of Governors of Fed. Rsrv. Sys., *Report to Congress: Finance Charges for Consumer Credit Under the Truth in Lending Act*, at 12 (Apr. 1996) ("The Board believes it is premature to present recommendations for statutory modifications of the finance charge at this time."), https://perma.cc/9Q4Y-9D76.

broadly." 60 Fed. Reg. at 66180. Even before *Loper Bright Enterprises v. Raimondo,* 603 U.S. 369 (2024), that type of unreasoned and nonbinding agency statement would have carried little weight. *See United States v. Mead Corp.,* 533 U.S. 218, 231 (2001). After *Loper Bright*, it should plainly play no role in a court's interpretation of Section 1605(a). *See* 603 U.S. at 387 ("The interpretation of the meaning of statutes . . . [is] 'exclusively a judicial function.'") (citation omitted).

The district court also observed that "[t]he 'amount financed' under TILA is 'the amount of credit of which the consumer has actual use,'" whereas the "finance charge" is "the cost the consumer pays for the privilege of the use." SPA35-36 (quoting 15 U.S.C. § 1638(a)(2)(A)). But that characterization supports Brigit, not plaintiffs. After all, a consumer must pay $0.00 "for the privilege of" using Instant Cash. SPA36. A consumer still obtains "actual use" of the same "amount of credit" even if he does not pay any fee. 15 U.S.C. § 1638(a)(2)(A). The express delivery fee pays *not* for the privilege of use, but instead for faster delivery.

54

### 2. The district court erred in adopting a boundless reading of "incident to."

The district court's interpretation of the phrase "incident to" was likewise flawed. The court acknowledged that a fee is "incident to" an extension of credit only if it "bears a 'necessary connection' to the extension of credit." SPA37 (quoting *Pfennig*, 541 U.S. at 241). But it then found that necessary connection on the ground that "[t]he fee exists only because the loan exists." SPA37. That reading contradicts *Pfennig* itself, because the over-limit fee there would not have existed absent the extension of credit—and yet the Court held that "the best interpretation of the term 'finance charge' may exclude over-limit fees." 541 U.S. at 240, 242. Moreover, if *every* fee that is at all connected to a loan were a finance charge, then there would have been no need for TILA and Regulation Z to carefully enumerate examples of both finance charges and fees that are not finance charges. *See* 15 U.S.C. § 1605(a); 12 C.F.R. § 1026.4(b). Accordingly, the court's interpretation would "render[] superfluous" key parts of the statute and regulation. *N.Y. Legal Assistance Grp. v. BIA*, 987 F.3d 207, 217 (2d Cir. 2021) (citation omitted).

The district court also relied on the "disjunctive" nature of Regulation Z's finance charge definition, SPA34, which references

55

charges that are "imposed . . . as an incident to *or* a condition of the extension of credit," 12 C.F.R. § 1026.4(a) (emphasis added). But critically, only the regulation—not the statute itself—uses that disjunctive formulation. The statute references only charges "imposed . . . as an incident to the extension of credit." 15 U.S.C. § 1605(a).

By adding the phrase "or a condition of," Regulation Z cannot have "rewrit[ten]" or amended the "clear statutory" language of "incident to." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014). Instead, a regulation "must be interpreted so as to harmonize with and further and not to conflict with the objective of the statute [it] implement[s]." *Koch Indus., Inc. v. United States*, 603 F.3d 816, 821 (10th Cir. 2010) (citation omitted). When read in that light, "or a condition of" reinforces that "incident to" encompasses only fees that must be paid as a condition of obtaining the extension of credit. Indeed, where the word "or" connects two phrases—here, "incident to *or* a condition of"—that formulation often creates "a single category" rather than "two separate categories." *United States v. Olano*, 507 U.S. 725, 732 (1993); *see, e.g.*, *McNally v. United States*, 483 U.S. 350, 359 (1987) ("second phrase" following the word "or" "simply made" the meaning of the first phrase "unmistakable"). The

56

district court thus erred in concluding that "the charge need not be a necessary condition to the extension of credit." SPA34.

### 3. The district court conflated the speed of delivery with the substance of the Instant Cash product.

The district court additionally relied on the premise that "[m]aximizing the time during which the consumer has access to liquidity" is the "*defining feature*" of Instant Cash. SPA36. But the court had no license to unilaterally decide how to define the service—instead, Brigit's unambiguous Terms define the service. And the Terms make clear that Instant Cash's defining feature is that it provides access to liquidity through "non-recourse cash advances." JA176-77. That defining feature applies equally to standard delivery and express delivery. After all, with standard delivery, the user obtains an influx of funds in only 1-3 days—far more quickly than the typical two-week payroll cycle. JA178.

The district court thus confused the method of delivery with the substance of the product. With or without express delivery, the substance of an Instant Cash advance is the same: an advance on a portion of already-earned wages. Payment of the express delivery fee simply changes the *speed* of delivery—but the amount of the advance, as

57

well as the other terms, remain identical. If a gift card is delivered within 3 business days in the normal course, or 1 business day for an express delivery fee, the recipient gets the same gift card either way. The express delivery fee does not transform the product itself.

That is the logic of the Eleventh Circuit's decision in *Veale*, to which the district court offered no cogent response. SPA39-40. The court emphasized that the funds in *Veale* were expeditiously delivered "not to the consumer directly but to some other creditor to whom the consumer owed money." SPA40. But that factual distinction is irrelevant to the finance charge question. Both here and in *Veale*, the consumer paid the fee to obtain the value of money more quickly (whether by directly receiving the funds or using the funds to pay off an existing mortgage). And because the consumer "could have chosen not to pay the [express delivery] fee and the [putative creditor] did not require it," the "fee was not imposed as an incident to the extension of credit." *Veale*, 85 F.3d at 579.

The district court incorrectly believed that the fee here was more akin to the one in *Rodash v. AIB Mortgage Co.*, 16 F.3d 1142 (11th Cir. 1994), than the one in *Veale*. SPA39-40. In *Rodash*, the "Federal Express

fee" was a finance charge because "without" paying to "mail[] the check to" another creditor, "the home equity transaction would not have been consummated." *Id.* at 1148. Drawing on *Rodash*, the court here asserted that "[w]ithout the [express delivery] fee, there was no 'instant cash.'" SPA40. But that is flatly wrong. As Brigit's Terms clearly explain, a user "can always receive an Advance" without paying the express delivery fee. JA178.

The district court's other cited authorities are even further afield. The court relied on *Orubo*'s statement that "[t]he time at which funds are received is a material term of credit." SPA36 (quoting 780 F. Supp. 3d at 938). But *Orubo* never even addressed the term "imposed"—much less explained how an optional fee could be imposed by a putative creditor on the consumer. The district court also quoted a never-finalized CFPB proposed interpretive rule for the proposition that "[s]peed of access to funds is an integral and defining aspect of [EWA] products." SPA36 (quoting 89 Fed. Reg. 61358, 61362 (July 31, 2024)). But the CFPB's recent Advisory Opinion "formally withdraw[s]" and "officially reject[s]" that proposed interpretive rule, 90 Fed. Reg. at 60076 n.81, finding its

conclusion that express delivery fees are finance charges to be "facially implausible," *id.* at 60075.

Nor is it material whether "the vast majority of EWA users pay expedite fees." SPA36 (citation omitted). Even assuming that is true, it would not establish that those fees are "*imposed*" upon users by Brigit—rather than voluntarily selected by those users to obtain funds more quickly. For instance, if most of a clothing store's online customers choose to pay extra for overnight shipping of their garments, no one would assume that the store imposed the overnight-shipping fee on the customers. The same logic applies here.

The district court reached an erroneous conclusion because it fundamentally misunderstood key aspects of Brigit's Instant Cash service. As one example, the court incorrectly stated that a user who pays an express delivery fee obtains a "longer term of the loan." SPA36. In fact, there is no "term" at all because a user can always defer or decline repayment of both the express delivery fee and advance—without facing any adverse financial consequence. Similarly, the court erroneously asserted that "pay[ing] the Express Fee" is the "one, and only one, way to receive funds instantly." SPA36. As explained above, a user can select

express delivery, receive an advance instantly, and avoid ever paying the fee (or repaying the advance) by revoking his debit authorization. *See supra* at 48.

The district court also deemed Brigit's marketing materials relevant to the "finance charge" question. *See* SPA35-36. But to determine whether express delivery fees are finance charges, the Court must apply the statutory definition of "finance charge" to Brigit's Terms with its users. Marketing materials cannot alter the nature of the parties' agreement. *See, e.g.*, *Schron v. Troutman Sanders LLP*, 986 N.E.2d 430, 433 (N.Y. 2013) ("As a general rule, extrinsic evidence is inadmissible to alter or add a provision to a written agreement."). In any event, those materials do not support the court's conclusion. They simply show that Brigit advertises the express delivery option; they do not suggest that paying the express delivery fee is the *only* way to obtain an advance—as would be necessary to establish that "the fee is part of the cost of the credit." SPA36.

### 4. The district court erred in analogizing to inapposite fees and distinct products.

The district court observed that TILA and Regulation Z "include a broad range of charges" as examples of finance charges. SPA35. But the

61

court cited no example resembling an optional fee for faster delivery. To the contrary, as the court itself recognized, the enumerated fees are "imposed as a cost for the consumer to obtain the 'actual use' of credit." SPA35 (quoting 12 C.F.R. § 1026.4(b)). As already explained, an Instant Cash user need not pay an express delivery fee "to obtain the 'actual use'" of an advance. SPA35. Because statutory language should be construed based on the "company it keeps," *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995), there is no basis for interpreting "finance charge" to include a fee that looks nothing like the enumerated examples.

The district court's analogies to other financial products are misplaced. SPA37-38. With an adjustable-rate mortgage, there is unquestionably an obligation to pay, as well as mandatory interest charges, and payment of a fee to convert the adjustable interest rate into a fixed rate "fundamental[y]" affects the "nature of the borrower's repayment obligation." 61 Fed. Reg. 49237, 49239 (Sept. 19, 1996). Here, by contrast, payment of an express delivery fee does not affect users' obligation to repay because, either way, they have no obligation at all. Meanwhile, "[c]redit life and disability insurance premiums" cut *against* the court's conclusion. SPA38. Regulation Z makes clear that such

62

premiums "may be *excluded* from the finance charge" if they are "[v]oluntary" and "[t]he insurance coverage is not required by the creditor." 12 C.F.R. § 1026.4(d)(1), (d)(1)(i) (emphasis added). While the regulation also requires certain "disclosure conditions," SPA38, those are simply designed to ensure that the premiums are in fact voluntary. *See* 12 C.F.R. pt. 1026, Supp. I, Para. 4(d) Insurance & Debt Cancellation & Debt Suspension Coverage ¶ 5 (2026) (explaining that premiums "must be voluntary . . . to be excluded from the finance charge," and "[w]hether the insurance or coverage is in fact required or optional is a factual question").

Finally, the district court emphasized "Congress's core concern that creditors would 'bur[y] the cost of credit in the price of goods sold.'" SPA34 (alteration in original) (citation omitted). But that concern has no application here because Brigit conspicuously discloses that express delivery fees are "optional" and need not be paid to obtain an advance. JA178. And for all the reasons explained, an optional fee—that does not affect the amount of an advance or whether it must be repaid—is not part of the "cost of credit" at all.

63

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's order denying Brigit's motion to compel arbitration.

Dated: June 12, 2026                    Respectfully submitted,

/s/ *Ephraim A. McDowell*
EPHRAIM A. MCDOWELL
COOLEY LLP
1299 Pennsylvania Avenue NW
Suite 700
Washington, DC 20004
(202) 842-7800
emcdowell@cooley.com

JAMES KIM
KAITLAND M. KENNELLY
HUGH B. HAMILTON
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
(212) 479-6000

*Counsel for Defendant-Appellant*

64

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation set forth in Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,763 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

Dated: June 12, 2026             */s/ Ephraim A. McDowell*
                                 Ephraim A. McDowell

## CERTIFICATE OF SERVICE

I hereby certify that, on June 12, 2026, I electronically filed the foregoing Brief of Defendant-Appellant with the United States Court of Appeals for the Second Circuit using the Court's electronic filing system, which will serve copies on all registered counsel.


Dated: June 12, 2026                    */s/ Ephraim A. McDowell*
                                         Ephraim A. McDowell

# 26-959

## In the United States Court of Appeals for the Second Circuit

ROBERT FEEMAN, GUSTAVO GILLY, AND MICHAEL COLLINS,
INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

*Plaintiffs-Appellees,*

v.

BRIDGE IT, INC. D/B/A BRIGIT,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK, NO. 1:25-CV-3806
HON. LEWIS J. LIMAN

## SPECIAL APPENDIX

JAMES KIM
KAITLAND M. KENNELLY
HUGH B. HAMILTON
COOLEY LLP
55 Hudson Yards
New York, NY 10001
(212) 479-6000

EPHRAIM A. MCDOWELL
  *Counsel of Record*
COOLEY LLP
1299 Pennsylvania Avenue NW
Suite 700
Washington, DC 20004
(202) 842-7800
emcdowell@cooley.com

*Counsel for Defendant-Appellant*

# TABLE OF CONTENTS

| __Date__ | __ECF__ | __Document Description__ | __Page__ |
|------|------|------------------------|------|
| 03/31/26 | 70 | Opinion & Order ......................................................SPA1 |
| N/A | N/A | 9 U.S.C. § 2...........................................................SPA44 |
| N/A | N/A | 10 U.S.C. § 987.....................................................SPA45 |
| N/A | N/A | 15 U.S.C. § 1605(a) ..............................................SPA53 |
| N/A | N/A | 12 C.F.R. § 1026.4(a)-(b) ......................................SPA54 |
| N/A | N/A | 32 C.F.R. § 232.3(f)(1), (g)-(h), (n), (s) .................SPA58 |
| N/A | N/A | 32 C.F.R. § 232.9(d) .............................................SPA60 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                  :

ROBERT FEEMAN, GUSTAVO GILLY, and     :
MICHAEL COLLINS, *individually and on behalf of all*  :
*other similarly situated*,             :
                  :
           Plaintiffs,    :
                  :
      -v-            :
                  :
BRIDGE IT, INC. d/b/a BRIGIT,        :
                  :
           Defendant.    :
                  :
------------------------------------------------------------------X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:_____
> DATE FILED: **3/31/2026**

25-cv-3806 (LJL)

<u>OPINION AND ORDER</u>

LEWIS J. LIMAN, United States District Judge:

Defendant Bridge It, Inc. d/b/a Brigit ("Brigit" or "Defendant"), moves, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the amended complaint or, alternatively, to compel arbitration. Dkt. No. 31. For the following reasons, the motion is denied.

