# No. 26-959

IN THE

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

ROBERT FEEMAN, GUSTAVO GILLY, & MICHAEL COLLINS,
INDIVIDUALLY, AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiffs-Appellees,

v.

BRIDGE IT, INC. D/B/A Brigit,

Defendant-Appellant.

On Appeal from the United States District Court for the Southern
District of New York, No. 1:25-CV-3806
(Honorable Lewis Liman)

## BRIEF OF DAILYPAY, LLC, STREAM PLATFORMS, INC., & ZAYZOON US INC. AS *AMICI CURIAE* IN SUPPORT OF DEFENDANT-APPELLANT AND REVERSAL

JEREMY M. CREELAN
MICHAEL W. ROSS
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, New York 10036
(212) 891-1600
JCreelan@jenner.com
MRoss@jenner.com

ADAM G. UNIKOWSKY
  *Counsel of Record*
EMANUEL POWELL III*
  *Application pending*
JENNER & BLOCK LLP
1099 New York Ave., NW
Suite 900
Washington, DC 20001
(202) 639-6000
AUnikowsky@jenner.com
EPowell@jenner.com

*Counsel for Amici DailyPay, LLC, Stream Platforms, Inc., & ZayZoon US Inc.*

## CORPORATE DISCLOSURE STATEMENT

*Amici curiae* certify that they have no outstanding shares or debt securities in the hands of the public. DailyPay, LLC is a wholly owned subsidiary of DailyPay Holdings, Inc., a privately held Delaware corporation. Stream Platforms, Inc. is a wholly owned subsidiary of Stream Group Holdings Ltd., a privately held company organized under the laws of England and Wales, and is an affiliate of Stream Platforms Ltd. ZayZoon US Inc. is a wholly owned subsidiary of ZayZoon US Operating Inc., a Delaware corporation that is wholly owned by ZayZoon, Inc., a privately held Canadian corporation headquartered in Calgary, Alberta. No publicly held company has a 10% or greater ownership interest in *amici curiae*.

*/s/ Adam G. Unikowsky*

i

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ...................................................i

TABLE OF AUTHORITIES.......................................................................... iii

STATEMENT OF INTEREST .........................................................................1

INTRODUCTION AND SUMMARY OF THE ARGUMENT....................5

ARGUMENT.....................................................................................................8

I.    EWA Services Are Not Credit or Lending.............................................8

    A.    EWA Services Are a Fundamentally Different Type of Transaction from Credit or Lending.............................................8

    B.    Conflating EWA Services with Credit and Lending Will Harm Consumers. ..................................................................16

II.    An Employer-Partnered EWA Model Is Not Before the Court..........................................................................................................20

    A.    The Trial Court's Holding Rests on Structural Features Absent from *Amici*'s Services. ....................................21

    B.    Employer-Partnered EWA Services Are Recognized by Regulators as Employing Features That Distinguish Them from Credit.............................................25

CONCLUSION ...............................................................................................29

CERTIFICATE OF COMPLIANCE............................................................31

CERTIFICATE OF SERVICE .....................................................................32

# TABLE OF AUTHORITIES

CASES

*Burrison v. FloatMe, Corp.*, No. 25-CV-10885, 2026 WL 444638 (D. Mass. Feb. 17, 2026), *appeal docketed*, No. 26-1256 (1st Cir. Mar. 17, 2026)...............................................................................23, 28

*Capela v. J.G. Wentworth, LLC*, No. 09-CV-00882, 2009 WL 3128003 (E.D.N.Y. Sept. 24, 2009), *report and recommendation adopted*, 2009 WL 10712637 (E.D.N.Y. Oct. 27, 2009) ..........................................................................................13

*In re Grand Union Co.*, 219 F. 353 (2d Cir. 1914)..............................................10

*Johnson v. Activehours, Inc.*, No. 1:24-CV-02283, 2025 WL 2299425 (D. Md. Aug. 8, 2025) ........................................................23

*Lowe v. MoneyLion Technologies Inc.*, No. 25 CIV. 4098, 2026 WL 654719 (S.D.N.Y. Mar. 9, 2026), *appeal docketed*, No. 26-655 (2d Cir. Mar. 18, 2026) ...................................................................23

*Moss v. Klover Holdings, Inc.*, No. 25-CV-5758, 2026 WL 622653 (N.D. Ill. Mar. 5, 2026)..................................................................23

*Odier v. Hoffmann School of Martial Arts, Inc.*, 619 F. Supp. 2d 571 (N.D. Ind. 2008) ............................................................................10

*Olson v. Unison Agreement Corp.*, No. 23-2835, 2025 WL 2254522 (9th Cir. Aug. 7, 2025)........................................................12

*Orubo v. Activehours, Inc.*, 780 F. Supp. 3d 927 (N.D. Cal. 2025) .................23

*Reed v. Val-Chris Investments, Inc.*, No. 11-CV-371, 2011 WL 6028001 (S.D. Cal. Dec. 5, 2011) ..............................................................10

*Revell v. Grant Money, LLC*, 808 F. Supp. 3d 1036 (N.D. Cal. 2025) ..............................................................................................23

*Russell v. Dave Inc.*, 812 F. Supp. 3d 998 (C.D. Cal. 2025)............................23

*S & H Packing & Sales Co. v. Tanimura Distributing, Inc.*, 883 F.3d 797 (9th Cir. 2018) ..............................................................10

*Veale v. Citibank, F.S.B.*, 85 F.3d 577 (11th Cir. 1996) ........................14, 15, 16