## BACKGROUND

Brigit is a financial-technology company that offers short-term cash advances, branded as "Instant Cash," through a mobile application. Dkt. No. 30 ("Compl.") ¶¶ 19, 71. The product is intended to address the liquidity needs of those who receive payment for their labor on a biweekly or semi-monthly cycle but who incur expenses during the course of the pay period. *See id.* ¶ 68. Instant Cash is what is known as an earned wage advance ("EWA") product: it provides workers, before their payday, with funds that purport to equal or approximate a portion of their earned but unpaid wages. *Id.* ¶¶ 2, 69–70. Brigit markets its product with statements like: "Need some extra cash? You've come to the right place. With Brigit Instant Cash, you can get a cash advance of $25–$250 in minutes." *Id.* ¶ 71. Its website and advertisements promise users that they will be able to receive funds "instantly," "quickly," "ASAP," "within seconds," "when you

**SPA1**

need it," and "in case of emergency." *Id.* ¶ 78.  Because the questions presented in this motion turn in significant part on the parties' agreement and on the mechanics of the product as designed, the Court describes both in some detail.

## A.  Terms of Service

A consumer's use of the Brigit application is governed by the Brigit Terms of Service ("TOS"), which represents "a legal agreement" between the consumer and Brigit that "sets forth the terms and conditions governing your use of and access to" the products offered by Brigit, including Instant Cash.  Dkt. No. 33-6 ("TOS") at 2.[1]  The TOS provides that the consumer's "USE OF AND ACCESS TO THE SERVICES ARE EXPRESSLY SUBJECT TO THESE TERMS" and that a consumer who does "NOT AGREE TO ALL OF THE TERMS . . . SHOULD NOT AND MAY NOT USE OR ACCESS THE SERVICES." *Id.*  By signing up for a Brigit account and using the application, the consumer "acknowledge[s] and agree[s] that [he or she has] read, understand[s], and agree[s] to be bound by the Terms." *Id.* at 3.

The TOS creates obligations running in both directions.  The consumer agrees, among other things, to provide "truthful, accurate, current and complete information," including information regarding the user's full name, email address, and mobile telephone number; to update Brigit "as soon as possible" if any of the user's account information changes; to authorize Brigit to "electronically debit your Payment Method for the applicable amounts, including, but not limited to, payments of cash advances [and] any loan repayments"; to "indemnify and hold

---

[1] Citations to this docket entry use ECF pagination.  It appears that since the date of the filing of this motion, Brigit has changed the TOS as they appear on its website.  *See* Brigit Terms of Service (Mar. 13, 2026), https://www.hellobrigit.com/terms (last accessed Mar. 31, 2026).  This Opinion and Order cites to the most recent version of the TOS that is contained in the record, which Brigit filed in connection with this motion and which is dated June 30, 2025.  *See* Dkt. No. 33-6.  Plaintiffs do not contest the authenticity of this document or that it may be considered on the present motion.

**SPA2**

harmless Brigit from and against any loss" arising from preauthorized withdrawals in certain circumstances; and to comply with Brigit's representations and warranties, including the warranty that the consumer "ha[s] the right to authorize [Brigit] to charge and debit [the consumer's] Bank Account or debit card . . . for payments due . . . under the Terms." *Id*. at 4, 6–7, 16. Section 15 of the TOS sets out additional "prohibited activities," the violation of which authorizes Brigit "at its sole discretion" to "take legal action and/or use other remedies." *Id.* at 18. Brigit, for its part, assumes obligations concerning the manner and timing of its debits, its response in the event of nonpayment, and its data-handling practices. *See id*. at 5–7, 10, 13.

The TOS is enforceable by both the consumer and Brigit through binding arbitration. *Id.* at 1, 20. Section 20 of the TOS provides that "any and all Disputes" between the consumer and Brigit—defined broadly to include disputes "arising from and/or relat[ing], directly or indirectly, to [the consumer's] interaction(s), experience(s) and communication(s)" with Brigit—"will be resolved by binding arbitration." *Id*. at 20–21. Both parties expressly "agree to give up the right to go to court to assert or defend claims and disputes relating to or arising out of the Terms and/or the Services." *Id.* at 1. The consumer also "waiv[es] the right to a trial by jury and to participate in a class or representative action." *Id*. at 2.

## B. Account Setup and Evaluation

To obtain an advance, a consumer must sign up for an account, link the account to their bank account, and authorize Brigit to access and retrieve the consumer's financial information, including account transaction history and balance information. *See* TOS at 3–4. Brigit then analyzes the account to determine whether the user meets its criteria for a cash advance, looking at information such as the user's average bank account balance, spending habits, and whether paychecks are coming in regularly. Compl. ¶¶ 98–103. Brigit's promotional materials indicate

3

**SPA3**

that for the consumer to be eligible for an advance, the connected account should be the primary account the consumer uses daily, be active for at least 60 days, have a balance above $0, and have at least three recurring deposits from the same source, such as direct deposit from the consumer's employer. *Id.* ¶ 101; Brigit, *How To Get a Cash Advance from Brigit*, https://www.hellobrigit.com/learn/how-to-get-a-cash-advance (last accessed Mar. 31, 2026).

To determine whether a borrower is worthy of an advance, and to decide how much cash to extend, the borrower's bank account is connected to Brigit through a financial services provider named Plaid, which allows Brigit to view customer banking information and verifies the assets and income of a borrower. Compl. ¶ 98. Brigit uses a proprietary "Brigit score" to determine whether a consumer qualifies for Instant Cash and, if so, how much to advance. *Id.* ¶ 101. The Brigit score evaluates financial data across three categories: (1) bank account health; (2) spending behavior; and (3) earnings profile. *Id.* Brigit determines how much money to advance based on borrowers' "past need and ability to pay back comfortably." *Id.* ¶ 104. Brigit generally begins by offering relatively low amounts of Instant Cash, such as $50 or $100. *Id.* ¶ 105. Consumers may obtain access to higher amounts by consistently repaying Brigit on time or otherwise improving their Brigit score with positive bank account health, spending behavior, and earnings. *Id.* Brigit restricts its largest advances of $250 to a select few consumers, by some estimates only approximately 1% of borrowers. *Id.* ¶ 106.

There is no mechanism available through the Brigit app to sign up for Instant Cash advances without first agreeing to monthly subscription charges. *Id.* ¶¶ 82, 85. There are two subscription tiers: "Premium," priced at $14.99 per month, and "Plus," priced between $5.99 and $9.99 per month. TOS at 5. The main difference between the two is that Premium subscribers

4

**SPA4**

are not charged expedited delivery fees as further detailed below. *See id.*; Compl. ¶ 82.[2] The

TOS states that certain "no-cost" products "may be available . . . from time to time" and that a

user "may be able to access Advance Services for free." *Id.* at 5.  Elsewhere, it adds:

> You are not required to enroll in a Subscription in order to receive an Advance or
> the Credit Monitoring service.  Users that are eligible for Advances and/or Credit
> Monitoring may access an Advance and/or Credit Monitoring without a
> Subscription and without paying the Subscription Fee.  To do so, email
> terms1@hellobrigit.com and state that you would like an Advance and/or Credit
> Monitoring without subscribing to one of our Subscription plans.  You may check
> whether you are eligible for Advances and Credit Monitoring through the Services.

*Id.* at 12.

### C.  Cash Advance Delivery and Repayment

When a user requests an advance for which they qualify, Brigit initiates a transfer of the

funds into the user's linked bank account.  *See* TOS at 9–11.  The time it takes for that advance

to arrive varies.  A standard ACH transfer takes up to three business days to post to the user's

account.  *Id.* at 11.  If, however, the user pays an "Express Fee" of between $0.99 to $3.99, the

funds are typically delivered within 20 minutes.  *Id.*; Compl. ¶ 75.  It costs Brigit less than five

cents to provide funds on an expedited basis.  Compl. ¶ 76.  The Express Fee is payable at the

time the user repays the advance.  TOS at 11.

When a user requests an advance, Brigit simultaneously schedules a repayment "due

date," usually keyed to the user's next expected payday, and the user authorizes Brigit to debit

the advanced amount from the same account on that date.  Compl. ¶ 108 & n.42; TOS at 6, 10.

The app displays the advance amount, the scheduled repayment date, and the amount that will be

debited together on one screen.  *See* Compl. ¶ 111.  The TOS describes the repayment mechanics

---

[2] Both subscriptions also provide users "access to advanced analytical & budgeting tools, credit monitoring and identity theft insurance."  TOS at 5.  Brigit Premium also provides access to a product called Credit Builder.  *Id.*

**SPA5**

in detail.  Section 7.6.1 provides that if the user receives an advance, "Brigit will charge your Payment Method in accordance with the Credit and Debit Authorization."  TOS at 10.  Brigit debits the consumer's account "any time after the later of: (a) the due-date displayed to you through the Services when you request the Advance; (b) the due-date chosen by you when extending your due-date within the app; or (c) any time Brigit sees a positive cash inflow into your linked bank account even if that available cash is not enough to pay the full amount owed on the Advance."  *Id*.  Thus, if on the due date there are insufficient funds in the linked account to repay the advance, Brigit has a continuing right to monitor the account and debit it until the advance is repaid.  The consumer may also repay manually by self-initiating an ACH transfer to Brigit without any early payment penalty.  *Id*.  The TOS disclaims responsibility for "any overdraft fees, over-the-limit fees, or insufficient fund charges . . . that result from your failure to maintain a balance . . . sufficient to repay an Advance."  *Id*. at 11.  It also states: "YOUR ADVANCE IS NOT CONDITIONED ON WHETHER YOU ELECT TO REPAY VIA PREAUTHORIZED ACH REPAYMENT OR MANUAL REPAYMENT."  *Id*.

### D.  "No Recourse" Clause

Section 7.6.2 of the TOS is titled "No Recourse In the Event of Non-Payment" and provides:

> Brigit warrants that it has no legal or contractual claim against you based on a failure to repay an Advance.  In the event you fail to repay an Advance, Brigit will suspend your access to future Advances until you repay the outstanding Advance in full.  With respect to a failure to repay an Advance, Brigit warrants it will not engage in any debt collection activities, place the amount owed with or sell to a third party for the purpose of debt collection activities, or report you to a consumer reporting agency.

*Id.* at 10.  Brigit "may send you an email, text or SMS message reminding you of an upcoming payment, however, such email, text or SMS message should not be construed as a demand for

6

**SPA6**

payment." *Id*. at 10–11.

The TOS also specifies that Section 7.6.2 "sets forth Brigit's recourse against you in the event that an Advance is not repaid" and that "[a]ny other recourse or remedies claimed by Brigit, including but not limited to, indemnities, limitations on liability, and disclaimers of warranty described in the Terms do not apply to non-payment of an Advance." *Id*. at 10. Notably, while the "no recourse" clause limits Brigit's remedies for nonpayment of an advance, it does not disclaim Brigit's right to enforce the TOS as a whole. Brigit retains the right to terminate or suspend the user's account "at any time for any reason," including where Brigit "reasonably believe[s] that you are engaging in activities intended to exploit, manipulate, or misuse the Services." *Id*. at 16. And Brigit retains the right to enforce the consumer's indemnification obligations, representations and warranties, and other contractual duties through binding arbitration. *See id*. at 16, 20–21.

**E. Revocation Mechanism**

Section 7.3 of the TOS addresses the consumer's right to revoke authorization for a preauthorized debit. The relevant language provides:

> [T]he electronic debit authorization contained in this Section represents your written authorization for automated clearinghouse ("ACH") transactions as provided herein and will remain in full force and effect until you notify Brigit that you wish to revoke this authorization by emailing info@hellobrigit.com. You must notify Brigit at least three (3) business days before the scheduled debit date in order to cancel this authorization. When you contact us, you must include the name and telephone number associated with your Brigit User Account. Failure to provide correct and complete information may make it impossible for Brigit to stop withdrawal of the preauthorized withdrawal.

*Id.* at 6. If Brigit does not receive notice "at least three (3) business days before the scheduled debit date," it "may attempt, in our sole discretion, to cancel the transaction" but "assume[s] no responsibility for [its] inability to do so." *Id*. at 7.

7

**SPA7**

Several features of the revocation mechanism are worth noting. First, Plaintiffs allege that the Brigit app itself "does not allow users an option to cancel the repayment debit or disconnect their bank account from which repayment is automatically" drawn. Compl. ¶ 115. Revocation must instead be accomplished by email to a specific address (info@hellobrigit.com), not through the app. TOS at 6. The TOS also contains precise requirements for the contents of the email. The email must include both the consumer's name and the telephone number associated with the account; "[f]ailure to provide correct and complete information may make it impossible for Brigit to stop withdrawal." *Id*. Furthermore, the consumer bears the risk of a failed revocation: the TOS requires the consumer to "indemnify and hold harmless Brigit from and against any loss incurred as a result of its withdrawal of a preauthorized debit transaction from your Bank Account if any of the information relied upon in your request to stop payment is incorrect or incomplete." *Id*. And finally, if the three-business-day deadline is missed, Brigit has no obligation to honor the revocation request—it "may attempt, in [its] sole discretion," to cancel the transaction, but "assume[s] no responsibility for [its] inability to do so." *Id*. at 7.