*Vickery v. Empower Finance, Inc.*, No. 25-CV-03675, 2025 WL 2841686 (N.D. Cal. Oct. 7, 2025), *appeal docketed*, No. 25-6377 (9th Cir. Oct. 9, 2025) ..............................................................14, 23

STATUTES

15 U.S.C. § 1602(f) ...........................................................................9

RCW § 31.04.505(5) ........................................................................12

OTHER AUTHORITIES

12 C.F.R. pt. 1026 ...........................................................................26

12 C.F.R. § 1026.2, CFPB Official Interpretation 2(a)(14)(1)(iii), https://www.consumerfinance.gov/rules-policy/regulations/ 1026/2/ ..............................................................................13

12 C.F.R. § 1026.2(a)(14) ...................................................................9

12 C.F.R. § 1026.18(e) .....................................................................17

12 C.F.R. § 1026.33(a) .....................................................................12

32 C.F.R. § 232.3(h) ..........................................................................9

ADP, *Earned Wage Access: Tapping Into the Potential of Flexible Pay for Today's World of Work* (2022) ........................................20

Lisa Berdie & Riya Patil, *Exploring Earned Wage Access as a Liquidity Solution*, Financial Health Network (2023), https://finhealthnetwork.org/wp-content/uploads/2023/12/ EWA-Users-Report-2023.pdf ..............................................................18, 19

Terri Bradford, *As Earned Wage Access Grows, Oversight Tries to Catch Up*, Federal Reserve Bank of Kansas City (May 15, 2024), https://www.kansascityfed.org/Payments%20Systems%20-Research%20Briefings/documents/10170/PaymentsSystemResearchBriefing24Bradford0515.pdf ......................................................19

CFPB, *Data Spotlight: Developments in the Paycheck Advance Market* (July 18, 2024), https://www.consumerfinance.gov/data-research/research-reports/data-spotlight-developments-in-the-paycheck-advance-market/ ..............................................19

*Debt, Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/debt (last visited June 22, 2026) ...........................9

Department of Treasury, *General Explanations of the Administration's Fiscal Year 2023 Revenue Proposals* (2022) .............................................................................................25

Department of Treasury, *General Explanations of the Administration's Fiscal Year 2024 Revenue Proposals* (2023) .............................................................................................25

Department of Treasury, *General Explanations of the Administration's Fiscal Year 2025 Revenue Proposals* (2024) ........................................................................................ 25-26

Fed. R. App. P. 29 .................................................................................1

*Get Paid Today with ZayZoon & Time and Pay: Employee FAQ*, ZayZoon, https://www.zayzoon.com/go/timeandpay (last visited June 22, 2026) ..........................................17

Jim Hawkins, *Is it Credit?*, 67 Wm. & Mary L. Rev. 1409 (2026) ...................18

*Liability, Black's Law Dictionary* (12th ed. 2024) ..........................................10

*Obligation, Black's Law Dictionary* (12th ed. 2024) .....................................10

*On-Demand Pay Program Terms*, DailyPay, https://www.dailypay.com/en-us/legal/program-terms/ (last updated June 3, 2026) ..........................................................11, 17

v

Payday, Vehicle Title, and Certain High-Cost Installment
    Loans, 82 Fed. Reg. 54472 (Nov. 17, 2017)..............................................25, 26

Truth in Lending (Regulation Z); Consumer Credit Offered to
    Borrowers in Advance of Expected Receipt of Compensation
    for Work, 90 Fed. Reg. 3622 (Jan. 15, 2025)................................................27

Truth in Lending (Regulation Z); Earned Wage Access
    Programs, 85 Fed. Reg. 79404 (Dec. 10, 2020)..............................................26

Truth in Lending (Regulation Z); Non-application to Earned
    Wage Access Products, 90 Fed. Reg. 60069 (Dec. 23, 2025)..........15, 27, 28

*ZayZoon USA EWA Terms of Service* (effective May 15, 2026),
    https://www.zayzoon.com/usaterms...............................................................11

vi

## STATEMENT OF INTEREST[1]

Earned wage access ("EWA") services give employees more flexible access to their earned pay in between pay periods. *Amici* represent a subset of EWA service providers called "employer-partnered EWA services." Such providers contract directly with employers to offer EWA services to their employees as an optional benefit that is fully integrated with the employer's payroll system. Because of that integration, when employees use an employer-partnered EWA service, those employees can access their pay based on the amount they have actually earned to date, calculated using data from the employer itself. And when employer-partnered EWA services recoup the amount transferred to employees, they do so through the employer's payroll process, not by debiting the employee's bank account, a distinction from the "direct-to-consumer" service that is at issue on this appeal.

*Amici* wholeheartedly agree with Bridge It, Inc. ("Brigit") that its direct-to-consumer EWA service is not lending or credit, as explained

---

[1] All parties consent to the filing of this brief. No party's counsel authored this brief in whole or in part, and no money intended to fund preparing or submitting this brief was contributed by a party or party's counsel or anyone other than *amici*, their members, or their counsel. *See* Fed. R. App. P. 29.

further below. *Amici* thus support reversal of the trial court's decision. *Amici* also write to explain how employer-partnered EWA services differ from the direct-to-consumer service before the Court here such that, should the Court reach a contrary conclusion on the facts of this case, the Court should ensure that its decision is not misconstrued as expressing a view on *employer-partnered* EWA services, which were not before the trial court.