## PROCEDURAL HISTORY

This case was initiated by a complaint filed in New York State Supreme Court, New York County, on March 20, 2025. Dkt. No. 1. The original complaint included claims for violations of the Military Lending Act ("MLA"), *see* 10 U.S.C. § 987, and the Truth in Lending Act ("TILA"), *see* 15 U.S.C. § 1638. Dkt. No. 1-1 ¶¶ 110–29. In particular, the complaint alleged that Defendant violated the MLA by offering consumer credit to military members in excess of the 36% interest rate cap on such loans. *Id*. ¶¶ 110–22. The complaint also alleged that Defendant violated TILA by failing to provide specific financing disclosures prior to consummating the loans. *Id*. ¶¶ 123–29.

8

**SPA8**

On May 7, 2025, Defendant removed the case to this Court pursuant to 28 U.S.C. §§ 1441 and 1446, asserting federal-question jurisdiction under 28 U.S.C. § 1331.  Dkt. No. 1.

On June 13, 2025, Defendant filed a motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  Dkt. No. 12.  That motion was rendered moot when, on June 27, 2025, Plaintiff filed the Amended Complaint.  Dkt. No. 24.  Plaintiff filed a Corrected Amended Complaint on July 10, 2025.  Dkt. No. 30.[3]  The Amended Complaint added additional Plaintiffs and causes of action under the Georgia Payday Lending Act and the Illinois Predatory Loan Prevention Act.  *Id.* ¶¶ 171–89.

Defendant filed this motion to dismiss the complaint or, in the alternative, to compel arbitration on July 18, 2025.  Dkt. No. 31.  It also filed a memorandum of law in support of the motion and the declaration of counsel, attaching exhibits.  Dkt. Nos. 32–33.  On August 12, 2025, Plaintiffs filed a memorandum of law in opposition to the motion to dismiss.  Dkt. No. 34. On August 27, 2025, Defendant filed a reply memorandum of law in further support of the motion to dismiss.  Dkt. No. 35.  From August 2025 through February 2026, Plaintiffs filed several notices of supplemental authority, *see* Dkt. Nos. 36, 40, 52, 56, 60, 63, and Defendant filed responses, Dkt. No. 38, 50, 53, 60, 66.

The Court held oral argument on February 19, 2026.  Feb. 19, 2026 Minute Entry.  Later that same day, Plaintiffs filed a notice of voluntary dismissal of the state law claims in the Amended Complaint.  Dkt. No. 65.

## LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, a complaint must include "sufficient

---

[3] Citations to the Amended Complaint are to the Corrected Amended Complaint at Dkt. No. 30.

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570

(2007)).  A complaint must offer more than "labels and conclusions," "a formulaic recitation of

the elements of a cause of action," or "naked assertion[s]" devoid of "further factual

enhancement." *Twombly*, 550 U.S. at 555.  The ultimate question is whether "[a] claim has

facial plausibility, [i.e.,] the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at

678.  "Determining whether a complaint states a plausible claim for relief will . . . be a

context-specific task that requires the reviewing court to draw on its judicial experience and

common sense." *Id.* at 679.  Put another way, the plausibility requirement "calls for enough fact

to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]."

*Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46

(2011).  When ruling on a motion to dismiss pursuant to Rule 12(b)(6), a district court may

consider "the facts alleged in the pleadings, documents attached as exhibits or incorporated by

reference in the pleadings and matters of which judicial notice may be taken." *Samuels v. Air

Transp. Local 504*, 992 F.2d 12, 15 (2d Cir. 1993).

Courts deciding motions to compel arbitration "apply a 'standard similar to that

applicable for a motion for summary judgment.'" *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74

(2d Cir. 2017) (quoting *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016)).  That

means that courts must "consider all relevant, admissible evidence submitted by the parties and

contained in pleadings, depositions, answers to interrogatories, and admissions on file, together

with affidavits, and draw all reasonable inferences in favor of the non-moving party." *Id.*

(cleaned up and citations omitted).  "Where a party seeks to compel arbitration, a party resisting

**SPA10**

arbitration 'should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue.'" *Lowe*, 2026 WL 654719, at *2 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 628 (1985)).

## DISCUSSION

Plaintiffs allege that Instant Cash advances are "consumer credit" or "loans" subject to the MLA and TILA, and that the associated fees constitute "finance charges" that violate rate caps and disclosure requirements. Compl. ¶¶ 150–70. Plaintiffs further contend that because the MLA applies, the arbitration agreement in the TOS is unenforceable. Dkt. No. 34 at 28 (citing 10 U.S.C. § 987(f)(4)).

Defendant responds that TILA and the MLA do not apply for two independent reasons: (1) the Instant Cash product fails to extend "credit" because "a consumer does not incur a debt (or receive credit) if he has no obligation to repay," Dkt. No. 32 at 15; and (2) the product is also not subject to a finance charge because "customers may obtain an Instant Cash advance regardless of whether they pay such a fee—so those fees are not 'imposed . . . by' Brigit on customers as an incident to their use of Instant Cash," Dkt. No. 35 at 6. Courts nationwide have recently confronted, and nearly uniformly rejected, similar arguments regarding similar products. *See, e.g.*, *Orubo v. Activehours, Inc.*, 780 F. Supp. 3d 927, 935–38 (N.D. Cal. 2025); *Revell v. Grant Money, LLC*, 808 F. Supp. 3d 1036, 1049 (N.D. Cal. 2025); *Johnson v. Activehours, Inc.*, 2025 WL 2299425, at *8–9 (D. Md. Aug. 8, 2025); *Vickery v. Empower Fin., Inc.*, 2025 WL 2841686, at *3–7 (N.D. Cal. Oct. 7, 2025); *Russell v. Dave Inc.*, 2025 WL 3691977, at *5–8 (C.D. Cal. Dec. 12, 2025); *Burrison v. Floatme, Corp.*, 2026 WL 444638, at *5–8 (D. Mass. Feb. 17, 2026); *Moss v. Klover Holdings, Inc.*, 2026 WL 622653, at *4–7 (N.D. Ill. Mar. 5, 2026); *Lowe v. Moneylion Techs. Inc.*, 2026 WL 654719, at *2–4 (S.D.N.Y. Mar. 9, 2026). *But see*

**SPA11**

*Golubiewski v. Activehours, Inc.*, 2024 WL 4204272, at *6 (M.D. Pa. Sept. 16, 2024).

This Court now joins those courts and holds that the Amended Complaint as pleaded states a claim for relief. The Court further concludes that the issue of arbitrability follows directly from whether the Amended Complaint survives Defendant's Rule 12(b)(6) motion. The motion to compel arbitration is therefore also denied.

## I. The Amended Complaint States a Claim Because Brigit Extends "Consumer Credit."

### A. Statutory Background

"TILA was enacted in 1968 to protect consumers against inaccurate and unfair credit billing and credit card practices and promote the informed use of credit by assuring a meaningful disclosure of credit terms." *Strubel v. Comenity Bank*, 842 F.3d 181, 186 (2d Cir. 2016) (internal quotation marks omitted) (quoting *Vincent v. The Money Store*, 736 F.3d 88, 105 (2d Cir. 2013)). Congress enacted TILA against the backdrop of a consumer credit market in which the use of credit was "expanding at an extremely rapid rate," but lenders disclosed terms in inconsistent and often incomprehensible ways, making it difficult for borrowers to compare the true cost of competing products. *See Mourning v. Family Publ'ns Serv., Inc.*, 411 U.S. 356, 363–64 (1973). The statute's core purpose is to "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601(a); *see Ford Motor Co. v. Milhollin*, 444 U.S. 555, 568 (1980) (describing the "concept of 'meaningful disclosure' that animates TILA"). For example, TILA aims to ensure that a borrower offered a short-term advance at a "small fee" can determine whether that fee, expressed as an annual percentage rate, represents a cost of 15% or 400% of the advance. *See Windward Bora, LLC v. Regalado*, 751 F. Supp. 3d 122, 134 (E.D.N.Y. 2024).

**SPA12**

TILA requires certain disclosures by a "creditor" in a "consumer credit transaction." 15 U.S.C. § 1638(a). The statute defines "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment," *id.* § 1602(f), and "creditor" as a person "who both (1) regularly extends . . . consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness," *id.* § 1602(g).[4] The statute does not define "debt." TILA directs the Consumer Financial Protection Bureau ("CFPB") to "prescribe regulations to carry out the purposes" of the statute, *id.* § 1604(a), and the CFPB has done so through rules contained in "Regulation Z," *see* 12 C.F.R. pt. 1026.[5] Regulation Z defines "finance charge" as including "any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit." 12 C.F.R. § 1026.4(a); *see also* 15 U.S.C.A. § 1605(a).

The MLA was enacted in 2006 in response to a Department of Defense report documenting the effects of predatory lending on military readiness. *See Steines v. Westgate Palace, L.L.C.*, 113 F.4th 1335, 1343 (11th Cir. 2024). It extends additional lending protections to active-duty servicemembers and their dependents. *See* 10 U.S.C. § 987. The MLA caps the military annual percentage rate ("MAPR") at 36 percent for covered consumer credit, *id.* § 987(b), imposes disclosure requirements beyond those required by TILA, *id*. § 987(c), and

---

[4] The statute states that "[t]he adjective 'consumer,' used with reference to a credit transaction, characterizes the transaction as one in which the party to whom credit is offered or extended is a natural person, and the money, property, or services which are the subject of the transaction are primarily for personal, family, or household purposes." 15 U.S.C. § 1602(i).

[5] Regulation Z was originally promulgated by the Federal Reserve Board. The Dodd-Frank Act transferred rulemaking authority from the Federal Reserve Board to the CFPB in 2011. *See* Pub. L. No. 111-203, § 1100A, 124 Stat. 1376, 2107.

**SPA13**

prohibits creditors from, among other things, requiring servicemembers to submit to arbitration or to waive their right to legal recourse under state or federal law, *id.* § 987(e)(2)–(3). The MLA's implementing regulations define "credit" using language materially identical to TILA's: "the right granted to a consumer by a creditor to defer payment of debt or to incur debt and defer its payment." 32 C.F.R. § 232.3(h). As with TILA, the term "debt" is undefined. "Consumer credit" under the MLA is such credit offered primarily for personal, family, or household purposes that is "subject to a finance charge" or "payable by a written agreement in more than 4 installments." *Id.* § 232.3(f)(1). The MLA's implementing regulations expressly incorporate Regulation Z's definition of "finance charges." *See* 32 C.F.R. § 232.3(n). Any credit agreement that violates the MLA is deemed void from its inception. 10 U.S.C. § 987(f)(3).

In sum, TILA and the MLA cover certain consumer credit transactions defined as those that (1) create a debt and (2) are subject to a finance charge. Brigit argues that neither requirement is met here and that it therefore does not extend consumer credit. The Court will address each requirement in turn.

### B. Instant Cash Creates a Debt.

The first question is whether Instant Cash involves a "right granted to a consumer by a creditor to defer payment of debt or to incur debt and defer its payment." 32 C.F.R. § 232.3(h); 15 U.S.C. § 1602(f). The parties agree that if Instant Cash creates a debt, its payment is deferred. *See, e.g.*, Dkt. No. 35 at 2. Plaintiffs have plausibly alleged that Instant Cash creates a debt.

Because the relevant statutes and regulations do not define the term "debt," it must be given its ordinary meaning. *See Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012); *FCC v. AT&T Inc.*, 562 U.S. 397, 403 (2011); *Perrin v. United States*, 444 U.S. 37, 42 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be

14

**SPA14**

interpreted as taking their ordinary, contemporary, common meaning.").  In assessing ordinary meaning, the parties invoke the same dictionary definitions.  *See* Dkt. No. 32 at 12; Dkt. No. 34 at 9.  Black's Law defines "debt" as "[l]iability on a claim; a specific sum of money due by certain and express agreement."  *Debt*, Black's Law Dictionary (12th ed. 2024).[6]  Merriam-Webster's defines it as "something owed; obligation," or "a state of being under obligation to pay or repay someone or something in return for something received; a state of owing."  *Debt*, https://www.merriam-webster.com/dictionary/debt (last accessed Mar. 31, 2026).

The "advances" provided by Brigit describe debt to a tee.  Brigit's own language is clear on this point.  The TOS states that "[i]f you . . . use Instant Cash . . . [or] any of the Services for which *payment to Brigit is required, including use of the Advance Service*, you authorize Brigit, its parents, subsidiaries, partners, third-party service providers, affiliates, agents, and assigns to electronically debit your Payment Method for the applicable amounts, including, but not limited to, *payments of cash advances*, any loan repayments, and/or monthly Subscription Fees."  TOS at 6 (emphasis added).  Thus, in return for receiving a cash advance—"for which payment to Brigit is required"—consumers expressly agree that Brigit may debit their bank accounts at a later date for repayment of the amount of the advance (and, in most cases, a fee).  If insufficient funds are in the account on the due date, consumers further agree that Brigit may debit their account at any later date when there are positive cash flows into it.  *Id.* at 10.  Brigit customers therefore have an "obligation to pay or repay someone or something in return for something received."  *See Debt*, https://www.merriam-webster.com/dictionary/debt (last accessed Mar. 31, 2026).

---

[6] The parties cite contemporary dictionaries.  Dictionaries from the time of TILA's enactment in 1968 are in accord.  *See Debt*, Black's Law Dictionary (4th ed. 1968).  Black's Law from 1968 further clarifies that a "sum of money due by certain and express agreement" means that the amount of payment is certain or ascertainable.  *See id.*

15

Other portions of the TOS confirm as much.  The TOS explains that users "warrant and represent to Brigit that [they] have the right to authorize [Brigit] to charge and debit [their] Bank Account or debit card . . . *for payments due to us* under the Terms."  *Id.* at 7 (emphasis added). And elsewhere, the TOS repeatedly refers to the "due date" for repayment of an advance.  *Id.* at 10–11.  The term "due" is advised.  It connotes a sum "owed or owing as a debt."  *Due*, https://www.merriam-webster.com/dictionary/due (last accessed Mar. 31, 2026); *see also Due*, Black's Law Dictionary (12th ed. 2024) (defining "due" in part as "owing or payable; constituting a debt").  Accordingly, when a consumer obtains cash from Brigit, it agrees that repayment is "owed or owing as a debt" on a specified date.