*Amicus* **DailyPay, LLC** ("DailyPay") is an EWA service provider that partners with employers to offer EWA as an optional workplace benefit through direct integration with employers' payroll, time, or attendance systems. DailyPay currently partners with employers with over six million employees nationwide.[2] When an employee opts to use DailyPay's services to access their earned pay, DailyPay delivers funds to the employee for their earned pay, based on verified data from the employer partner. DailyPay then recoups the amount directly from its employer partner. Employees who use DailyPay's services go through no credit application process and no credit check, and have no obligation to pay DailyPay. DailyPay does not charge interest, does not perform consumer credit underwriting, and does

---

[2] Some of those workers are employees and some are independent contractors; this brief uses the term employee for both for ease of reference.

not report to the consumer credit bureaus. DailyPay has no claim for payment or other recourse to the employee relating to the transferred funds. DailyPay has a direct and substantial interest in the question presented, because the legal classification of EWA directly affects DailyPay's ability to offer EWA services to American workers.

*Amicus* **Stream Platforms, Inc.** ("Stream") is a leading workplace finance provider whose EWA service is offered to over one million American employees through some of the country's leading employers. Stream's EWA service is delivered as a no-interest employee benefit integrated directly with the employer's payroll, time, or attendance systems. Stream is a certified B Corporation whose social charter—embedded in its Articles of Association as a legally binding commitment—requires that every product it offers measurably improve employees' financial wellbeing and reduce reliance on high-cost credit. Employees who use Stream's services go through no credit application process and no credit check; they incur no obligation to pay Stream. Stream does not charge interest, does not perform consumer credit underwriting, and does not report to the consumer credit bureaus. Stream does not have any claim for payment or other recourse to the employee relating to the transferred funds. Stream has a direct and

3

substantial interest in the question presented, because the legal classification of EWA directly affects Stream's ability to offer EWA services to American workers.

*Amicus* **ZayZoon US Inc.** ("ZayZoon") is a leading provider of EWA and related financial-wellness tools designed for small and mid-sized businesses and their hourly workforce. ZayZoon partners with employers and their payroll providers to deliver EWA to employees, integrated directly into the employer's existing payroll process. Employees who use ZayZoon's services go through no credit application process and no credit check; they make no promise and have no obligation to pay ZayZoon. ZayZoon does not charge interest, does not perform consumer credit underwriting, does not report to the consumer credit bureaus. Nor does ZayZoon have any claim for payment or other recourse to the worker relating to the transferred funds. ZayZoon has a direct and substantial interest in the question presented, because the legal classification of EWA directly affects ZayZoon's ability to offer EWA services to American workers.

4

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Many American workers today live paycheck-to-paycheck, and legacy bi-weekly or similar periodic pay cycles fail to meet their increasing need for liquidity to cover expenses between pay dates. For lower- or middle-class workers, expenses incurred between pay dates can require resort to expensive workarounds such as over-drafting, obtaining high-cost payday loans, or relying on revolving credit card balances.

Recent advances in technology have made it possible for workers to access their earned wages prior to periodic payroll dates. Innovative companies such as *amici* have developed technological solutions for employees and employers that solve the problem of the payroll cycle and provide access to the funds a worker has *already earned*—avoiding the need to take out a payday loan, incur overdraft fees, or carry credit card balances. EWA services leverage technological advances to allow everyday American workers to meet their financial needs without having to resort to high-cost predatory lending products.

*Amici* present two distinct arguments to the Court. *First*, as detailed below, the district court erred because all EWA services are fundamentally distinct from lending or credit. In an EWA transaction, employees exercise

their existing right to receive payment of their already earned wages. EWA transactions like those at issue in this case involve no credit application or credit check; no legal obligation to repay the amount received; no recourse by the provider against the employee; no interest and no credit reporting or debt collection for a failure to repay. In short, EWA services are substantively distinct from concepts of lending, credit, and debt. And, as detailed below, finding otherwise would disserve the interests of the sizable portion of the American workforce that has come to rely on them for early access to their earned wages.

*Second*, *amici* also write to make clear that, in reaching its erroneous legal ruling, the district court did not have before it—and distinguished from the model in this case—the employer-partnered EWA services that *amici* provide. Employer-partnered EWA services are integrated with an employer's payroll, time, or attendance systems in order to allow the employer to offer EWA as an optional workplace benefit. This integration with employer IT systems gives employer-partnered EWA services the data necessary to provide accurate calculations of earned wages, and it also allows the provider to recoup any prior EWA transfers from the employer, without debiting funds from an employee's bank account. Those features of

6

employer-partnered EWA services make them different from the direct-to-consumer service addressed by the trial court. Thus, in reaching its conclusion, this Court should take care not to issue a ruling that covers employer-partnered EWA services, which are not before the Court.

## ARGUMENT

### I.  EWA Services Are Not Credit or Lending.

Various federal and state laws regulate the provision of "credit" and "loans" including, as relevant to this appeal, the Military Lending Act ("MLA") and the Truth in Lending Act ("TILA"). The district court below held that Appellees adequately pleaded violations of these laws because Brigit's EWA service constituted "credit" under TILA and the MLA and "consumer credit" under both statutes because Brigit's EWA service was subject to a "finance charge."

The district court erred. EWA services are not credit or lending, and they do not involve finance charges.

### A.  EWA Services Are a Fundamentally Different Type of Transaction from Credit or Lending.

EWA services use payroll, time, or attendance data to calculate, verify, and provide a portion of an employee's earned wages between employer pay dates. At the time of an EWA transaction, the employee has a *current right* to receive a sum certain: The individual has already done the work and is already entitled to payment for that work from the employer. Thus, when the employee receives funds from the EWA provider, that employee is accessing the wages they already earned. The amount the

8

employee receives is not transferred for temporary use; they keep it permanently. When the earned wages are later paid by the employer, the employee should not be paid twice for the same work.