Defendant resists this straightforward conclusion, arguing that there is no obligation to repay an advance because (1) Brigit has disclaimed any "legal or contractual claim" against the Plaintiffs "based on a failure to repay an Advance" and has covenanted that it "will not engage in any debt collection activities" or report Plaintiffs to a "consumer-reporting agency," Dkt. No. 32 at 14 (quoting TOS at 10); and (2) a consumer can rescind the repayment authorization it provided for Defendant to debit its bank account before repayment of an advance, Dkt. No. 35 at 2–3.  In other words, Brigit argues that it lacks recourse against both the individual and their bank account and that therefore no debt is established.  Dkt. No. 35 at 4–5.  Neither argument is persuasive.  Recourse against an individual is not required to create a debt, and a consumer's ability to rescind repayment authorization does not defeat the debt that is created when she seeks and receives an advance.

### 1. Legal Recourse Against the Individual Is Not Required

The Court starts with a simple but important point: The fact that Brigit has disclaimed legal and contractual claims against a borrower who fails to repay an advance does not mean that

16

**SPA16**

the borrower has no obligation to repay.  Recourse against the individual is not an essential feature of debt.  Put another way, a person who agrees that a lender can be repaid through execution on the borrower's property is no less a debtor than a person who agrees he can be subject to suit personally.  Defendant acknowledged as much during oral argument.  Oral Argument Transcript ("Tr.") at 14:12–23.

Many of the most common extensions of credit involve debts secured by property rather than by recourse against the individual personally.  Reverse mortgages—transactions in which a lender extends credit to a borrower and the borrower's principal dwelling serves as security for the loan—present one such example.  Regulation Z expressly recognizes these nonrecourse transactions as establishing a "consumer credit obligation."  *See* 12 C.F.R. § 1026.33(a); *see also Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 411 (1998) (applying TILA to a reverse mortgage without questioning its status as consumer credit); *Olson v. Unison Agreement Corp.*, 2025 WL 2254522, at *2 (9th Cir. Aug. 7, 2025) (unpublished).[7]

Alternatively, a consumer who does not have or wish to offer a dwelling as security may offer a car or an item of physical chattel rather than her person as security.  These so-called "pawn" transactions take many forms, but all involve borrowing money and incurring a debt in exchange for conveying the right to the lender to execute against property rather than against the borrower personally for the sums borrowed.  In a vehicle title loan, for example, the borrower

---

[7] The MLA carves out reverse mortgages from its scope, *see* 10 U.S.C. § 987(i)(6); 32 C.F.R. § 232.3(f)(2)(i), but not because they fail to extend credit and create a debt.  They plainly do.  In fact, these transactions' specific exclusion from the MLA's definition of "credit" only underscores that a normal understanding of the term covers them.  The MLA was enacted in response to a 2006 Department of Defense report focused on a particular ecosystem of predatory loans, which did not include mortgages.  *See* Dep't of Def., *Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents* 2 (2006) ("Mortgage lending was not considered by these counselors as having the level of prevalence associated with the types of loans listed above, and consequently was not reviewed as part of this report.").

**SPA17**

receives cash in exchange for pledging the vehicle's certificate of title as security; upon repayment of the loan and associated charges, the borrower regains title to the vehicle. If the borrower fails to repay, the pawnbroker's sole remedy is to retain and sell the pledged item (be it a car, watch, guitar, ring, etc.)—the pawnbroker has no claim against the borrower personally.

These transactions extend consumer credit. Indeed, in 2007, the Department of Defense recognized vehicle title loans as one of three quintessential examples of consumer credit in its regulations implementing the MLA. *See* Limitations on Terms of Consumer Credit Extended to Service Members and Dependents, 72 Fed. Reg. 50580, 50592 (Aug. 31, 2007). In 2015, the Department amended the regulation "primarily for the purpose of extending the protections of the MLA to a broader range" of products beyond those three that "present the *most severe* risks to Service members and their families." *See* Limitations on Terms of Consumer Credit Extended to Service Members and Dependents, 80 Fed. Reg. 43560, 43560, 43567 (July 22, 2015) (codified at 32 C.F.R. 232.3). As such, vehicle title loans are no longer expressly recognized as consumer credit transactions in the regulations, but if anything, the 2015 amendment strengthens these loans' classification as consumer credit. *See also In re Spinner*, 398 B.R. 84, 92 (Bankr. N.D. Ga. 2008) (applying TILA to a vehicle title loan); *Wiley v. Earl's Pawn & Jewelry, Inc.*, 950 F. Supp. 1108, 1111–13 (S.D. Ala. 1997) (same); *Barlow v. Evans*, 992 F. Supp. 1299, 1303–06 (M.D. Ala. 1997) (same); *Cox v. Cmty. Loans of Am., Inc.*, 2014 WL 1216511, at *8 (M.D. Ga. Mar. 24, 2014), *aff'd*, 625 F. App'x 453 (11th Cir. 2015) (applying the MLA to vehicle title loans notwithstanding the defendants' argument that "Plaintiffs did not take on 'debt' because Plaintiffs did not incur any personal liability to repay the 'money advanced'"). [8]

---

[8] The MLA does not cover "loan[s] procured in the course of purchasing a car or other personal property, when that loan is offered for the express purpose of financing the purchase and is secured by the car or personal property procured." 10 U.S.C. § 987(i)(6). But so long as the

18

Likewise, and most closely analogous to this case, a person can borrow money and assume a debt by (1) accepting cash immediately and (2) delivering in return a post-dated check permitting the lender on a later date to draw a sum from the borrower's bank account greater than the amount that is borrowed. The defining characteristics of these "deferred presentment" transactions, also called payday loans, are that the service provider agrees to pay the customer a specific amount and, in exchange, the costumer tenders to the service provider the customer's check, which the service provider agrees to hold for a period of time before negotiation, redemption, or presentment. *See, e.g.*, Mich. Comp. Law § 487.2122(g); Fla. Stat. § 560.402(4); Nev. Rev. Stat. § 604A.050; Alaska Stat. § 06.50.900(4).[9] In effect, the consumer agrees to the payment of sums in the future "for the privilege of obtaining cash . . . today." *Hamilton v. York*, 987 F. Supp. 953, 958 (E.D. Ky. 1997).

These transactions create debt and are considered consumer credit transactions both under the ordinary meaning of the term and as a matter of state and federal law. *See Turner v. E-Z Check Cashing, Inc.*, 35 F. Supp. 2d 1042, 1045, 1048 (M.D. Tenn. 1999) ("Courts that have addressed the issue have held, without exception, that deferred presentment transactions are extensions of 'credit' under TILA."); *Arrington v. Colleen, Inc.*, 2001 WL 34117735, at *3 (D. Md. Mar. 29, 2001) (collecting cases); *In re Miller*, 215 B.R. 970, 974 (Bankr. E.D. Ky. 1997) ("If this is not an extension of credit, [it is] hard to imagine any transaction that is."); *cf.* 12 C.F.R. pt. 1026, Supp. I, Paragraph 2(a)(14) Credit ¶ 2 (official interpretations of Regulation Z

---

loan is not offered for the express purpose of financing the very collateral securing the loan, the MLA applies. *See Davidson v. United Auto Credit Corp.*, 65 F.4th 124, 128 (4th Cir. 2023) (analyzing whether a particular loan involving a car was for the express purpose of financing the car, and assuming that if the loan was not offered for that express purpose, TILA would apply).
[9] *See* 12 C.F.R. § 1026.2(b) (TILA's implementing regulations stating that undefined terms are informed by state law and contract).

19

noting that "credit" includes "a transaction in which a cash advance is made to a consumer in exchange for the consumer's personal check, and where the parties agree either that the check will not be cashed or deposited, or that the consumer's deposit account will not be debited, until a designated future date").

The Instant Cash product is substantially similar.  In exchange "for the privilege of obtaining cash . . . today," *Hamilton v. York*, 987 F. Supp. at 958, the consumer tenders to Brigit the right to debit the consumer's bank account for the sums advanced on a "due" date in the future.  It is immaterial that the right to draw on the account takes the form of an ACH authorization rather than a post-dated check.  Both operate against the same asset—the funds on deposit in the consumer's bank account—and both serve the same economic function: they give the creditor a mechanism to collect repayment directly from the borrower's account on a future date, rather than going through the burdensome process of suing the borrower personally and then, after obtaining a judgment, executing upon that judgment.  Indeed, having an ACH authorization against the consumer's bank account (much like having a physical check) is undoubtedly more valuable to the creditor and provides greater security than being forced to go to court and enforce a judgment.  The debit authorization mechanism in the TOS permits Brigit to short-circuit that process.

*2. The Right to Revoke ACH Authorization Does Not Negate the Debt Created*

Brigit argues that Instant Cash is unlike the products detailed above because Brigit lacks recourse against not only the individual *but also the underlying asset*.  Dkt. No. 35 at 3–5.  Brigit does not point to any language in the TOS stating outright that there is no recourse against the underlying asset.  Instead, Brigit relies on language in Section 7.3 of the TOS, which states that the written authorization for ACH transactions that the consumer has provided as a condition for

20

**SPA20**

receiving the advance "will remain in full force and effect" until the consumer notifies Brigit of the consumer's "wish" to revoke the authorization, which the consumer must do: "at least three (3) business days before the scheduled debit date"; by email; and by providing the correct name and telephone number associated with the consumer's account. TOS at 6. Because a consumer could theoretically withdraw ACH authorization after receiving an advance but before the repayment due date, Brigit contends that it has no recourse against the bank account and that there is no debt. The Court disagrees.

The principal flaw in Brigit's argument is that it elides the distinction between the obligation that is created when a Brigit consumer receives an advance with the consumer's qualified right to revoke a method of recourse after assuming that obligation. As previously explained, in order to receive an advance, a consumer must grant Brigit access to her bank account and "authorize Brigit, its parents, subsidiaries, partners, third-party service providers, affiliates, agents, and assigns to electronically debit [her] Payment Method for the applicable amounts, including, but not limited to, payments of cash advances" on a date when repayment is "due." TOS at 6–7. All of the elements necessary to create a binding legal obligation are satisfied when the consumer requests an advance and Brigit agrees to extend one. *See Vincent v. Nat'l Debt Relief LLC*, 2024 WL 3344227, at *5 (S.D.N.Y. July 8, 2024) (detailing requirements for formation of online consumer contracts). The consumer makes a request (an "offer"), Brigit agrees to accept that offer after its underwriting requirements have been satisfied ("acceptance"), and the transaction is supported by consideration: Brigit provides the cash advance, while the consumer agrees that "Brigit [has the right] to charge [the consumer's] Payment Method in accordance with the Credit and Debit Authorization" and can do so on the due date. TOS at 10. Brigit forswears any right of recourse against the consumer directly. But it decidedly does not

21

**SPA21**

forego the right to proceed against the consumer's bank account.

Section 7.3 presupposes the existence of an obligation that the consumer has a limited right to revoke. The consumer represents that the electronic debit authorization she has provided constitutes her "written authorization for [ACH] transactions" and warrants that the authorization "will remain in full force and effect." *Id.* at 6. The consumer can under certain circumstances revoke that authorization. But the right to do so is qualified. Section 7.3's language, which states that the consumer may "wish to revoke this authorization," connotes that the consumer is taking back what has already been given. And what has been given is an obligation in consideration for the advance.

The right that the consumer has to avoid Brigit drawing on her bank account thus may be analogized to the familiar distinction from contract law between contracts that are void and ones that are voidable. A "promise for breach of which the law neither gives a remedy nor otherwise recognizes a duty of performance by the promisor" is void. Restatement (Second) of Contracts § 7 cmt a (A.L.I. 1981). "[S]uch a promise is not a contract at all"; it has no legal effect. *Id.* A "voidable" contract, by contrast, creates obligations that may be "avoided." It is "one[] where one or more parties have the power[] by a manifestation of election to do so[] to avoid the legal relations created by the contract." *Id.*; *accord In re Estate of Rothko*, 372 N.E.2d 291, 299 (N.Y. 1977). Unless and until the party holding the power of avoidance properly exercises that right, the parties remain in legal relations. *See Rothko*, 372 N.E.2d at 299 ("Where a contract is voidable on both sides, . . . the transaction is not wholly void, since in order to prevent the contract from having its normal operation the claim or defense must in some manner be asserted and also since the contract is capable of ratification, such a contract affects from the outset the legal relations of the parties."); *Sphere Drake Ins. Ltd. v. Clarendon Nat. Ins. Co.*, 263 F.3d 26,

22

**SPA22**

31 (2d Cir. 2001) ("Unlike a void contract, a voidable contract is an agreement that '[u]nless rescinded . . . imposes on the parties the same obligations as if it were not voidable.'" (quoting 1 Williston on Contracts § 20 (4th ed. 1990)); *see also First Int'l Bank of Isr., Ltd. v. Blankstein & Son, Inc.*, 452 N.E.2d 1216, 891 (N.Y. 1983) (explaining that an agreement "rescindable at will" is a "voidable obligation"); *Weiss v. Phillips*, 65 N.Y.S.3d 147, 155 (1st Dep't 2017) (explaining that a voidable transaction is "one where a transfer is deemed to have occurred, but can be revoked").[10]

A promise is not enforceable unless supported by consideration. *See Tarpon Bay Partners LLC v. Zerez Holdings Corp.*, 79 F.4th 206, 228 (2d Cir. 2023). But the fact that a consumer may with three days' notice withdraw ACH authorization does not deprive the transaction between the consumer and Brigit of legal effect or render illusory the consumer's obligation to repay the advance, which is formed at the moment the consumer requests the advance and agrees to the TOS, including that her account may be debited. The consumer's obligation is not "so insubstantial as to impose no obligation" at all on her. *WCA Holdings III, LLC v. Panasonic Avionics Corp.*, 704 F. Supp. 3d 473, 495 (S.D.N.Y. 2023); *see also* Restatement (Second) of Contracts § 7 cmt. a. It is black letter law that "[a]lthough a contract might seemingly permit one party to cancel or terminate the undertaking, a closer examination of the agreement might reveal that it, in some way, limits or restricts that party's power to rescind

---

[10] Contracts terminable at will by one party are routinely enforced up to the point of termination; the right to terminate does not retroactively void the obligations that accrued before it was exercised. *See, e.g.*, *R&D Hotel, LLC v. Stop & Shop Supermarket Co. LLC*, 2016 WL 4367971, at *3 (S.D.N.Y. Aug. 15, 2016) (rejecting the argument that because one party could "unilaterally terminate the Lease . . . there was never a legitimate agreement between the parties," and holding instead that, under New York law, a contract is not illusory merely because one party has such discretion); *Lebowitz v. Dow Jones & Co.*, 508 F. App'x 83, 84 (2d Cir. 2013) (summary order) ("Under New York law, a contract is not illusory merely because its terms give discretion to one party to the contract. . . .").