EWA transactions do not fall under the definitions of lending, credit, or debt for several reasons. *First*, the legal concepts used by the relevant statutes—whether using the term "credit," "debt," or "loan"—all require an *obligation to repay*. Both the MLA and TILA define "credit" as the right to defer payment of a "debt,"[3] which means "being under *obligation* to pay or repay someone or something in return for something received."[4] In turn, an "obligation" is "[a] formal, binding agreement or acknowledgment of a liability to pay a certain amount or to do a certain thing for a particular

---

[3] MLA regulations define "[c]redit" as "the right granted to a consumer by a creditor to defer payment of debt or to incur debt and defer its payment." 32 C.F.R. § 232.3(h). TILA similarly provides that credit is "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. § 1602(f); 12 C.F.R. § 1026.2(a)(14).

[4] *See Debt, Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/debt (last visited June 22, 2026) (emphasis added).

person or set of persons."[5] In legal terms, a "liability" is understood as the "condition of being legally obligated or accountable."[6]

Similarly, the terms "lending" or "loan" also entail an obligation to repay. The Second Circuit has long held that "[i]n order to constitute a loan there must be a contract whereby, in substance one party transfers to the other a sum of money which that other *agrees to repay absolutely*, together with such additional sums as may be agreed upon for its use."[7] The obligation to repay is a feature courts regularly recognize as indicative of whether a transaction is a loan.[8]

---

[5] *See Obligation*, *Black's Law Dictionary* (12th ed. 2024). *See Reed v. Val-Chris Invs., Inc.*, No. 11-CV-371, 2011 WL 6028001, at *2 (S.D. Cal. Dec. 5, 2011) (holding that the transaction "was not a credit transaction subject to TILA's requirements" where, among other things, the party who received an advance on his inheritance "had no obligation to pay [the other party] anything if the Estate did not satisfy the amount"); *see also Odier v. Hoffmann Sch. of Martial Arts, Inc.*, 619 F. Supp. 2d 571, 577 (N.D. Ind. 2008) ("[T]he term 'debt' likely refers to a legally enforceable obligation to pay money.").

[6] *Liability*, *Black's Law Dictionary* (12th ed. 2024).

[7] *In re Grand Union Co.*, 219 F. 353, 356 (2d Cir. 1914) (emphasis added) (quotation marks omitted).

[8] *See, e.g., S & H Packing & Sales Co. v. Tanimura Distrib., Inc.*, 883 F.3d 797, 808 (9th Cir. 2018).

But EWA services involve no such obligation to repay. Contractual terms agreed upon by the employee provide explicitly that there is no repayment obligation. For example, in describing its EWA service, DailyPay's terms provide that the service is "not intended to create any debt obligation owed by you to us[.]" "[I]f the Hiring Entity [*i.e.*, the employer] is unable to make payment because its business has slowed down or closed in the ordinary course of business—then you will owe us nothing."[9] With no legal obligation to repay, EWA services are not credit or lending.

The trial court erroneously found an obligation to repay based on the revocable debiting of an employee's bank account. But that feature also does not make EWA services credit. Providing voluntary authorization, that can

---

[9] *See On-Demand Pay Program Terms*, DailyPay, https://www.dailypay.com/en-us/legal/program-terms/ (last updated June 3, 2026) (emphasis added). They also provide that: "[u]nder such circumstances, we will have no direct or indirect legal or contractual claim or remedy against you, including no right to take payment from your regular transaction accounts (*i.e.*, deposit accounts, prepaid accounts, or payroll card accounts), based on our inability to collect the full amount of the Daily Earnings, and we will not engage in debt collection activities against you, place the Daily Earnings as a debt or sell them to a third party for collection, or report you to a consumer reporting agency." *Id.*; *see also ZayZoon USA EWA Terms of Service* (effective May 15, 2026), https://www.zayzoon.com/usaterms ("ZayZoon has no right to assert a claim against you with respect to your wages." (capitalization omitted)).

be revoked, does not create a legal obligation or recourse, or any other hallmark of credit.

*Second*, EWA services are not credit or lending because they are non-recourse to the user. Just as EWA terms of service explain that the transaction does not create an obligation to repay, EWA terms of service independently and additionally provide that if the employer-partnered EWA provider is unable to recoup the amount it provided to the employee, the provider has no recourse and accepts the loss.[10] The absence of any recourse for nonpayment confirms that there is no credit transaction. This makes sense where there is no payment obligation in the first place.

---

[10] Some courts have reasoned that some nonrecourse transactions can create "consumer credit obligation[s]." *Olson v. Unison Agreement Corp.*, No. 23-2835, 2025 WL 2254522, at *3 (9th Cir. Aug. 7, 2025) (citing RCW § 31.04.505(5)); SPA17 (citing 12 C.F.R. § 1026.33(a)). But those cases involve transaction types for which the statute and regulations expressly encompass "nonrecourse" transactions. RCW § 31.04.505(5) (applying to "nonrecourse" transactions); 12 C.F.R. § 1026.33(a) (applying to "a nonrecourse consumer credit obligation…."). Indeed, in a case recognizing this, *Olson*, the Ninth Circuit expressly recognized that "as a general matter, a consumer's grant of a purchase option in exchange for cash would not ordinarily be thought of as creating a 'credit obligation,' because it does not involve an advance of money in exchange for an expectation of future payments by the consumer back to the option holder." 2025 WL 2254522, at *4. Unlike in those cases, the statutes here do not through legal fictions extend their coverage expressly to "nonrecourse" transactions.