**SPA23**

or terminate the contract."  3 Williston on Contracts § 7:14 (4th ed. 2025).  In that instance, the

obligation is not illusory, and the agreement is supported by consideration.  "[T]he tendency is to

interpret even a slight restriction on the exercise of the right of cancellation, such as by imposing

a sufficient condition upon the right of cancellation or termination," as enough to render the

underlying obligation genuine rather than illusory.  *Id.*  Thus, for example, the obligation would

not be illusory "where the reservation of the right to cancel is . . . upon written notice, or after a

definite period following the giving of notice, or upon the occurrence of some extrinsic event."

*Id.*; *see, e.g.*, *Johnson Lakes Dev., Inc. v. Cent. Neb. Pub. Power & Irrigation Dist.*, 576 N.W.2d

806, 817 (Neb. 1998) ("Even a slight restriction on the exercise of the right of termination, such

as the requirement that advance notice be given, is sufficient to prevent a unilateral right of

termination from being regarded as illusory in nature."); *Niagara Mohawk Power Corp. v.*

*Graver Tank & Mfg. Co.*, 470 F. Supp. 1308, 1316 (N.D.N.Y. 1979) ("[Defendant] contends that

a unilateral termination clause, without the imposition of good faith limitations, constitutes an

illusory promise, lacking in consideration.  However, a notice provision, such as that contained

in the termination clause in question here, prevents the promise, made by the party with the right

of termination, from being regarded as illusory in nature.").

Brigit's TOS imposes meaningful contractual limits on the right to rescind ACH

authorization.  For one, Plaintiffs allege that Brigit provides no in-app mechanism for canceling a

scheduled repayment debit.  Compl. ¶ 115.  Revocation is also subject to three conditions, the

failure of any one of which makes the revocation ineffective.  Any revocation must (1) be made

three business days before the scheduled debit date; (2) be directed to the specified email address

provided by Brigit in the TOS; and (3) include the name and telephone number associated with

the consumer's Brigit account.  TOS at 6.  Thus, to revoke, the user must know that the right

**SPA24**

exists (it appears in the TOS, not in the app interface) and exercise it in a particular manner and in a specific window.[11]  A user who sends the email to the wrong address, includes the wrong information in the message, or sends the email two days before the repayment date rather than three will have failed to revoke.  And the consumer agrees to relieve Brigit of any liability and hold it harmless "if any of the information relied upon in your request to stop payment is incorrect or incomplete."  *Id.*  The consumer has received value, has authorized a specific mechanism for repayment, and—unless she takes affirmative and specific steps to disrupt that mechanism—the debit will proceed as scheduled.  That is the hallmark of a voidable obligation, not an illusory one.  *See In re Estate of Rothko*, 372 N.E.2d at 299.

An example demonstrates the point.  If, in a deferred presentment transaction, a lender gave the borrower a right to retrieve her post-dated check, but only if she traveled to the lender's faraway offices and arrived between 12:30 and 1:00 PM on the Wednesday before the date on which the check would be tendered, the transaction between the parties would still constitute a loan.  The repayment obligation that the borrower assumed when she provided the post-dated check would not be an illusory one.  Neither is the obligation here.  The fact that Brigit's consumer can under certain prescribed circumstances withdraw the authorization previously

---

[11] Plaintiffs allege that "Brigit provides no mechanism for cancelling repayment debits," and that "[o]nce an Instant Cash loan has been taken, the app does not allow users an option to cancel the repayment debit or disconnect their bank account from which repayment is automatically scheduled to be drawn."  Compl. ¶ 115.  Indeed, the email revocation described in Section 7.3 of the TOS is seemingly the only path by which a consumer can escape the obligation to repay.  A consumer who closes her linked bank account while an advance is outstanding would appear to breach both the Section 7.3 warranty that she "ha[s] the right to authorize [Brigit] to charge and debit [her] Bank Account," TOS at 7, and the Section 12.1 representation that her linked bank account information is "accurate, current, and complete," *id*. at 16–17.  Those appear to be independent obligations for which the "no recourse" clause does not limit Brigit's remedies.  *See id*. at 10 (Section 7.6.2 providing that "[a]ny other recourse or remedies claimed by Brigit, including but not limited to, indemnities, limitations on liability, and disclaimers of warranty described in the Terms do not apply to non-payment of an Advance").

**SPA25**

provided does not render illusory the prior agreement to provide such authorization and allow the account to be debited.  Of course, the method of revocation here might be more convenient for the consumer, but in both instances, there are meaningful limitations on the revocation right such that the underlying repayment obligation established is a genuine one.  Put another way, the substance of the parties' relationship is one in which there are real obligations running in both directions.  *See Ford Motor Credit Co. v. Cenance*, 452 U.S. 155, 158 (1981) (cautioning courts not to "elevat[e] form over substance" in analyzing the applicability of TILA); *Williams v. Chartwell Fin. Servs., Ltd.*, 204 F.3d 748, 753 (7th Cir. 2000) (noting the Seventh Circuit's "consistent assertion that courts are to focus on the economic substance of the transaction in determining whether TILA has been violated"); *Burnett v. Ala Moana Pawn Shop*, 3 F.3d 1261, 1262 (9th Cir. 1993) (same).

Brigit argues that Plaintiffs' argument would mean that "every consumer enrolled in autopay for a subscription service . . . [would have] an 'obligation' to pay for the following month, simply because a debit will occur unless the consumer cancels before the next month." Dkt. No. 35 at 1.  Brigit contends that "[a] person with a video-streaming subscription does not have an *obligation* to pay for future months simply because they have enrolled in autopay." *Id.* at 3.  The analogy is both imprecise and inapt.  Assuming, as Brigit asserts, that the payment is for future months, then no debt would be created because up to the point that the consumer is debited, the consumer has not received anything for which payment or repayment might be due. And, assuming Brigit instead means by its hypothetical to refer to a situation where the service provider comes to enjoy the right to debit the consumer's account by virtue of the consumer's continued use of a service after a period of time, there would in that instance be no obligation until the consumer—with notice—continues to use the service after the specified period of time.

26

**SPA26**

*See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004) ("It is standard contract doctrine that when a benefit is offered subject to stated conditions, and the offeree makes a decision to take the benefit with knowledge of the terms of the offer, the taking constitutes an acceptance of the terms, which accordingly becomes binding on the offeree."). Here, Brigit does not obtain its right to access the consumer's account by inaction. It obtains that right by the consumer's action in taking the advance with notice that the taking of the advance gives Brigit the right to repayment. *See* TOS at 6 (explaining that if the consumer "use[s] Instant Cash or use[s] any of the Services for which payment to Brigit is required, including use of the Advance Service, [the consumer] authorize[s] Brigit . . . to electronically debit" the consumer's account for the applicable amounts). On any ordinary understanding of the relevant terms, there is a "debt" or "obligation" where someone receives an advance in exchange for agreeing to authorize repayment on a future date.

    3.  *The CFPB Opinions*

The Court's conclusion that Instant Cash extends a debt fits comfortably within the CFPB's own regulatory treatment of EWA products. Over the course of four years and three presidential administrations, the CFPB has issued two advisory opinions and one proposed interpretive rule addressing whether EWA products constitute "credit" under Regulation Z. In none does the CFPB accord operative significance to the fact that the advance is non-recourse against the individual's person, or that there might be events (such as an ACH authorization revocation) which result in the creditor failing to recover the balance of the advance. Rather, the distinction the CFPB has consistently drawn turns on whether the provider is merely facilitating early access to wages that the employee has already earned or instead extending its own funds against the employee's bank account.

**SPA27**

In December 2020, the CFPB issued an advisory opinion (the "2020 Opinion") concluding that a narrow category of employee-partnered EWA programs do not involve the offering or extension of credit as defined by Regulation Z. *See* Truth in Lending (Regulation Z); Earned Wage Access Programs, 85 Fed. Reg. 79404, 79405 (Dec. 10, 2020). The 2020 Opinion defined the exempted "Covered EWA Programs" as those meeting all of several identified conditions, including: providing the consumer with no more than the amount of accrued wages earned; provision by a third party fully integrated with the employer; no consumer payment, voluntary or otherwise, beyond recovery of paid amounts via a payroll deduction from the next paycheck, and no other recourse or collection activity of any kind; and no underwriting or credit reporting. *See id.* at 79405–06.

The CFPB reasoned that if all of those conditions are satisfied, the Covered EWA Program can be conceptualized as one that "facilitates employees' access to wages they have already earned, and to which they are already entitled, and thus functionally operates like an employer that pays its employees earlier than the scheduled payday." *Id.* at 79406. The CFPB concluded that such programs were akin to a customer borrowing against the accrued cash value of an insurance policy because "the accrued cash value of an employee's earned but unpaid wages is the employee's own money," the "employee is 'in effect, only using the [employee's] own money' when she accesses earned wages through a Covered EWA Program, and is not incurring debt or deferring its payment," and "the Provider may only recover the corresponding EWA amounts via the allowed employer-facilitated payroll deduction" rather than from wages that have already been earned and paid. *Id.* at 79407. The Bureau expressly distinguished such Covered EWA Programs from ones in which providers take "payment authorization from employees, such as a check, ACH, or debit card authorization" and "pull credit reports or credit

28

scores on individual employees or otherwise assess their credit risk." *Id.*[12]

Four years later, the CFPB issued a proposed interpretative rule (the "PIR") addressing the types of programs that were not included in the 2020 Opinion's protective mantle—that is, "'direct-to-consumer' products [that] provide funds to employees in amount that they estimate to be below accrued wages" where "funds are then recovered via automated withdrawal from the consumer's bank account." Truth in Lending (Regulation Z); Consumer Credit Offered to Borrowers in Advance of Expected Receipt of Compensation for Work, 89 Fed. Reg. 61358, 61358 (July 31, 2024). The CFPB proposed to replace the 2020 Opinion with a new interpretative rule that would treat the employer-partnered products addressed by the 2020 Opinion the same as the direct-to-consumer products, with both being treated as creating "consumer credit." *Id.* at 61359–61. The CFPB reasoned that with both types of products, the consumer incurs an obligation to pay money at a future date, even if there is "an element of contingency" such as whether enough funds are available from the next payroll to cover the amount that the consumer received. *Id.* at 61360. "[T]hat is still an obligation to pay money at a future date," as "TILA has long been understood to cover contingent obligations." *Id.* at 61360. The proposed interpretative rule was not adopted.

In December 2025, the CFPB issued yet another advisory opinion (the "2025 Opinion"). Truth in Lending (Regulation Z); Non-Application to Earned Wage Access Products, 90 Fed. Reg. 60069 (Dec. 23, 2025). This opinion took issue with the conclusions reached by the PIR in

---

[12] Following issuance of the opinion, the CFPB further emphasized that the opinion was limited to free products, noting that products that include payment of any fee may still constitute credit. *See* Letter from CFPB General Counsel Seth Frotman to New Jersey Citizen Action (Jan. 18, 2022), https://tinyurl.com/2znp73ju (noting that the "advisory opinion, by its terms, is limited to a narrow set of facts—as relevant here, earned wage products where no fee, voluntary or otherwise, is charged or collected. . . . Products that include the payment of any fee, voluntary or not, are excluded from the scope of the advisory opinion and may well be TILA credit.").

**SPA29**

2024 but did not take issue with the distinctions drawn by the 2020 Opinion. The CFPB concluded that EWA products with all of the following characteristics are not covered by Regulation Z:

> (1) Covered EWA transactions do not exceed the accrued cash value of the wages the worker has earned up to the date and time of the transaction, which amount is determined based upon payroll data that evidence this amount. . . .
>
> (2) The provider uses a payroll process deduction in connection with the worker's next payroll event. In a payroll process deduction, payment instructions received and acted upon by the payroll processor (or by the employer itself if it does not use a processor) enable the EWA provider to receive accessed amounts without debiting the consumer's regular transaction account after the consumer is paid. A transfer to the provider from any of the consumer's regular transaction accounts after the payment of wages into that account is not a payroll process deduction.
>
> (3) Before providing Covered EWA, the provider clearly and conspicuously explains to the worker, and warrants to the worker as part of the contract between the parties, that it: (a) has no legal or contractual claim or remedy, direct or indirect, against the worker in the event the payroll process deduction is insufficient to cover the full amount of a Covered EWA transaction, including no right to take payment from any of the consumer's regular transaction accounts; and (b) will not engage in any debt collection activities related to Covered EWA, place a Covered EWA transaction amount as a debt with or sell it to a third party, or report to a consumer reporting agency concerning Covered EWA.
>
> (4) The provider does not directly or indirectly assess the credit risk of individual workers, including through obtaining and reviewing credit reports or credit scores about the individual workers.