12

Indeed, the law recognizes numerous types of transactions in which a party that monetizes a right to payment does not thereby enter into a lending relationship, such as monetizing a stream of payments for a structured settlement.[11] Although the technology is new, EWA services build on a solid legal foundation under which an employee merely monetizes a right to payment and accesses their own funds.

*Third*, EWA services do not involve "finance charges" under TILA or the MLA. For the reasons already stated, EWA transactions do not constitute credit or lending, so no "finance charges" are involved by implication. Further, any EWA-related fees are not a "charge for the use of money" but rather fees associated with the method employees choose to access their own funds. Just like a financial institution may charge a fee for a customer to use a wire transfer instead of a free transfer of the customer's own funds, so too with EWA.

---

[11] *See Capela v. J.G. Wentworth, LLC*, No. 09-cv-00882, 2009 WL 3128003, at *10 (E.D.N.Y. Sept. 24, 2009) (considering structured settlement rights in connection with TILA), *report and recommendation adopted*, 2009 WL 10712637 (E.D.N.Y. Oct. 27, 2009); 12 C.F.R. § 1026.2, CFPB Official Interpretation 2(a)(14)(1)(iii), https://www.consumerfinance.gov/rules-policy/regulations/1026/2/ (noting that insurance premium plans that involve installment payments are not considered credit).

On this score, the Eleventh Circuit's reasoning in *Veale v. Citibank, F.S.B.*, is instructive. In that case, the court considered an "express" fee charged for expedited delivery of loan proceeds, which was offered as an alternative to regular mail.[12] The Eleventh Circuit held that "[i]f the borrower can choose to avoid the Federal Express fee by having the documents sent via regular mail[] . . . and the bank did not require it, then the fee was not imposed as an incident to the extension of credit and need not be included in the Finance Charge."[13] Instead, EWA consumers incur such fees only if they elect an optional service, like in *Veale*.[14] As the Eleventh Circuit recognized under similar circumstances in *Veale*, EWA services do not involve finance charges.[15]

---

[12] 85 F.3d 577, 579 (11th Cir. 1996).

[13] *Id.*

[14] *Id.*

[15] Some courts have held that *Veale* is not applicable to the consideration of whether expedite fees customers elect to use with EWA services are "finance charge[s]" under TILA because the charge in *Veale* "was the result of expediting the pay outs to the other financial institutions." SPA39 (quoting *Veale*, 85 F.3d at 579); *Vickery v. Empower Fin., Inc.*, No. 25-CV-03675, 2025 WL 2841686, at *7 (N.D. Cal. Oct. 7, 2025) ("Further, whereas the Federal Express fee did not relate to Citibank's own extension of credit but rather the plaintiffs' repayment to other creditors, Empower's Instant Transfer Fee is a condition of Plaintiffs' receipt of instant credit from Empower."), *appeal docketed*, No. 25-6377 (9th Cir. Oct. 9, 2025). Whether a

14

The district court dismissed the import of *Veale*, holding that the case would only be analogous where "Brigit offered an option pursuant to which it would deliver the cash that a consumer borrowed not to the consumer directly but to some other creditor to whom the consumer owed money."[16] The Eleventh Circuit made no such limitation in its holding. As the Consumer Financial Protection Bureau ("CFPB") recently explained in an advisory opinion discussing the *Veale* decision (the advisory opinion is discussed further below), "expedited delivery fees are the cost of obtaining earned wages more quickly than via ACH, and are triggered by the consumer's opting for expedited delivery; they are not 'directly or indirectly imposed' by the provider."[17] So too with EWA services where providers do

---

borrower or a third-party specified by the borrower receives the loan proceeds has no bearing on the nature of the borrower's payment obligations or the characterization of an expedited delivery fee as a finance charge. These holdings ignore *Veale's* reasoning, which explained that because the customer "could have chosen not to pay the . . . fee and the bank did not require it, then the fee was not <u>imposed</u> as an incident to the extension of credit and need not be included in the Finance Charge." *Veale*, 85 F.3d at 579.

[16] SPA39-40.

[17] Truth in Lending (Regulation Z); Non-application to Earned Wage Access Products, 90 Fed. Reg. 60069, 60075 (Dec. 23, 2025) (emphasis added).

not "require[] the fee before [they] would extend" consumers access to their earnings.[18]

*Fourth,* EWA services do not have various other telltale features of consumer credit. They do not involve a consumer credit check, because it is not a consumer credit risk transaction for the provider (*e.g.,* consumers have no payment obligation). Employees are not subject to filing an application, underwriting, or other form of credit approval. There are no reports to credit bureaus or debt collection activities for non-payment. The absence of those features is an important reason employees view EWA services as distinct from debt and should not be ignored here. *See infra* pp. 17-19.

### B. Conflating EWA Services with Credit and Lending Will Harm Consumers.

The district court's misclassification of EWA services as lending will needlessly harm consumers by causing confusion of the type that consumer protection laws were intended to ameliorate. The district court's decision, if affirmed, would effectively transform EWA services into loan products with all the additional credit assessment and other requirements associated with

---

[18] *Veale*, 85 F.3d at 579.

lending.[19] This outcome would limit consumer choice over products to address short-term liquidity needs and result in customer confusion.