*Id.* at 60071. When all of those characteristics are satisfied, the CFBP concluded that what might be characterized as an advance "resembles early wage payment and does not resemble an extension of credit." *Id*. at 60072. The CFPB reasoned that workers receiving such payments have effectively received "earlier-than-normal access to wage amounts accrued, so they are owed less at payday." *Id.* "Rather than the consumer's repayment of a debt, the provider's payroll process deduction from the payroll event associated with that work serves to ensure the consumer is not effectively compensated twice for the same work." *Id.* The CFPB stated that

30

**SPA30**

the Covered EWA products are missing what it characterizes as the "defining element of

'credit,'" i.e., "a consumer's repayment," for the following reason: "When an EWA provider

makes arrangements to ensure that the appropriate amount of the consumer's paycheck is

directed to it through a payroll process deduction, the funds never touch the consumer's regular

transaction account, and accordingly the consumer makes no deferred payment." *Id.*

These advisory opinions and the proposed interpretive rule do not carry the force and

effect of law and are not binding on this Court. *See Christensen v. Harris County*, 529 U.S. 576,

587 (2000); *Carfora v. Tchrs. Ins. Annuity Ass'n of Am.*, 631 F. Supp. 3d 125, 143 (S.D.N.Y.

2022). Their reasoning, however, only reinforces the Court's conclusion. In neither of the

opinions issued over the course of four years by two presidential administrations (with the same

President), nor in the PIR (adopted during yet a third presidential administration), does the CFPB

accord determinative weight to the fact that the advance provided by the EWA product is

non-recourse against the individual's person or that EWA provider's right of repayment is

contingent. The common thread running through the 2020 and 2025 opinions is that a provider

escapes Regulation Z only when it functions as an adjunct to the payroll system—advancing no

more than accrued wages collected through payroll deductions that intercept funds before they

reach the consumer's bank account, and performing no independent assessment of the

consumer's creditworthiness. Where the provider plays such a role, the CFPB has concluded,

the provider is not extending credit by lending money to the consumer. It is giving the consumer

access to her own money that she would not have had without the provider's services. In effect,

the EWA provider is not lending money but solving a logistical challenge for employers who

otherwise would be bound to the bi-weekly pay cycle.

Brigit's Instant Cash product satisfies none of those conditions. It is only nominally an

**SPA31**

"earned wage advance" product.  Instant Cash does not operate in conjunction with the consumer's employer or through a payroll processor.[13]  Nor does it limit advances to accrued wages determined from employer-provided payroll data.  It engages in its own underwriting to determine each consumer's "Bank Account Health," "Spending Behavior," and "Earnings Profile," and it assesses how much to advance not on accrued earnings but based on the consumer's "past need and ability to pay back comfortably."  Compl. ¶¶ 100–01, 104.  "Brigit's underwriting process is both rigorous and continual."  *Id.* ¶ 102.  After reviewing a borrower's financials, Brigit determines that 20% of its customers are not credit-worthy and declines to offer them Instant Cash advance access.  *Id.* ¶ 103.  Brigit also collects repayment not through a payroll deduction but through a preauthorized debit against the consumer's personal bank account—including, under Section 7.6.1(c) of the TOS, "any time Brigit sees a positive cash inflow into your linked bank account even if that available cash is not enough to pay the full amount owed on the Advance."  TOS at 10.  And, while Brigit warrants to consumers that it will not sue them directly, it retains the right to collect the advance from funds contained in their primary bank account regardless of the source of those funds.  Under the CFPB's own framework(s), a product with these characteristics extends consumer credit.

**B.  Instant Cash Imposes "Finance Charges" Under TILA and the MLA.**

Defendant next argues that even if Instant Cash creates a debt, the product still does not

---

[13] The notion that EWA products merely give consumers access "to their own money" through their employers' direct payroll or otherwise may not be determinative of whether the cash advances constitute "credit."  Tax refund anticipation loans ("RALs") provide consumers with early access to their own money by advancing funds in exchange for the right to collect a payment from the government in the amount of a taxpayer's anticipated tax refund.  *See* 1 Nat'l Consumer L. Ctr., *Truth in Lending* § 2.8.10.3 (11th ed. 2023).  These loans have long been understood to extend consumer credit.  *See* 72 Fed. Reg. at 50592 (Department of Defense recognizing RALs as one of the three original types of "consumer credit" covered by the MLA).

**SPA32**

fall within the scope of TILA and the MLA because the advances are not subject to "a finance charge." 32 C.F.R. § 232.3(f)(1); 12 C.F.R. § 1026.2(a)(17)(i).[14]  Brigit asserts that it does not impose a finance charge because "a user can obtain an Instant Cash advance without paying anything, with the difference being whether the advance is delivered via ACH or expedited disbursement." Dkt. No. 32 at 21.  This argument must also be rejected.

TILA and Regulation Z draw a distinction, in any given consumer credit transaction, between the "amount financed" and a "finance charge." 15 U.S.C. § 1638(a).  The two are mutually exclusive categories. *Carlson v. Raymour & Flanigan Furniture*, 2011 WL 1793242, at *2 (W.D.N.Y. May 9, 2011); *Yarney v. Wells Fargo Bank, N.A.*, 2010 WL 3075460 (W.D. Va. Aug. 5, 2010) (amount financed and finance charges are "undeniably inversely related" in calculating total payments).  They must be disclosed and itemized separately. *See* 15 U.S.C. § 1638(a)(2)–(3).  The "amount financed" is "the amount of credit of which the consumer has actual use." 15 U.S.C. § 1638(a)(2)(A).  The CFPB, to which Congress has delegated the authority to prescribe regulations containing "such classifications, differentiations, or other provisions . . . necessary or proper to effectuate the purposes of [TILA]," *id.* § 1604(a), has defined "finance charge" as "the cost of consumer credit as a dollar amount," 12 C.F.R. § 1026.4(a).  This includes "any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit." *Id.*  "Finance charge" under the MLA enjoys the same meaning.  32 C.F.R. § 232.3(n).[15]

---

[14] Plaintiffs do not allege that Instant Cash is payable in more than four installments, so the product is not consumer credit unless a charge associated with Instant Cash qualifies as a "finance charge."

[15] Plaintiffs acknowledge that subscription fees are exempted from the definition of "finance charge" under TILA and the MLA but state that these fees are nonetheless considered part of the MAPR. *See* Dkt. No. 34 at 17 n.12.  The Court need not address that issue at this juncture.

**SPA33**

The distinction between the two categories reflects Congress's core concern that creditors would "'bur[y]' the cost of credit in the price of goods sold" and that "in many credit transactions in which creditors claimed that no finance charge had been imposed, the creditor merely assumed the cost of extending credit as an expense of doing business, to be recouped as part of the price charged in the transaction." *Mourning*, 411 U.S. at 366. "Congress was well aware, from its extensive studies, of the possibility that merchants could use such devices to evade the disclosure requirements of the Act." *Id.*

As indicated above, "finance charge" is defined in the disjunctive. 12 C.F.R. § 1026.4(a). It includes charges that are either "incident to or a condition of the extension of credit." *Id.* Thus, the charge need not be a necessary condition to the extension of credit. The ordinary meaning of "incident to" when TILA was enacted encompassed things "usually connected with another, or connected for some purpose, though not inseparably." Black's Law Dictionary (4th ed. 1968). The Supreme Court has observed "incident to" "implies some *necessary* connection between the antecedent and its object"—that is, between the charge and the extension of credit. *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 241 (2004) (citing *Holly Farms Corp. v. NLRB*, 517 U.S. 392, 403, n. 9 (1996)).

At the time of TILA's drafting, the term "impose" meant: "to levy or exact as by authority; to lay as a burden, tax, duty, or charge." Black's Law Dictionary (4th ed. 1968). Notably, "impose" had a different and broader meaning than "require," which was defined as "[t]o direct, order, demand, instruct, command, claim, compel, request, need, exact." *Id.* "Impose" connotes an exercise of authority by the party setting the charge, not a requirement that the charge be unavoidable by the party paying it. The "finance charge" definition directly contrasts (i) charges "*payable* directly or indirectly by" the consumer with (ii) charges "*imposed*

34

**SPA34**

directly or indirectly by" the creditor.  15 U.S.C. § 1605(a); 12 C.F.R. § 1026.4(a) (emphasis added).  "Imposed" thus identifies the party conducting the charging; it is not a standalone requirement that the charge be a sine qua non to access the credit.  As the Federal Reserve Board (the "Fed") has stated in the past, "the term 'imposed' is understood broadly, to include any cost charged by the creditor (unless otherwise excluded), including charges for optional services paid by the consumer."  Truth in Lending, 60 Fed. Reg. 66179, 66180 (Dec. 21, 1995).

Under TILA, a "finance charge" is not limited to interest as conventionally understood; nor does it exclude charges that in some way benefit the borrower.  *See, e.g.*, 12 C.F.R. § 1026.4(b).  Both the statute and Regulation Z include a broad range of charges imposed as a cost for the consumer to obtain the "actual use" of credit, including but not limited to: loan fees, finder's fees, fees for credit investigations or reports, borrower-paid mortgage broker fees, and insurance premiums protecting the creditor against default.  *Id.*; 15 U.S.C. § 1605(a).  Those categories are examples, not an exhaustive list.  15 U.S.C. § 1605(a) ("Examples of charges which are included in the finance charge include . . ."); *see Nat'l Shooting Sports Found., Inc. v. James*, 144 F.4th 98, 111 (2d Cir. 2025) ("Where 'including' is used to introduce a list of examples, such examples are to be viewed as 'illustrative, not exhaustive.'" (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 162 (2012)).  The statute and the regulation specifically exclude "any charge of a type payable in a comparable cash transaction."  15 U.S.C. § 1605(a); 12 C.F.R. § 1026.4(a).  TILA and Regulation Z also explicitly exclude fees and amounts imposed by third-party closing agents that the creditor does not require and does not retain.  15 U.S.C. § 1605(a); 12 C.F.R. § 1026.4(a)(2).

The Express Fee is a finance charge.  The "amount financed" under TILA is "the amount of credit of which the consumer has actual use."  15 U.S.C. § 1638(a)(2)(A).  The "finance

35

**SPA35**

charge" is, separately, the cost the consumer pays for the privilege of that use. *Id.* § 1605(a). The Express Fee is such a cost. Maximizing the time during which the consumer has access to liquidity is not just an important part of Instant Cash, but its *defining feature*. The name says it all: Instant. Cash. As alleged in the Amended Complaint, Brigit's intended users are consumers living paycheck to paycheck "who turn to EWA providers *for the precise reason that their need for cash is urgent and cannot wait*." Compl. ¶ 43 (emphasis added). It is therefore unsurprising that "the vast majority of EWA users pay expedite fees to obtain immediate funds disbursement." *Id.* ¶ 44.

Brigit asserts that the Express Fee "is no different from same-day or overnight shipping for online purchases—the product is unchanged." Dkt. No. 35 at 6. Not so. Brigit promotes Instant Cash as a way to get money "instantly," "quickly," "ASAP," "within seconds," "when you need it," and "in case of emergency." *Id.* ¶ 78. The time to receipt is an integral part of the product. A consumer who needs short-term liquidity and turns to a product called "Instant Cash" has one, and only one, way to receive funds instantly: pay the Express Fee. The consumer who pays the fee receives the borrowed funds on Day 1 rather than Day 3 or later—and thereby obtains two to three additional days of actual use of borrowed capital within the loan's fixed repayment window. Brigit is deprived of the use of that capital for the same period. Though the consumer need not opt for the Instant Cash product, when she does so, the speed and the longer term of the loan is a material feature of the credit extended, so the fee is part of the cost of the credit. *See Orubo*, 780 F. Supp. 3d at 938 ("The time at which funds are received is a material term of credit."); *Cf.* 89 Fed Red. at 61362 ("Speed of access to funds is an integral and defining aspect of earned wage products. They are designed to address—and marketed as addressing— the liquidity problem that arises between the accrual of wages and their actual payment. That

36

problem necessarily occurs in a very short period, so the value of this type of credit to the consumer includes the rapid availability of funds.").

The Express Fee bears a "necessary connection" to the extension of credit.  *See Pfennig*, 541 U.S. at 241.  It does not convey any value other than the extended actual use that the consumer enjoys and that Brigit correspondingly foregoes.  The fee exists only because the loan exists; it determines when the consumer obtains actual use of the loan proceeds, and it is payable only within the loan transaction.  Moreover, the fee is "imposed" by Brigit within the meaning of the statute and the regulation.  Brigit designed the fee, set its price, built it into the architecture of the Instant Cash transaction, and collects it directly from the consumer at the time of repayment. TOS at 11.

It is immaterial that the consumer can avoid the Express Fee by waiting an additional two to three days and foregoing the use of capital for that additional period.  It is invariably the case that a lender who offers one credit product will offer other options for borrowers who want the use of capital on different terms—on a different date, for a different duration, with different repayment options.  The fact that the putative borrower can choose among options does not make each charge associated with those options any less of a finance charge.  A lender, for example, may offer a loan with two different options, one that remains variable over its duration and a second that permits the borrower to convert the loan to a fixed-rate obligation at a future date. Such convertible adjustable-rate mortgages are common.  It also is common that a borrower who elects to have the option in the future to convert the loan may have to pay an additional charge for that feature.  Such a charge is "voluntary."  *See* Dkt. No. 32 at 17; Dkt. No. 35 at 6.  The borrower can avoid it by opting for the version of the loan that remains variable.  But, as the Fed has recognized, the fact that the rate conversion charge is not obligatory does not make it any

37

**SPA37**

less incident to the extension of credit.  *See* Truth in Lending, 61 Fed. Reg. 49237, 49239 (Sept. 19, 1996).  For the borrower who elects to receive the loan that is convertible, the charge is the cost it must pay for the actual use of credit extended by the lender.  In other words, those charges are costs that, although the borrower could avoid by forgoing a material feature of the credit, represent part of the cost of obtaining the credit of which the borrower has actual use.  *See* 15 U.S.C. § 1605(a).