Consumers choose EWA services because they do not have the features of loans; classifying them as such would therefore undermine that choice. For instance, imposing TILA's required disclosures on EWA services would mislead users into believing EWA services involve interest (*i.e.*, fees would increase based on the time between disbursement of the earned wages and payment by the employer), or that EWA services involve an obligation to repay. Forcing EWA services into a credit regime could also signal that their availability is limited to creditworthy consumers and that non-payment is subject to debt collection. In other words, imposing a credit

---

[19] Requiring TILA disclosures, for example, would be nonsensical as applied to EWA and result in meaningful customer confusion. Under TILA and Regulation Z, finance charges of $5 or less are excluded as *de minimis* from the APR disclosure requirement. 12 C.F.R. § 1026.18(e). EWA provider fees, generally, are less than $5 and would therefore be considered *de minimis*. *See, e.g., On-Demand Pay Program Terms*, DailyPay, https://www.dailypay.com/en-us/legal/program-terms/ (last updated June 3, 2026) (disclosing no-cost ACH transfers and flat expedited delivery fees of $1.99-$3.99 that are set on an employer-by-employer basis); *Get Paid Today with ZayZoon & Time and Pay: Employee FAQ*, ZayZoon, https://www.zayzoon.com/go/timeandpay (last visited June 22, 2026) (noting a flat $5 transaction fee).

regime would burden consumers with misleading disclosures and indicate to them that the features they were intending to avoid would now be in play.

Conflating EWA services and loans would be inconsistent with consumer expectations. Consumers value EWA services, as reflected in the dearth of consumer complaints received by federal regulators.[20] In the wake of the pandemic—when costs for essential items skyrocketed and healthcare costs increased for many—consumers came to know and rely on the EWA industry, based on the premise that EWA services support liquidity without borrowing. For example, in a November 2023 research study on EWA users, the Financial Health Network found that "nearly all participants" saw EWA services as "fundamentally different from a loan."[21] Consumers agree that

---

[20] *See, e.g.*, Jim Hawkins, *Is it Credit?*, 67 Wm. & Mary L. Rev. 1409, 1461-62 (2026) ("At the start of 2025, the CFPB had published eighty-nine complaints about earned wage access. To put that in perspective, during that same period, the CFPB had received 7,361,299 total complaints, meaning complaints about earned wage access accounted for around 0.0012 percent of the complaints the CFPB received." (footnote omitted)).

[21] *See* Lisa Berdie & Riya Patil, *Exploring Earned Wage Access as a Liquidity Solution*, Financial Health Network 14 (2023), https://finhealthnetwork.org/wp-content/uploads/2023/12/EWA-Users-Report-2023.pdf.

EWA services are "payment for work already performed" and "money already earned."[22]

Use of EWA services has grown significantly as consumers seek liquidity without incurring debt. According to the CFPB's Data Spotlight, in 2022, approximately 10 million users accessed EWA services for a total of $31.9 billion.[23] This represents 7.2 million employees who used employer-partnered EWA services to access $22.8 billion and approximately three million consumers using direct-to-consumer EWA services to access $9.1 billion.[24] This builds on the pre-pandemic growth of the EWA market, which, according to one study, tripled from $3.2 billion in 2018 to $9.5 billion in 2020.[25] About 80% of employers with 1,000 or more employees now offer

---

[22] *Id.*

[23] CFPB, *Data Spotlight: Developments in the Paycheck Advance Market* (July 18, 2024), https://www.consumerfinance.gov/data-research/research-reports/data-spotlight-developments-in-the-paycheck-advance-market/.

[24] *Id.*

[25] *See* Terri Bradford, *As Earned Wage Access Grows, Oversight Tries to Catch Up*, Federal Reserve Bank of Kansas City 3 (May 15, 2024), https://www.kansascityfed.org/Payments%20Systems%20-Research%20Briefings/documents/10170/PaymentsSystemResearchBriefing24Bradford0515.pdf.

EWA as an optional employee benefit.[26] Use of EWA services has further accelerated during the recent periods of high inflation, where it is harder for workers to pay bills and make ends meet between pay periods.

Affirming the district court's misclassification of EWA as credit will harm the growing market of EWA consumers. Consumers view and use EWA services as an alternative to payday loans, credit card debt, and other forms of lending. Classifying EWA services as loans will cause customer confusion about whether EWA services continue to not obligate repayment and remain non-recourse, or are subject to additional requirements associated with lending, including credit risk underwriting, or being subject to debt collection. If affirmed, the district court's holding would needlessly reduce consumer choice, create consumer confusion, and likely harm the most financially vulnerable consumers.[27]

## II.  An Employer-Partnered EWA Model Is Not Before the Court.

However the Court ultimately disposes of this case, it should not extend its holding to the employer-partnered EWA model. The district court

---

[26] ADP, *Earned Wage Access: Tapping Into the Potential of Flexible Pay for Today's World of Work* 6 (2022).

[27] Upholding the underlying opinion would also disrupt ongoing state- and federal-level policymaking on this issue.

distinguished employer-partnered EWA models from the model in this case.[28] This Court too should clarify that the employer-partnered EWA model is not before the Court.

### A. The Trial Court's Holding Rests on Structural Features Absent from *Amici*'s Services.

The district court's determination that Brigit's EWA offering constitutes "credit" centered on aspects of direct-to-consumer models that are absent from employer-partnered EWA services. In particular, the district court noted "consumers expressly agree that Brigit may debit their bank accounts at a later date for repayment" of Brigit's EWA service.[29] The district court held that this feature, among others, created an "obligation to pay or repay someone or something in return for something received."[30] In rejecting Brigit's arguments to the contrary, the district court relied on cases and regulatory guidance discussing vehicle title loans, "pawn" transactions, "payday loans," and "deferred presentment" transactions.[31]

---

[28] SPA31.
[29] SPA15.
[30] SPA15 (quotation marks omitted).
[31] SPA17-19.