Regulation Z's treatment of other optional charges confirms the point.  Credit life and disability insurance premiums, for example, are charges that a borrower elects but is not required to purchase.  Yet Regulation Z classifies them as finance charges by default.  12 C.F.R. § 1026.4(d)(1); *see also* 15 U.S.C. § 1605(c).  A creditor may exclude these charges from coverage only by satisfying specific disclosure conditions (e.g., disclosures must be in writing, and the consumer must provide "an affirmative written request" for the insurance after receiving the disclosures).  12 C.F.R. § 1026.4(d)(1).  Unless those conditions are met, the premium is a finance charge—even though the borrower chose to purchase it and even though the borrower received something of independent value.  *See also Lifanda v. Elmhurst Dodge, Inc.*, 237 F.3d 803, 805, 808–09 (7th Cir. 2001) (holding that optional auto theft insurance purchased as an incident to the extension of credit for buying a car was a finance charge).  The Regulation thus does not treat optionality as a reason itself to exclude a charge from the finance charge definition.

The Express Fee here is functionally no different.  A consumer who elects Instant Cash with expedited disbursement and pays the Express Fee has obtained a particular credit product— one in which she receives the borrowed funds immediately.  The Express Fee is the cost of obtaining that credit on those terms.  The fact that the consumer could have elected a different

**SPA38**

version of the product—one with slower disbursement and no fee—does not make the Express Fee any less incident to the credit than the credit in the convertible-adjustable-rate-mortgage example addressed by the Fed.

The Eleventh Circuit's decision in *Veale v. Citibank, F.S.B.*, 85 F.3d 577 (11th Cir. 1996), does not compel a different result.  In that case, Citibank included a $21 FedEx fee in the "Amount Financed" section of a TILA Disclosure Statement rather than under the "Finance Charge" section.  *Id.* at 579.  The fee was charged to the customer as an expense in connection with Citibank's delivery of a portion of the funds to pay off the customer's prior debts to Citibank and to other lenders.  *Id.* at 578–79.  The court concluded that Citibank had not made a mistake in including the charge as a portion of the amount financed rather than as a finance charge.  *Id.* at 579.  There was no evidence that "Citibank required the fee before it would extend credit to the Veales."  *Id.*  Instead, the delivery charge was provided as a separate service by Citibank: "the delivery charge was the result of expediting the pay outs to the other financial institutions in an effort to save the Veales additional interest expense."  *Id.*  In so holding, the court distinguished but did not overrule its own prior decision in *Rodash v. AIB Mortgage Co.*, 16 F.3d 1142 (11th Cir. 1994).  In *Rodash*, the court concluded that a $22 FedEx fee that the bank charged to pay off a then-existing mortgage loan was a finance charge because, as part of the new loan, the consumer was required to pay off the old loan.  *See id.* at 1147–48.  *Rodash* held that the FedEx fee was a finance charge because without the mailing, "the home equity transaction would not have been consummated."  *Id.* a 1148.  By contrast, in *Veale,* the borrowers "could have chosen not to pay the Federal Express fee and the bank did not require it." 85 F.3d at 579.

*Veale* would be analogous to this case if Brigit offered an option pursuant to which it

39

**SPA39**

would deliver the cash that a consumer borrowed not to the consumer directly but to some other creditor to whom the consumer owed money. The consumer would receive the actual use of capital at the same time regardless of whether she paid an extra fee; but if she wanted cash to be sent to the other creditor (e.g., in order to avoid having to send the money herself or to save transaction costs), she would have to pay for the service. Under that hypothetical, it could be said that Brigit would not have "required the fee before it would extend [the] credit." *Id.* The consumer, in effect, would be using its own money borrowed from Brigit to pay for an ancillary service. It would properly be treated as an amount financed.

But here there was no ancillary service. The Express Fee was "[p]art-and-parcel of the fulfillment of the transaction." *Rodash*, 16 F.3d at 1148. Without the fee, there was no "instant cash." "The purpose of TILA is to make various credit terms available to consumers, so they can more easily compare such terms between banks and other financial institutions. Consequently, financial institutions may not bury any costs of credit as such indirection would hinder consumers in comparing credit terms and making the best informed decision on the use of credit." *Id.*

Defendant's remaining cited authorities do not alter the analysis. *Stutman v. Chemical Bank*, 1996 WL 539845 (S.D.N.Y. Sept. 24, 1996), and *Adamson v. Alliance Mortgage Co.*, 861 F.2d 63 (4th Cir. 1988), both involved fees imposed after the loan was originated: in *Stutman*, for services in connection with extinguishing a debt *three years* after the extension of the loan, 1996 WL 539845, at *1, *3, and in *Adamson*, for releasing a deed of trust after a mortgage was fully repaid, 861 F.2d at 64–66. In neither case was the fee connected to the original extension of credit or to a material term of the loan. *See Adamson*, 861 F.2d at 65 ("The release fees were not charged during the transaction in which credit was extended, but as an incident to the formal

40

**SPA40**

extinguishment of the Lenders' liens after the debts had been repaid.  The loans were in no way conditioned on the plaintiffs agreeing to pay the release fees; the record reveals no evidence that the plaintiffs were ever under any legal obligation to pay the fees."); *Stutman*, 1996 WL 539845, at *3 (explaining that the fee "was incident not to the extension of the loan, but rather to the extinguishment of the debt, was not a condition of the loan, and should not be included within the finance charge").  Those fees bear no resemblance to Express Fees charged at the time of the advance as the price of receiving the borrowed funds immediately.

Finally, Brigit cites *Golubiewski v. Activehours, Inc.*, 2024 WL 4204272, at *6 (M.D. Pa. Sept. 16, 2024), for the proposition that "optional tips and fees" for EWA products are not finance charges under TILA.  *Golubiewski* is unpersuasive in several respects, as other courts have observed.  *See, e.g.*, *Orubo*, 780 F. Supp. 3d at 937; *Johnson*, 2025 WL 2299425, at *5. For one, the court in *Golubiewski* suggested that TILA requires "a *necessary* condition for credit," when *Pfennig* makes clear that what is required is instead only a "necessary connection." 2024 WL 4204272, at *6.  Furthermore, the court failed entirely to address the fact that the timing of an advance can be a material term of the loan, noting simply that because an alternative standard delivery service existed, "users c[ould] choose whichever option they prefer."  *Id.* at *4. The Court disagrees with that conclusion for all the reasons already provided.

Brigit's Instant Cash involves an extension of consumer credit under TILA and the MLA. Plaintiffs have therefore stated a claim for relief, and Defendant's motion to dismiss the Amended Complaint is denied.

## II.  The Motion to Compel Arbitration Is Denied.

Brigit also moves to compel arbitration pursuant to the arbitration clause in the TOS. Dkt. No. 32 at 25–26.  At oral argument, however, it conceded that the arbitrability of the TILA

41

**SPA41**

and MLA claims "rises and falls on the merits" of the consumer credit question.  Tr. at 25:18–26:18.[16]  That is because the MLA makes it unlawful for any creditor to extend consumer credit to a covered borrower with respect to which "the creditor requires the borrower to submit to arbitration."  10 U.S.C. § 987(e)(3); *see also* 32 C.F.R. § 232.8(c).  The statute further provides that "no agreement to arbitrate any dispute involving the extension of consumer credit shall be enforceable against any covered member or dependent of such member, or any person who was a covered member or dependent of that member when the agreement was made."  10 U.S.C. § 987(f)(4).  And any credit agreement that fails to comply with the MLA or that contains a prohibited provision "shall be void from the inception of such agreement."  10 U.S.C. § 987(f)(3); 32 C.F.R. § 232.9(c).  Brigit's own TOS recognizes this prohibition.  Section 20.5 provides that if a user is a "covered borrower" as defined by the MLA and 32 C.F.R. § 232.3, "the Arbitration Agreement does not apply to you and you do not need to opt out of or take any action to ensure inapplicability of the Arbitration Agreement."  TOS at 24; *see also id*. at 29.

The Amended Complaint alleges that all three named Plaintiffs were active-duty servicemembers when they received Instant Cash advances.  Compl. ¶¶ 13–18, 119–30.  They are therefore "covered borrowers" within the meaning of the statute.  *See* 10 U.S.C. § 987(i)(1); 32 C.F.R. § 232.3(g).  Brigit has not argued otherwise.  *See* Dkt. No. 32 at 12 n.18 ("reserv[ing] the right to challenge" at a later stage "whether Plaintiffs are 'covered member[s]' under the MLA").  Because Plaintiffs are covered borrowers and have plausibly alleged that Instant Cash extends consumer credit under the MLA, the arbitration clause is unenforceable.  *See Steines v. LoanMax Title Loans*, 113 F.4th 1338, 1343 (11th Cir. 2024) ("The statutory text of the MLA

---

[16] Brigit did not make a similar concession with respect to Plaintiffs' state law claims, *see* Tr. at 26:9–18, but those claims have since been voluntarily dismissed, *see* Dkt. No. 65.

SPA42

couldn't be clearer that where the MLA applies, the FAA does not."); *see also Burrison*, 2026 WL 444638, at *3–5.

**CONCLUSION**

Defendant's motion to dismiss the Amended Complaint pursuant to Rule 12(b)(6) or, alternatively, to compel arbitration is DENIED.

SO ORDERED.

Dated: March 31, 2026
      New York, New York

                                      LEWIS J. LIMAN
                             United States District Judge

**SPA43**

## 9 U.S.C. § 2

### § 2. Validity, Irrevocability, and Enforcement of Agreements to Arbitrate

A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract or as otherwise provided in chapter 4.

SPA44

## 10 U.S.C. § 987

### § 987. Terms of Consumer Credit Extended to Members and Dependents: Limitations

**(a)** **Interest.**—A creditor who extends consumer credit to a covered member of the armed forces or a dependent of such a member shall not require the member or dependent to pay interest with respect to the extension of such credit, except as—

    **(1)** agreed to under the terms of the credit agreement or promissory note;

    **(2)** authorized by applicable State or Federal law; and

    **(3)** not specifically prohibited by this section.

**(b)** **Annual percentage rate.**—A creditor described in subsection (a) may not impose an annual percentage rate of interest greater than 36 percent with respect to the consumer credit extended to a covered member or a dependent of a covered member.

**(c)** **Mandatory loan disclosures.**—

    **(1)** **Information required.**—With respect to any extension of consumer credit (including any consumer credit originated or extended through the internet) to a covered member or a dependent of a covered member, a creditor shall provide to the member or dependent the following information orally and in writing before the issuance of the credit:

        **(A)** A statement of the annual percentage rate of interest applicable to the extension of credit.

        **(B)** Any disclosures required under the Truth in Lending Act (15 U.S.C. 1601 et seq.).

        **(C)** A clear description of the payment obligations of the member or dependent, as applicable.

SPA45

**(2)** **Terms.**—Such disclosures shall be presented in accordance with terms prescribed by the regulations issued by the Board of Governors of the Federal Reserve System to implement the Truth in Lending Act (15 U.S.C. 1601 et seq.).

**(d)** **Preemption.**—

**(1)** **Inconsistent laws.**—Except as provided in subsection (f)(2), this section preempts any State or Federal law, rule, or regulation, including any State usury law, to the extent that such law, rule, or regulation is inconsistent with this section, except that this section shall not preempt any such law, rule, or regulation that provides protection to a covered member or a dependent of such a member in addition to the protection provided by this section.

**(2)** **Different treatment under State law of members and dependents prohibited.**—States shall not—

**(A)** authorize creditors to charge covered members and their dependents annual percentage rates of interest for any consumer credit or loans higher than the legal limit for residents of the State; or

**(B)** permit violation or waiver of any State consumer lending protections covering consumer credit for the benefit of residents of the State on the basis of nonresident or military status of a covered member or dependent of such a member, regardless of the member's or dependent's domicile or permanent home of record.

**(e)** **Limitations.**—It shall be unlawful for any creditor to extend consumer credit to a covered member or a dependent of such a member with respect to which—

**(1)** the creditor rolls over, renews, repays, refinances, or consolidates any consumer credit extended to the borrower by the same creditor with the proceeds of other credit extended to the same covered member or a dependent;

**SPA46**

**(2)** the borrower is required to waive the borrower's right to legal recourse under any otherwise applicable provision of State or Federal law, including any provision of the Servicemembers Civil Relief Act (50 U.S.C. 3901 et seq.);

**(3)** the creditor requires the borrower to submit to arbitration or imposes onerous legal notice provisions in the case of a dispute;

**(4)** the creditor demands unreasonable notice from the borrower as a condition for legal action;

**(5)** the creditor uses a check or other method of access to a deposit, savings, or other financial account maintained by the borrower, or the title of a vehicle as security for the obligation;

**(6)** the creditor requires as a condition for the extension of credit that the borrower establish an allotment to repay an obligation; or

**(7)** the borrower is prohibited from prepaying the loan or is charged a penalty or fee for prepaying all or part of the loan.

**(f)  Penalties and remedies.—**

**(1) Misdemeanor.—**A creditor who knowingly violates this section shall be fined as provided in title 18, or imprisoned for not more than one year, or both.

**(2) Preservation of other remedies.—**The remedies and rights provided under this section are in addition to and do not preclude any remedy otherwise available under law to the person claiming relief under this section, including any award for consequential and punitive damages.

**(3) Contract void.—**Any credit agreement, promissory note, or other contract prohibited under this section is void from the inception of such contract.

**(4) Arbitration.—**Notwithstanding section 2 of title 9, or any other Federal or State law, rule, or regulation, no agreement

**SPA47**

to arbitrate any dispute involving the extension of consumer credit shall be enforceable against any covered member or dependent of such a member, or any person who was a covered member or dependent of that member when the agreement was made.