To start, treating a revocable debit authorization as an obligation to pay has no support. Cases concerning debt secured by a vehicle or "physical chattel" or those concerning "deferred presentment" transactions cannot be extended to provide support for treating EWA as credit. That is especially true since all EWA transactions lack an irrevocable payment obligation.

Regardless, the debiting feature being reviewed by the Court *is absent* from employer-partnered EWA services. For the services provided by *amici*, the employee receives the EWA transfer before the regular pay date by disbursement to an account of the employee's choice in a manner functionally similar to an employer's direct deposit of pay. At the end of a pay cycle, *amici* do not debit funds from an employee's bank account; instead, they receive money directly from the employer.

Because of those features, the district court's reasoning is irrelevant to employer-partnered EWA service models. By way of illustration, if an employer voluntarily paid an employee twice—once *during* a pay cycle and once at the *end* of the pay cycle—no one would call the first payment a loan. From the employee's perspective, that is what happens when using an employer-partnered EWA service: the employee gets paid once during the pay cycle (with the EWA provider providing the funds), and once at the end

of the pay cycle. When the employer repays the EWA provider at the end of the pay cycle, it does so without debiting the employee's account. The main feature that led the district court to (incorrectly) classify the underlying EWA service as credit—the fact that money is debited from *consumers'* accounts at the end of the pay cycle—is absent from employer-partnered EWA services.

For similar reasons, the case law relied on by the district court is also irrelevant to employer-partnered EWA services. Each of the reported decisions[32] has dealt with fact patterns that do *not* involve employer-partnered EWA services. This Court should not shoehorn the employer-partnered EWA services offered by *amici* into the reasoning of those cases when none of them involved the distinguishing features of *amici*'s services.

---

[32] *See* SPA11(citing *Orubo v. Activehours, Inc.*, 780 F. Supp. 3d 927 (N.D. Cal. 2025); *Revell v. Grant Money, LLC*, 808 F. Supp. 3d 1036 (N.D. Cal. 2025); *Johnson v. Activehours, Inc.*, No. 1:24-CV-02283, 2025 WL 2299425 (D. Md. Aug. 8, 2025); *Vickery*, 2025 WL 2841686, at *1; *Russell v. Dave Inc.*, 812 F. Supp. 3d 998 (C.D. Cal. 2025); *Burrison v. Floatme, Corp.*, No. 25-CV-10885, 2026 WL 444638 (D. Mass. Feb. 17, 2026), *appeal docketed*, No. 26-1256 (1st Cir. Mar. 17, 2026); *Moss v. Klover Holdings, Inc.*, No. 25-CV-5758, 2026 WL 622653 (N.D. Ill. Mar. 5, 2026); *Lowe v. MoneyLion Techs. Inc.*, No. 25 CIV. 4098, 2026 WL 654719 (S.D.N.Y. Mar. 9, 2026), *appeal docketed*, No. 26-655 (2d Cir. Mar. 18, 2026)).

There are other relevant features of employer-partnered EWA services that are distinct from the services before the district court. Although all EWA service providers receive data about employee earnings, because, as noted above, an employer-partnered EWA service is integrated with the employer's or payroll processor's systems, such services obtain directly from the employer information on wages, hours worked, attendance, and other data necessary to provide accurate calculations of earned wages. This helps ensure the employer-partnered provider transfers only accrued but unpaid wages "determined from employer-provided payroll data" to an employee, and not more.[33] The district court took note of these factual distinctions, agreeing with CFPB guidance that an EWA "provider is not extending credit by lending money to the consumer" "when it functions as an adjunct to the payroll system—advancing no more than accrued wages collected through payroll deductions that intercept funds before they reach the consumer's bank account, and performing no independent assessment of the consumer's creditworthiness."[34] These distinguishing features are fundamental to the employer-partnered EWA service model.

---

[33] SPA32.

[34] SPA31.

24

### B. Employer-Partnered EWA Services Are Recognized by Regulators as Employing Features That Distinguish Them from Credit.

As the district court recognized below, federal regulators have consistently recognized features of employer-partnered EWA services that distinguish these services from concepts of credit and lending.

For example, in its 2017 Payday Lending Rule, the CFPB excluded "programs that provide innovative access to consumers' wages," such as "when an employer allows an employee to draw accrued wages ahead of a scheduled payday and then later reduces the employee's paycheck by the amount drawn."[35] The CFPB found that "the employee may not be incurring a debt at all," and that programs that provide consumers access to their earned wages "do not seem to pose the kinds of risks and harms presented by covered loans."[36] Further, the CFPB explained that such offerings were

---

[35] *See* Payday, Vehicle Title, and Certain High-Cost Installment Loans, 82 Fed. Reg. 54472, 54547 (Nov. 17, 2017) (codified at 12 C.F.R. pt. 1041).