**(5) Civil liability.**—

**(A) In general.**—A person who violates this section with respect to any person is civilly liable to such person for—

**(i)** any actual damage sustained as a result, but not less than $500 for each violation;

**(ii)** appropriate punitive damages;

**(iii)** appropriate equitable or declaratory relief; and

**(iv)** any other relief provided by law.

**(B) Costs of the action.**—In any successful action to enforce the civil liability described in subparagraph (A), the person who violated this section is also liable for the costs of the action, together with reasonable attorney fees as determined by the court.

**(C) Effect of finding of bad faith and harassment.**—In any successful action by a defendant under this section, if the court finds the action was brought in bad faith and for the purpose of harassment, the plaintiff is liable for the attorney fees of the defendant as determined by the court to be reasonable in relation to the work expended and costs incurred.

**(D) Defenses.**—A person may not be held liable for civil liability under this paragraph if the person shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error. Examples of a bona fide error include clerical, calculation,

**SPA48**

computer malfunction and programming, and printing errors, except that an error of legal judgment with respect to a person's obligations under this section is not a bona fide error.

**(E) Jurisdiction, venue, and statute of limitations.**— An action for civil liability under this paragraph may be brought in any appropriate United States district court, without regard to the amount in controversy, or in any other court of competent jurisdiction, not later than the earlier of—

**(i)** two years after the date of discovery by the plaintiff of the violation that is the basis for such liability; or

**(ii)** five years after the date on which the violation that is the basis for such liability occurs.

**(6) Administrative enforcement.**—The provisions of this section (other than paragraph (1) of this subsection) shall be enforced by the agencies specified in section 108 of the Truth in Lending Act (15 U.S.C. 1607) in the manner set forth in that section or under any other applicable authorities available to such agencies by law.

**(g) Servicemembers Civil Relief Act protections unaffected.**— Nothing in this section may be construed to limit or otherwise affect the applicability of section 207 of the Servicemembers Civil Relief Act (50 U.S.C. 3937).

**(h) Regulations.**—

**(1)** The Secretary of Defense shall prescribe regulations to carry out this section.

**(2)** Such regulations shall establish the following:

**(A)** Disclosures required of any creditor that extends consumer credit to a covered member or dependent of such a member.

**SPA49**

**(B)** The method for calculating the applicable annual percentage rate of interest on such obligations, in accordance with the limit established under this section.

**(C)** A maximum allowable amount of all fees, and the types of fees, associated with any such extension of credit, to be expressed and disclosed to the borrower as a total amount and as a percentage of the principal amount of the obligation, at the time at which the transaction is entered into.

**(D)** Definitions of "creditor" under paragraph (5) and "consumer credit" under paragraph (6) of subsection (i), consistent with the provisions of this section.

**(E)** Such other criteria or limitations as the Secretary of Defense determines appropriate, consistent with the provisions of this section.

**(3)** In prescribing regulations under this subsection, and not less often than once every two years thereafter, the Secretary of Defense shall consult with the following:

**(A)** The Federal Trade Commission.

**(B)** The Board of Governors of the Federal Reserve System.

**(C)** The Office of the Comptroller of the Currency.

**(D)** The Federal Deposit Insurance Corporation.

**(E)** The Bureau of Consumer Financial Protection.

**(F)** The National Credit Union Administration.

**(G)** The Treasury Department.

**(i)** **Definitions.**—In this section:

**(1)** **Covered member.**—The term "covered member" means a member of the armed forces who is—

**SPA50**

**(A)** on active duty under a call or order that does not specify a period of 30 days or less; or

**(B)** on active Guard and Reserve Duty.

**(2) Dependent.**—The term "dependent", with respect to a covered member, means a person described in subparagraph (A), (D), (E), or (I) of section 1072(2) of this title.

**(3) Interest.**—The term "interest" includes all cost elements associated with the extension of credit, including fees, service charges, renewal charges, credit insurance premiums, any ancillary product sold with any extension of credit to a servicemember or the servicemember's dependent, as applicable, and any other charge or premium with respect to the extension of consumer credit.

**(4) Annual percentage rate.**—The term "annual percentage rate" has the same meaning as in section 107 of the Truth and Lending Act (15 U.S.C. 1606), as implemented by regulations of the Board of Governors of the Federal Reserve System. For purposes of this section, such term includes all fees and charges, including charges and fees for single premium credit insurance and other ancillary products sold in connection with the credit transaction, and such fees and charges shall be included in the calculation of the annual percentage rate.

**(5) Creditor.**—The term "creditor" means a person—

**(A)** who—

    **(i)** is engaged in the business of extending consumer credit; and

    **(ii)** meets such additional criteria as are specified for such purpose in regulations prescribed under this section; or

**(B)** who is an assignee of a person described in subparagraph (A) with respect to any consumer credit extended.

**SPA51**

**(6)**     **Consumer credit.**—The term "consumer credit" has the meaning provided for such term in regulations prescribed under this section, except that such term does not include (A) a residential mortgage, or (B) a loan procured in the course of purchasing a car or other personal property, when that loan is offered for the express purpose of financing the purchase and is secured by the car or personal property procured.

## 15 U.S.C. § 1605(a)

### § 1605. Determination of Finance Charge

### (a)   "Finance charge" defined

Except as otherwise provided in this section, the amount of the finance charge in connection with any consumer credit transaction shall be determined as the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit. The finance charge does not include charges of a type payable in a comparable cash transaction. The finance charge shall not include fees and amounts imposed by third party closing agents (including settlement agents, attorneys, and escrow and title companies) if the creditor does not require the imposition of the charges or the services provided and does not retain the charges. Examples of charges which are included in the finance charge include any of the following types of charges which are applicable:

(1)   Interest, time price differential, and any amount payable under a point, discount, or other system of additional charges.

(2)   Service or carrying charge.

(3)   Loan fee, finder's fee, or similar charge.

(4)   Fee for an investigation or credit report.

(5)   Premium or other charge for any guarantee or insurance protecting the creditor against the obligor's default or other credit loss.

(6)   Borrower-paid mortgage broker fees, including fees paid directly to the broker or the lender (for delivery to the broker) whether such fees are paid in cash or financed.

\*      \*      \*

**SPA53**

## 12 C.F.R. § 1026.4(a)-(b)

### § 1026.4. Finance Charge

**(a)** Definition. The finance charge is the cost of consumer credit as a dollar amount. It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit. It does not include any charge of a type payable in a comparable cash transaction.

**(1)** Charges by third parties. The finance charge includes fees and amounts charged by someone other than the creditor, unless otherwise excluded under this section, if the creditor:

**(i)** Requires the use of a third party as a condition of or an incident to the extension of credit, even if the consumer can choose the third party; or

**(ii)** Retains a portion of the third-party charge, to the extent of the portion retained.

**(2)** Special rule; closing agent charges. Fees charged by a third party that conducts the loan closing (such as a settlement agent, attorney, or escrow or title company) are finance charges only if the creditor:

**(i)** Requires the particular services for which the consumer is charged;

**(ii)** Requires the imposition of the charge; or

**(iii)** Retains a portion of the third-party charge, to the extent of the portion retained.

**(3)** Special rule; mortgage broker fees. Fees charged by a mortgage broker (including fees paid by the consumer directly to the broker or to the creditor for delivery to the broker) are finance charges even if the creditor does not require the consumer to use a mortgage broker and even if the creditor does not retain any portion of the charge.

**SPA54**

**(b)** Examples of finance charges. The finance charge includes the following types of charges, except for charges specifically excluded by paragraphs (c) through (e) of this section:

**(1)** Interest, time price differential, and any amount payable under an add-on or discount system of additional charges.

**(2)** Service, transaction, activity, and carrying charges, including any charge imposed on a checking or other transaction account (except a prepaid account as defined in § 1026.61 or a covered asset account as that term is defined in § 1026.62) to the extent that the charge exceeds the charge for a similar account without a credit feature.

**(3)** Points, loan fees, assumption fees, finder's fees, and similar charges.

**(4)** Appraisal, investigation, and credit report fees.

**(5)** Premiums or other charges for any guarantee or insurance protecting the creditor against the consumer's default or other credit loss.

**(6)** Charges imposed on a creditor by another person for purchasing or accepting a consumer's obligation, if the consumer is required to pay the charges in cash, as an addition to the obligation, or as a deduction from the proceeds of the obligation.

**(7)** Premiums or other charges for credit life, accident, health, or loss-of-income insurance, written in connection with a credit transaction.

**(8)** Premiums or other charges for insurance against loss of or damage to property, or against liability arising out of the ownership or use of property, written in connection with a credit transaction.

**(9)** Discounts for the purpose of inducing payment by a means other than the use of credit.

**SPA55**

**(10)** Charges or premiums paid for debt cancellation or debt suspension coverage written in connection with a credit transaction, whether or not the coverage is insurance under applicable law.

**(11)** With regard to a covered separate credit feature and an asset feature on a prepaid account that are both accessible by a hybrid prepaid-credit card as defined in § 1026.61:

**(i)** Any fee or charge described in paragraphs (b)(1) through (10) of this section imposed on the covered separate credit feature, whether it is structured as a credit subaccount of the prepaid account or a separate credit account.

**(ii)** Any fee or charge imposed on the asset feature of the prepaid account to the extent that the amount of the fee or charge exceeds comparable fees or charges imposed on prepaid accounts in the same prepaid account program that do not have a covered separate credit feature accessible by a hybrid prepaid-credit card.

**(12)** With regard to a covered asset account as that term is defined in § 1026.62(b)(2):

**(i)** Any service, transaction, activity, or carrying charge imposed on the separate credit account required by § 1026.62(c); and

**(ii)** Any service, transaction, activity, or carrying charge imposed on the covered asset account to the extent that the charge exceeds a comparable charge imposed on a checking or other transaction account that does not have overdraft credit.

**(iii)** For purposes of paragraph (b)(12)(ii) of this section, a charge or combination of charges, including a per transaction fee, imposed on a covered asset account when overdraft credit is extended is not comparable to the following fees or charges imposed on a checking or

**SPA56**

other transaction account that does not have overdraft credit:

**(A)** A charge for authorizing or paying a transaction that overdraws the checking or other transaction account.

**(B)** A charge for declining to authorize or pay a transaction.

**(C)** A charge for returning a transaction unpaid.

**(D)** A charge for transferring funds into the checking or other transaction account from any credit account.

**(E)** A charge for transferring funds into the checking or other transaction account from any other asset account.

\* \* \*

**SPA57**

## 32 C.F.R. § 232.3(f)(1), (g)-(h), (n), (s)

### § 232.3. Definitions

As used in this part:

\* \* \*

**(f)(1)** Consumer credit means credit offered or extended to a covered borrower primarily for personal, family, or household purposes, and that is:

    **(i)** Subject to a finance charge; or

    **(ii)** Payable by a written agreement in more than four installments.

\* \* \*

**(g)(1)** Covered borrower means a consumer who, at the time the consumer becomes obligated on a consumer credit transaction or establishes an account for consumer credit, is a covered member (as defined in paragraph (g)(2) of this section) or a dependent (as defined in paragraph (g)(3) of this section) of a covered member.

  **(2)** The term "covered member" means a member of the armed forces who is serving on—

    **(i)** Active duty pursuant to title 10, title 14, or title 32, United States Code, under a call or order that does not specify a period of 30 days or fewer; or

    **(ii)** Active Guard and Reserve duty, as that term is defined in 10 U.S.C. 101(d)(6).

  **(3)** The term "dependent" with respect to a covered member means a person described in subparagraph (A), (D), (E), or (I) of 10 U.S.C. 1072(2).

**SPA58**

**(4)** Notwithstanding paragraph (g)(1) of this section, covered borrower does not mean a consumer who (though a covered borrower at the time he or she became obligated on a consumer credit transaction or established an account for consumer credit) no longer is a covered member (as defined in paragraph (g)(2) of this section) or a dependent (as defined in paragraph (g)(2) of this section) of a covered member.

**(h)** Credit means the right granted to a consumer by a creditor to defer payment of debt or to incur debt and defer its payment.

\* \* \*

**(n)** Finance charge has the same meaning as "finance charge" in Regulation Z.

\* \* \*

**(s)** Regulation Z means any rules, or interpretations thereof, issued by the Bureau to implement the Truth in Lending Act, as amended from time to time, including any interpretation or approval issued by an official or employee duly authorized by the Bureau to issue such interpretations or approvals. However, for any provision of this part requiring a creditor to comply with Regulation Z, a creditor who is subject to Regulation Z (12 CFR part 226) issued by the Board of Governors of the Federal Reserve System must continue to comply with 12 CFR part 226. Words that are not defined in this part have the same meanings given to them in Regulation Z (12 CFR part 1026) issued by the Bureau, as amended from time to time, including any interpretation thereof by the Bureau or an official or employee of the Bureau duly authorized by the Bureau to issue such interpretations. Words that are not defined in this part or Regulation Z, or any interpretation thereof, have the meanings given to them by State or Federal law.

\* \* \*

**SPA59**

## 32 C.F.R. § 232.9(d)

### § 232.9.  Penalties and Remedies

\*       \*       \*

**(d)**    Arbitration. Notwithstanding 9 U.S.C. 2, or any other Federal or State law, rule, or regulation, no agreement to arbitrate any dispute involving the extension of consumer credit to a covered borrower pursuant to this part shall be enforceable against any covered borrower, or any person who was a covered borrower when the agreement was made.

**SPA60**

## CERTIFICATE OF SERVICE

I hereby certify that, on June 12, 2026, I electronically filed the foregoing Special Appendix with the United States Court of Appeals for the Second Circuit using the Court's electronic filing system, which will serve copies on all registered counsel.

Dated: June 12, 2026
                                    */s/ Ephraim A. McDowell*
                                    Ephraim A. McDowell