[36] *Id.* The Treasury Department has echoed this approach in considering the application of tax regulations, proposing in 2022, 2023, and 2024 to amend the Internal Revenue Code to clarify that EWA services are not loans and to define them as "an arrangement that allows employees to withdraw earned wages before their regularly scheduled pay dates." Dep't of Treasury, *General Explanations of the Administration's Fiscal Year 2023 Revenue Proposals* 107 (2022); Dep't of Treasury, *General Explanations of the Administration's Fiscal Year 2024 Revenue Proposals* 208 (2023); Dep't of

25

unlikely to be considered credit or debt, "especially . . . where the employer does not reserve any recourse upon the payment made to the employee other than the corresponding reduction in the employee's paycheck."[37]

Approximately three years later, the CFPB reiterated and expanded upon this view in a 2020 Advisory Opinion on EWA services. In concluding that employer-partnered EWA programs are not "credit," the CFPB stated that "debt" is a "liability on a claim," and "no such liability of the employee arises" in EWA transactions when the service provider recoups the EWA transfer directly from the employer "through an employer-facilitated payroll deduction."[38] The CFPB explicitly noted that the substance of such EWA transactions is more like an employer paying an employee early than a lender making a loan.[39]

---

Treasury, *General Explanations of the Administration's Fiscal Year 2025 Revenue Proposals* 233 (2024).

[37] 82 Fed. Reg. at 54,547 (codified at 12 C.F.R. pt. 1041).

[38] *See* Truth in Lending (Regulation Z); Earned Wage Access Programs, 85 Fed. Reg. 79404, 79406 (Dec. 10, 2020) (internal quotation marks omitted) (to be codified at 12 C.F.R. pt. 1026) (hereinafter the "2020 Advisory Opinion").

[39] *See id.* ("[T]he Bureau believes that a Covered EWA Program facilitates employees' access to wages they have already earned, and to which they are already entitled, and thus functionally operates like an employer that pays its employees earlier than the scheduled payday.").

In 2025, the CFPB rescinded its 2020 Advisory Opinion[40] and subsequently issued a new opinion identifying features that place an EWA service outside of the definition of credit—features fundamental to employer-partnered EWA services.[41] Those features include: (1) the transaction does not exceed the employee's accrued cash wages; (2) repayment occurs through a payroll process deduction at the employee's next payroll event; (3) the EWA provider "clearly and conspicuously" warrants to the employee that the provider has no legal claim or remedy if "the payroll process deduction is insufficient" and that the provider will not engage in debt collection activities; and (4) the EWA provider does not assess the credit risk of individual employees.[42] Because TILA defines credit as "the right to defer payment of debt or to incur debt and defer its

---

[40] Truth in Lending (Regulation Z); Consumer Credit Offered to Borrowers in Advance of Expected Receipt of Compensation for Work, 90 Fed. Reg. 3622 (Jan. 15, 2025).

[41] 90 Fed. Reg. 60069. The advisory opinion expressly states that it should not be understood to provide that EWA products outside its coverage are credit under Regulation Z, and the text of the opinion supports reversal of the underlying decision. *See id.* at 60071. For the reasons explained above, EWA services in general, including direct-to-consumer services, fall outside accepted definitions of credit and lending.

[42] *Id.*

27

payment," the CFPB looked to the "common meaning of debt"—*i.e.*, "a sum of money due by certain and express agreement" or "a financial liability or obligation owed by one person, the debtor, to another, the creditor"[43]—and concluded that EWA with the aforementioned features "resembles early wage payment and does not resemble an extension of credit."[44]

Although *amici* respectfully disagree with the trial court's opinion about Brigit's EWA services, the trial court did correctly acknowledge the distinction between EWA models that "operate in conjunction with the consumer's employer or through a payroll processor"[45] and models which lack this feature. As stated below, when an EWA provider "functions as an adjunct to the payroll system" it is "not lending money but solving a logistical challenge for employers who otherwise would be bound to the bi-weekly pay cycle."[46] This feature and other features of employer-partnered EWA services discussed in this brief were not present in the underlying case

---

[43] *Id.* (internal quotation marks omitted).

[44] *Id.* at 60072.

[45] SPA32 (citing 90 Fed. Reg. 60069); *see also Burrison*, 2026 WL 444638, at *6 n.5 (noting an EWA service would not constitute credit under the CFPB's 2025 advisory opinion where it "use[d] payroll data to determine accrued wages").

[46] SPA31.

and therefore, the Court's ruling should not extend to employer-partnered EWA services.

## CONCLUSION

*Amici* agree with Brigit that the district court erred and that this Court should reverse the decision below. But, however this appeal is resolved, employer-partnered EWA services fall outside the scope of the case.

29

Respectfully submitted,

JENNER & BLOCK LLP

Dated: June 22, 2026                          By: */s/ Adam G. Unikowsky*

JEREMY M. CREELAN                      ADAM G. UNIKOWSKY
MICHAEL W. ROSS                          *Counsel of Record*
JENNER & BLOCK LLP                      EMANUEL POWELL III*
1155 Avenue of the Americas             *Application pending*
New York, New York 10036             JENNER & BLOCK LLP
(212) 891-1600                               1099 New York Ave., NW
JCreelan@jenner.com                      Suite 900
MRoss@jenner.com                         Washington, DC 20001
                                                      (202) 639-6000
                                                      AUnikowsky@jenner.com
                                                      EPowell@jenner.com

*Counsel for Amici DailyPay, LLC, Stream Platforms, Inc., & ZayZoon US Inc.*

30

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that:

1.      This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i) and Second Cir. R. 29.1(c) because this brief contains 5,834 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief was prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Expanded LT Standard font.

<u>*/s/ Adam G. Unikowsky*</u>

## CERTIFICATE OF SERVICE

I hereby certify that on June 22, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

<u>/s/ Adam G. Unikowsky</u>

32