# 26-959

# United States Court of Appeals

*for the*

# Second Circuit

ROBERT FEEMAN, Individually and on behalf of all other similarly situated, GUSTAVO GILLY, Individually and on behalf of all other similarly situated, MICHAEL COLLINS, Individually and on behalf of all other similarly situated,

*Plaintiffs-Appellees,*

– v. –

BRIDGE IT, INC., DBA Brigit,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF OF ACTIVEHOURS, INC. D/B/A EARNIN AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANT-APPELLANT AND REVERSAL**

ANDREW W. LESTER
SPENCER FANE LLP
9400 North Broadway Extension, Suite 600
Oklahoma City, Oklahoma 73114
(405) 844-9900

MARK E. ROONEY
MICHAEL G. SILVER
JONATHAN E. CORNFIELD
SPENCER FANE LLP
1233 20th Street NW, Suite 600
Washington, DC 20036
(202) 293-0444

*Attorneys for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amicus curiae* Activehours, Inc. d/b/a EarnIn states that it does not have a parent corporation and that no publicly held corporation owns 10% or more of its stock.

Dated:    June 22, 2026               /s/ *Mark E. Rooney*

Attorney for EarnIn

i

## TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ............................................. i

TABLE OF AUTHORITIES ..................................................................iii

STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY ........... 1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................... 3

   I.   EWA is Not Credit.........................................................................8

      a.   EWA Does Not Involve Debt....................................................10

      b.   The Lower Court Erred in Concluding that Recourse is Not an Essential Feature of Debt ..........................................................12

      c.   EWA Products are not Payday Loans........................................16

      d.   Regardless of Delivery Channel, EWA is Not Credit.................21

   II.   Access to EWA Products Benefits Consumers, as Policymakers Have Recognized .....................................................................27

      a.   EWA is an Innovative Product Benefiting Millions of Consumers ......................................................................................28

      b.   The Status of EWA Products is Better Left to Ongoing Legislative Development...........................................................34

CONCLUSION ...................................................................................36

CERTIFICATE OF COMPLIANCE.....................................................38

CERTIFICATE OF SERVICE..............................................................39

CERTIFICATE OF SERVICE FOR PAPER BRIEFS...........................40

# TABLE OF AUTHORITIES

## Cases

*Comm. Fin. Serv. Ass'n of America, Ltd. v. Consumer Fin. Protection Bureau*, 51 F.4th 616 (5th Cir. 2022), *aff'd* 601 U.S. 416 (2024).........22

*Feeman v. Brigit*, 2026 WL 880508 (S.D.N.Y. Mar. 31, 2026) ...................
.................................................................................. 11, 12, 16, 18, 25

*Harmon v. Fifth Third Bancorp.*, No. 18-cv-00402, 2020 WL 2512820 (S.D. Ohio May 15, 2020), *aff'd*, 858 F. App'x 842 (6th Cir. 2021)......10

*Odier v. Hoffman Sch. of Martial Arts, Inc.*, 619 F. Supp. 2d 571 (N.D. Ind. 2008)................................................................................ 10, 11, 12

*Reed v. Val-Chris Invs., Inc.*, No. 11-cv-371 BEN (WMC), 2011 WL 6028001 (S.D. Cal. Dec. 5, 2011).......................................................11

*Vickory v. Empower Finance, Inc.*, Case No. 25-6377 ............................36

## Statutes

15 U.S.C. § 1602(f)..........................................................................10

C.G.S. § 36a-785(f-g)........................................................................14

N.Y. Pers. Prop. L. § 315...................................................................14

## Rules and Regulations

12 C.F.R. § 1041.3(d)(7) and (8) ..........................................................20

12 C.F.R. pt. 1026, Supp. I., Para. 2(a)(14) Credit ¶ 2 .........................18

12 C.F.R. § 1026.17 ........................................................................19

12 C.F.R. § 1026.2(a)(14)............................................................. 11, 20

32 C.F.R. § 232.3(h) .................................................................9, 11

32 C.F.R. § 232.3(f)(1) ..................................................................27

64 Fed. Reg. 60368, 60368 (Nov. 5, 1999) ...................................19

65 Fed. Reg. 17129 (Mar. 31, 2000) ............................................18

82 Fed. Reg. 54,472 (Nov. 17, 2017) .......................... 5, 17, 19, 20, 32, 14

89 Fed. Reg. 61358, 61361 n.29 (Jul. 31, 2024) .........................22

90 Fed Reg. 60069, 60071-72 (Dec. 23, 2025) ....................... 10, 22-27, 31

FRAP 29(a)(4)(E) ...........................................................................2

FRAP 29(a)(2) ................................................................................2

## Other Authorities

Center for Responsible Lending, et al, Comment Letter on "Payday, Vehicle Title, and Certain High-Cost Installment Loans" Proposed Rule, submitted October 7, 2016, *available at*: https://www.regulations.gov/comment/CFPB-2016-0025-185182 .......21

CFPB, *Data Spotlight: Developments in the Paycheck Advance Market* (July 18, 2024), https://www.consumerfinance.gov/data-research/research-reports/data-spotlight-developments-in-the-paycheck-advance-market/#executive-summary ...............................29

CFPB, *What are the Costs and Fees for a Payday Loan?,* https://www.consumerfinance.gov/ask-cfpb/what-are-the-costs-and-fees-for-a-payday-loan-en-1589/ ........................................29

Congressional Research Service, Earned Wage Access Products (July 31, 2024), https://www.congress.gov/crs_external_products/IF/PDF/IF12727/IF12727.1.pdf (last accessed June 15, 2026) ...........................................35

iv

Consumer Financial Protection Bureau Fact Sheet, "CFPB finalizes rule to stop payday debt traps" (October 5, 2017), available at https://files.consumerfinance.gov/f/documents/201710_cfpb_fact-sheet_payday-loans.pdf ...................................................................6

Consumer Financial Protection Bureau, Consumer Response Annual Report, March 2026 (the "2025 CFPB Complaint Report"), https://files.consumerfinance.gov/f/documents/cfpb_2025-cr-annual-report_2026-03.pdf ...................................................................30

Earned Wage Access Consumer Protection Act, H.R. 9330, 119th Cong. (2026), https://www.congress.gov/119/bills/hr9330/BILLS-119hr9330ih.pdf .....35

EarnIn Terms of Service, https://www.earnin.com/privacyandterms/cash-out/terms-of-service (last accessed June 16, 2026) ...........................................................26

Jeff Weninger, Ariz. Op. Atty. Gen. No. I22-005 (Ariz.A.G., 2022)........36

Jim Hawkins, *Is it Credit?*, 67 Wm. & Mary L. Rev. 1409 (2026)............8

Marshall Lux & Cherie Chung, Earned Wage Access: An Innovation in Financial Inclusion? (Harv. Kennedy Sch. June 2023), https://www.hks.harvard.edu/sites/default/files/centers/mrcbg/214_A WP_final_2.pdf .................................................................32

Pew Charitable Trusts, Payday Loan Facts and the CFPB's Impact, 1 (May 2016), https://www.pew.org/en/research-and-analysis/fact-sheets/2016/01/payday-loan-facts-and-the-cfpbs-impact.......................6

Rob Levy & Joshua Sledge, "A Complex Portrait: An Examination of Small-Dollar Credit Consumers" (Ctr. for Fin. Servs. Innovation, 2012), *available at*: https://downloads.regulations.gov/CFPB-2016-0025-143313/attachment_9.pdf.................................................................31

Terri Bradford, KCFed Payment System Research Briefing, "As Earned Wage Access Grows, Oversight Tries to Catch Up" ("KC Fed Research Briefing) (May 15, 2024), available at: https://www.kansascityfed.org/documents/10170/PaymentsSystemResearchBriefing24Bradford0515.pdf ....................................................... 33

U.C.C. § 9-608 ................................................................................. 14

## STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY

EarnIn is a financial technology company based in Mountain View, California, founded in 2013 with the goal of empowering consumers and addressing inequality in the financial system. EarnIn's mission is to create products and solutions that meet the needs of American consumers today.

EarnIn addresses the economic rollercoaster working-class Americans experience by giving consumers a choice of how and when to receive their earned but unpaid income. Most Americans live paycheck to paycheck, unable to pay for goods and services when they need them while waiting for pay that is tied up in the payroll system. The two- and four-week pay cycle is a 150-year-old relic that leaves tens of millions of Americans constantly a step behind on everyday expenses. Yet there is no reason to delay wage payment in an era of on-demand technology.

Instead of a system that serves the interests of employers, EarnIn flips the traditional paradigm of who controls when people can access their wages. EarnIn enables consumers to access the money they have earned when they need it, not limited to an arbitrary date only convenient to the employer. This helps consumers manage their budgets

and cash flow, relieves financial stress, and allows them quick access to their earned wages to pay bills, cover essentials, and handle unexpected expenses without late fees or penalties. EarnIn achieves this by giving consumers access to a portion of their earned wages without charging mandatory fees and without exposing them to the risk of falling into a debt trap if they cannot repay the EWA transactions. EarnIn's earned wage access product is similar to appellant Brigit's in that it uses a direct-to-consumer model, meaning the worker and EWA company enter into an agreement with each other. Other EWA providers involve partnerships with employers, known as the employer-based model.

All parties have consented to EarnIn filing this brief. Accordingly, EarnIn is authorized to file this brief under Rule 29(a)(2) of the Federal Rules of Appellate Procedure ("FRAP"). In compliance with FRAP 29(a)(4)(E), EarnIn states that no party's counsel authored any part of this brief, and no party or its counsel contributed any money that was intended to fund preparing or submitting it.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Courts increasingly face the challenge of applying outdated consumer credit laws and regulations to innovative financial products and services that fall outside of settled statutory and regulatory parameters. This case involves a particularly stark example.

Earned wage access, or EWA, products arose in the 2010s as an alternative to the traditional payroll system, enabling consumers to access earned wages more flexibly and reducing reliance on other short-term financial options such as overdraft fees, high interest credit cards, and payday loans. EWA products are objectively safer and cheaper than these alternatives. Millions of consumers embrace them annually, with demand continuing to grow through the present inflationary environment.

The plaintiffs in this case and other similar cases—and the advocacy organizations supporting them—assert that EWA transactions are payday loans masquerading as a different product. But merely saying a product is a payday loan does not make it so. The comparison

is facile, and the definition of credit under applicable law in fact dictates the opposite.

For three reasons, EWA is fundamentally distinct from credit by history, design, and function. First, consumers can only access wages *to which they are already entitled*, rather than funds in anticipation of *future earnings* from *unperformed* work. Second, EWA providers do not impose interest or mandatory fees, and there is no underwriting. Third, and most significantly, an EWA transaction is *non-recourse* against both the consumer personally and against her property. No enforceable legal obligation to repay the EWA transaction exists—ever. Collectively, these three structural features place EWA transactions categorically outside any established legal definition of credit.

Like Brigit, EarnIn obtains a consumer's authorization to debit their bank account to recoup the EWA transaction on the consumer's next payday. The court below concluded that use of this payment mechanism helps create "debt." It does not. The court overlooked the critical point that the consumer can revoke that authorization at any time (subject to banking system time constraints) and face no obligation to repay. As a result, a consumer may retain the funds without legal consequence even

4

if authorization is revoked and EarnIn is unable to recover any amount. In that event, EarnIn does not engage in debt collection activities or report the unpaid amount to consumer reporting agencies. The only practical impact is that the consumer may not be eligible for future EWA transactions with EarnIn.

In 2017, when the Consumer Financial Protection Bureau ("CFPB") finalized the first ever federal rule regulating payday loans, the agency purposefully chose—after a five-year rulemaking process generating nearly 1.5 million public comments—to *expressly exclude* EWA products from coverage precisely *because* of the products' critical differences. CFPB, "Payday, Vehicle Title, and Certain High-Cost Installment Loans" Final Rule, 82 Fed. Reg. 54,472 (Nov. 17, 2017) ("2017 Payday Rule").

EWA products differ from payday loans in other important ways. It is well-documented that many consumers cannot repay payday loans on time, resulting in lengthy sequences of consecutive loans before finally paying them off. This is the pernicious "debt trap" that underpinned the CFPB's 2017 Payday Rule.[1] With EWA, no debt trap exists because there

---

[1] *See, e.g.*, Consumer Financial Protection Bureau Fact Sheet, "CFPB finalizes rule to stop payday debt traps" (October 5, 2017), available at

are no opportunities to roll outstanding sums into new transactions, no extensions of repayment deadlines for additional charges, and no mandatory fees—and any voluntary fees are typically much lower than payday loan fees, which often exceed the principal amount borrowed.[2] And, with EWA, access is limited to already-accrued income.

EWA products, regardless of delivery channel, are not credit. They are not payday loans. Some district courts, however, have shoehorned EWA transactions into existing law by misconstruing EWA, ignoring key features that differentiate EWA from credit, and distorting existing statutory language in ways that would deprive workers of a tool that is demonstrably safer than other available alternatives. This type of

---

https://files.consumerfinance.gov/f/documents/201710_cfpb_fact-sheet_payday-loans.pdf (last accessed June 14, 2026).

[2] Pew Charitable Trusts, Payday Loan Facts and the CFPB's Impact, 1 (May 2016), https://www.pew.org/en/research-and-analysis/fact-sheets/2016/01/payday-loan-facts-and-the-cfpbs-impact (noting that to borrow $375.00, payday borrowers average $520.00 in additional fees) (last accessed June 14, 2026).

square-peg, round-hole approach exemplified by the opinion below will harm consumers.

Widespread availability of EWA promotes consumer choice and provides a variety of benefits. Recognizing this market innovation, policymakers in many states have crafted bespoke legislation to govern EWA. These new EWA laws provide a battery of licensing requirements and consumer protections tailored to EWA products and the market, instead of jamming them into ill-fitting and sclerotic statutory regimes or anachronistic regulatory definitions. Most of these states have drawn the same basic line: fully non-recourse EWA products are not credit.

The opinion below—which held at the motion to compel stage that an interest-free, non-recourse, EWA product is "credit" and therefore subject to the Military Lending Act's ("MLA") limits on arbitration—is incompatible with fundamental understandings of credit itself. State and federal regulators have consistently classified EWA products as non-credit precisely because of their critical differences. If upheld, the decision below would significantly curtail workers' access to their own

earned wages and lead to negative outcomes for millions of consumers. The Court should reverse the district court's decision.

## ARGUMENT

### I. EWA is Not Credit

Whether a consumer financial product constitutes "credit" has been the subject of debate since at least the early 1960s when Congress first considered early iterations of what eventually became the Truth in Lending Act ("TILA") in 1968. Over the ensuing 60 years, based on evolving consumer demands and American financial services innovations, new financial products regularly enter the marketplace which test the old definitions.[3]

This case is no exception. The Court is asked to analyze whether the MLA's definition of "credit" applies to the EWA product offered by Brigit. It does not. The definition of "credit" under MLA rulemaking has always required the existence of a "debt." 32 C.F.R. § 232.3(h) ("credit"

---

[3] Professor Jim Hawkins thoroughly examines the legal and historical underpinnings of what constitutes credit in a recent article, concluding that EWA, regardless of product type, is not credit because of its non-recourse nature and other factors. Jim Hawkins, *Is it Credit?*, 67 Wm. & Mary L. Rev. 1409, 1450-51 (2026).

is defined as "the right granted to a consumer by a creditor to defer payment of debt or to incur debt and defer its payment"). With EWA, including the "Instant Cash" product offered by appellant here and similar products offered by amicus, there is no enforceable obligation to repay and therefore no "debt." The court below also went astray by dismissing EWA products' non-recourse status as no different than pawn and vehicle title loans, which ignores that those loan, unlike EWA transactions, *do* involve an obligation to repay that is secured by collateral which is forfeited upon non-repayment.

The lower court further likened EWA products to payday loans. This reasoning is also wrong. It overlooks the many product features that differentiate EWA from payday loans and how the CFPB's regulatory treatment of payday loans has specifically excluded EWA. The court also highlighted legally irrelevant distinctions among different EWA product types in concluding that Brigit's product is credit. But EWA products are not credit regardless of their form, so long as the consumer has no obligation to repay and there is no recourse against the consumer.

9

### a. EWA Does Not Involve Debt

Under the MLA, "credit" is defined as "the right granted to a consumer by a creditor to defer payment of debt or to incur debt and defer its payment."[4]   32 C.F.R. § 232.3(h).   To constitute credit, then, a consumer must incur debt—but "debt" is not defined in the MLA or TILA. The most common and relevant definition involves an "obligation owed" by a consumer to a creditor.  *See, e.g.*, 90 Fed Reg. 60069, 60071-72 (Dec. 23, 2025) ("2025 Advisory Opinion").  As applied to EWA products, where workers access wages they *already earned*, and therefore workers are legally entitled to those wages, there is no debt.

Decades of case law examining consumer financial products support this conclusion.  *See, e.g.*, *Harmon v. Fifth Third Bancorp.*, No. 18-cv-00402, 2020 WL 2512820, at \*9 (S.D. Ohio May 15, 2020), *aff'd*, 858 F. App'x 842 (6th Cir. 2021) (where a consumer "has no liability . . . for losses associated with [an advance]," it does not constitute "credit" within the meaning of TILA); *Odier v. Hoffman Sch. of Martial Arts, Inc.*, 619 F. Supp. 2d 571, 576-77 (N.D. Ind. 2008) (interpreting Regulation Z to mean

---

[4] TILA and its implementing Regulation Z have a similar definition of "credit."  *See* 15 U.S.C. § 1602(f); 12 C.F.R. § 1026.2(a)(14).

that debt "refers to a legally enforceable obligation to pay money"); *Reed v. Val-Chris Invs., Inc.*, No. 11-cv-371 BEN (WMC), 2011 WL 6028001, at *2 (S.D. Cal. Dec. 5, 2011) (cash advance on the plaintiff's inheritance was not TILA "credit" because the plaintiff "incurred no debt" and the defendant had no recourse to recover it).

The court below incorrectly reasoned that Brigit's advances were credit in part because users must authorize automated debits from their linked external bank account on a "'due' date in the future." *Feeman v. Brigit*, 2026 WL 880508, at *9 (S.D.N.Y. Mar. 31, 2026). A revocable bank-debit authorization or a payroll-deduction mechanism is only a payment conduit. It is not a legally binding promise to repay or an enforceable legal obligation. A user can revoke the debit authorization at any time. *See Odier*, 619 F. Supp. 2d at 581 ("[I]t may be that the ability to cancel an agreement is what distinguishes between agreements that do extend credit and those that do not under [TILA]"). When one party can unilaterally cancel their repayment for any reason or no reason, without any recourse, no debt is created.

The lower court stated that a consumer's ability to rescind repayment authorization "does not defeat the debt that is created when

11

she seeks and receives an advance." *See Feeman*, 2026 WL 88050 at *8. Yet voluntary provision of debit authorization happens across the economy. This logic would mean that a consumer's gym membership, streaming service, or any other service where consumers provide an authorization for a recurring charge "in the future" creates a debt. These ubiquitous auto-pay arrangements are not "debt" under the MLA or TILA because the payment authorization is revocable. *See Odier*, 619 F. Supp. 2d at 581 ("[T]he ability to cancel an agreement plays an important (if not determinative) role in deciding whether or not an agreement to provide a service in exchange for an agreement to pay in installments constitutes an extension of credit.").

### b. The Lower Court Erred in Concluding that Recourse is Not an Essential Feature of Debt

The district court's analysis of EWA's non-recourse status and its relevance to the "credit" question is misplaced. The court stated that "[r]ecourse against the individual is not an essential feature of debt" and that disclaiming legal and contractual obligations against a borrower who fails to repay "does not mean that the borrower has no obligation to repay." *Feeman*, 2026 WL 880508 at *8. The court casts this as a "simple but important point," *id.* It is not. The court's premise is incorrect,

12

however, and the ensuing discussion and reasoning illustrates the court's error.

Importantly, the court's analysis misses the mark because it wrongly analogizes EWA to credit products that are partially non-recourse—that is, non-recourse only for the consumer *personally* even though those products involve recourse against the consumer's *property*. The court writes that, "[m]any of the most common extensions of credit involve debts secured by property rather than by recourse against the individual personally," citing reverse mortgages, vehicle title loans, and pawn loans as examples of these other products that are non-recourse against the consumer personally. *See id.* The court elaborates that, "If the borrower fails to repay, the pawnbroker's sole remedy is to retain and sell the pledged item (*be in a car, watch, guitar, ring, etc.*)" and "there is no claim against the borrower personally" (emphasis added). *See id.* at *9.

At a threshold level, it is worth noting that with vehicle title loans—which are among the high-cost, short-term credit products covered by the CFPB's 2017 Payday Rule—the lenders do not have recourse only against the borrower's property, i.e., the vehicle. In many states, including all

13

three in this Circuit, the lender can both repossess the vehicle and *hold the consumer personally liable* for any deficiency balance after the sale.[5]

More fundamentally, these credit products share a common feature with each other that they *do not* share with EWA: they take a security interest in the consumer's real or personal *property*. Indeed, as the court itself noted, taking a security interest in or retaining property to ensure repayment of a debt is a common form of recourse. *See id.* at *8. An EWA provider, however, takes *neither* a security interest *nor* a right to possession of any property. Rather, there is no recourse at all with an

---

[5] N.Y. Pers. Prop. L. § 315 ("the buyer shall be liable to the holder for any deficiency [after default and sale]"); C.G.S. § 36a-785(f-g) (buyer is liable for any deficiency based on the fair market value of goods); U.C.C. § 9-608 (in Vermont, providing for procedure for collecting deficiency after sale and/or disposition of collateral). There are also different practical consequences between failing to repay a vehicle title loan and an EWA transaction. In the 2017 Payday Rule, the CFPB noted survey evidence showing that 15 percent of vehicle title loan borrowers would have no way to get to work or school if they lost their vehicle. *See* 82 Fed. Reg. at 54839. With EWA, because there is no possible loss of either money or property, there also are no knock-on effects from non-payment, such as losing transportation to work.

14

EWA transaction. The court acknowledges the distinction but apparently gives it no weight.

The comparison between EWA and pawn loans further illustrates the issue with the court's reasoning. With pawn loans, the consumer must repay by contract. If the consumer does not repay by the contracted due date, the pawnbroker can keep possession of the pledged item to enforce the *binding legal obligation* to repay. Unlike EWA, the consumer cannot walk away from a pawn loan transaction scot-free. Under no circumstance could a consumer pledge a ring and receive funds, but then return to the store a day later and demand the return of the ring—while *keeping* the cash.

The lower court ultimately did not give appropriate weight to the fact that the lenders in these analogous circumstances have some recourse—recourse against a borrower's property. By contrast, EWA is fully non-recourse—the EWA provider does not have recourse against either the consumer personally or against her property.

EWA products are fundamentally different from these other products in that respect, making the analogies inapplicable. Therefore, in contrast to the lower court's reasoning, EWA's *truly* full non-recourse

15

status is an "essential feature" of why the product is not credit. *Feeman,* 2026 WL 880508 at *8.

### c. EWA Products are not Payday Loans

EWA transactions and payday loans have superficial similarities because they are financial products addressing liquidity gaps between paydays. The lower court echoed this comparison, calling EWA "substantially similar" to a payday loan because both models "give the creditor a mechanism to collect repayment directly from the borrower's account on a future date" rather than going through the "burdensome process" of suing the borrower personally and obtaining a judgment. *Feeman,* 2026 WL 880508, at *9. In reality, the products are fundamentally different, for four key reasons.

First, the legal and structural aspects of EWA and payday loans diverge substantially. EWA transactions give access to wages *already accrued*, while payday loans are made in anticipation of future earnings from *unperformed work*. Unlike payday loans, EWA providers do not charge interest, and any fees paid to the EWA provider (e.g., expedited transfer fees) are entirely voluntary. And unlike EWA, payday loans

16

create enforceable legal obligations with recourse, debt collection, and negative credit reporting.

Second, EWA transactions do not—indeed, they *cannot*—cause a "debt trap" because no rollovers occur with EWA transactions. As the CFPB explained in the 2017 Payday Rule, many states' authorizing laws for payday lending permit the borrower to pay a fee to extend the due date of, or "roll over," the loan. 82 Fed. Reg. at 54478. The CFPB found that because the loans were unaffordable from the start, many consumers encountered difficulty repaying the principal by the due date, leading to high numbers of rollovers. *Id.* at 54508 (describing data that half of all payday loans were made as part of loan sequences comprising ten or more consecutive loans). With EWA, however, the consumer will *never* pay a fee to defer repayment. Any fee is voluntary and associated with a new transaction. Conceptually, moreover, rollovers do not translate to the EWA product structure. EWA transactions have no legally enforceable obligation to repay by a fixed maturity date that could be extended in the first place.

Third, contrary to the lower court's assertion, *see Feeman*, 2026 WL 880508, at *10, EWA transactions are *not* "deferred presentment

17

transactions" as described in Regulation Z's Official Interpretations, or "Commentary," which clarify the Regulation Z definition of "credit." *See* 12 C.F.R. pt. 1026, Supp. I., Para. 2(a)(14) Credit ¶ 2 ("Comment 2(a)(14)-2" or "Comment"). The court cited Comment 2(a)(14)-2 as a guidepost for analyzing the "credit" question. *Feeman*, 2026 WL 880508, at \*10. But this reliance is incorrect.

The Comment's regulatory history and text, as well as the context in which the Comment was added to Regulation Z, elucidate that the Federal Reserve Board[6] (the "Board") was merely clarifying that *then-emergent* payday loan products were TILA credit. The Board added the Comment to Regulation Z in a rulemaking finalized in 2000. *See* 65 Fed. Reg. 17129 (Mar. 31, 2000). In the proposal, the Board indicated that it "ha[d] been asked to clarify whether 'payday loans'—also known as 'cash advance loans,' 'check advance loans,' and 'post-dated check loans'—constitute credit for purposes of TILA." 64 Fed. Reg. 60368, 60368 (Nov. 5, 1999). It makes perfect sense that payday loans were top of mind for the Board in 1999 and 2000 given the history of the small-dollar lending

---

[6] Prior to the Dodd-Frank Act, the Federal Reserve Board possessed rulemaking authority over TILA and Regulation Z.

18

market. As the CFPB described in the 2017 Payday Rule, "new forms of short-term small-dollar lending appeared in several States in the 1990s." 82 Fed. Reg. at 54476. In the proposal, the Board also alluded to payday lenders often permitting rollovers for a fee. 64 Fed. Reg. at 60369. But, as noted above, rollovers cannot occur with EWA transactions.

The Comment's text reinforces the regulatory history and context. The second sentence reads "[t]his type of transaction is often referred to as a 'payday loan' or 'payday advance' or 'deferred-presentment loan.'" Furthermore, the last sentence cross-references the disclosure requirements in 12 C.F.R. § 1026.17. As discussed above, 12 C.F.R. § 1026.17(c) is tied to *enforceable* contract terms. If the contract does not give the EWA provider an enforceable right to repayment, there is no legal obligation for repayment and thus nothing to disclose as "credit."

It was therefore plainly erroneous for the court below to interpret Comment 2(a)(14)-2 in isolation from its regulatory context to address the credit status of a financial product emerging in the market *decades after* the Board revised the Commentary to address payday loans as the Board understood that product *at the time.* To the extent *any* Commentary passages on the "credit" definition in 12 C.F.R.

19

§ 1026.2(a)(14) are germane to this case, other subsections are far more applicable. For example, the CFPB's 2025 Advisory Opinion favorably cited Comment 2(a)(14)-1.v, which clarifies that "'borrowing against the accrued cash value of an insurance policy or a pension account if there is no independent obligation to repay' is 'not considered credit.'" 90 Fed. Reg. at 60072.

Fourth, in the 2017 Payday Rule, the CFPB made a considered choice to *expressly exclude* EWA transactions from the final rule. *See* 12 C.F.R. § 1041.3(d)(7) and (8). The CFPB explained that "based on its experience with the marketplace for different types of small-dollar loans," EWA transactions "are likely to benefit consumers and unlikely to lead to the risks and harms described" with payday loans and other covered products. 82 Fed. Reg. at 54548. The EWA exclusions reflected a larger policy goal of the 2017 Payday Rule, which was to encourage alternative product development and market innovations that would lead to cheaper and safer short-term liquidity options for consumers.

The 2017 Payday Rule involved a five-year rulemaking process, and the agency received nearly 1.5 million public comments. Notably, the CFPB finalized the EWA exclusion over the objections of stakeholders

20

that were and remain persistent policy critics of the EWA industry.[7] Although the CFPB subsequently revoked part of the 2017 Payday Rule in 2020, the remaining provisions—concerning a cap on payday lenders' payment collection attempts—withstood a legal challenge by industry trade groups in the Fifth Circuit and the Supreme Court, and the Rule took effect last year. *Comm. Fin. Serv. Ass'n of America, Ltd. v. Consumer Fin. Protection Bureau*, 51 F.4th 616 (5th Cir. 2022), *aff'd* 601 U.S. 416 (2024). The CFPB has not, to date, revisited the EWA exclusion.

If EWA transactions were truly payday loans, the agency that wrote the first ever federal rule to regulate payday loans surely would have included them in the rule scope. The CFPB chose not to.[8]

### d. Regardless of Delivery Channel, EWA is Not Credit

Both the Brigit product in this case and EarnIn's own EWA product are direct-to-consumer products, meaning the worker and EWA company

---

[7] *See* Center for Responsible Lending, et al, Comment Letter on "Payday, Vehicle Title, and Certain High-Cost Installment Loans" Proposed Rule, submitted October 7, 2016, at 44-51, *available at*: https://www.regulations.gov/comment/CFPB-2016-0025-185182 (last accessed June 14, 2026).

[8] The CFPB, in an unfinalized and later discredited interpretive rule in 2024, argued that because the 2017 Payday Rule's EWA exclusions only operated to the extent such products are TILA credit, the decision to

enter into an agreement with each other. Funds are made available by the EWA provider based on the worker's earned but unpaid income, and the worker authorizes the provider to initiate a debit from the worker's linked bank account on the anticipated payday to recover the EWA transaction amount, unless the worker subsequently withdraws the authorization. Automatic repayment occurs, if at all, after the worker's linked bank account is credited with proceeds from the worker's next regular paycheck.

A second type of EWA product involves a relationship between an EWA company, an employee, and an employer or payroll service company. In these employer-based EWA programs, the worker agrees to repay the EWA provider through the payroll process (e.g., through an employer routing the employee's full paycheck to the EWA provider,

exclude such products "has no impact on the credit status of [EWA products] under TILA." 89 Fed. Reg. 61358, 61361 n.29 (Jul. 31, 2024). This assertion is wrong and was later repudiated by the agency. As the CFPB's 2025 Advisory Opinion stated, the CFPB "was clear" in the 2017 Payday Rule "that it was providing these exclusions precisely because it recognized that such products might not be TILA credit" and that "[a]bsent a final determination of EWA's credit status, the CFPB needed to provide the exclusions to ensure that the Payday Rule would not apply to these products." 90 Fed. Reg. at 66074 n.54.

22

which deducts the advance previously provided before forwarding residual pay to the worker, or through a payroll deduction). *See generally* 90 Fed. Reg. at 60070.

While the two product types have meaningful operational and practical distinctions, a focus on these differences tends to obscure the products' fundamental similarities from a legal perspective. So long as the EWA transactions are made without recourse and the worker is not subject to a legally enforceable obligation to repay, EWA products are not credit—regardless of the mechanism of repayment or whether repayment occurs just before a worker's wages reach her bank account or just after.

The CFPB's treatment of EWA in recent years has unintentionally amplified focus on the EWA product distinctions. The 2025 Advisory Opinion applies only to "Covered EWA" which the CFPB defines as EWA products meeting four criteria: (1) the transaction does not exceed a worker's earned wages; (2) the EWA repayment occurs through a payroll deduction; (3) the provider clearly and conspicuously explains that the transaction is without recourse and that it will not engage in debt

23

collection activities; and (4) the EWA provider does not assess credit risk in connection with the transaction. *See id*. At 60071.

The 2025 Advisory Opinion ultimately concludes that certain employer-based EWA products are not credit and further recognizes that certain direct-to-consumer products likewise may fall outside the definition of credit where they satisfy the characteristics of "Covered EWA," including the use of what the CFPB called a "payroll process deduction." *See id*. at 60071 n.29. The CFPB also emphasized that the advisory opinion "does not state, and nothing in it should be understood to state, that EWA products that are *not* Covered EWA *are* credit under Regulation Z." *Id*. at 60071.[9] This clear declaration belies the lower court's conclusion that the CFPB views EWA as not credit "only when it

---

[9] The CFPB added that it "continues to seek stakeholder feedback and evaluate whether it should take further legal steps with respect to EWA products, including steps that might encompass Non-Covered EWA and/or other provisions of law besides Regulation Z." 90 Fed. Reg. at 60071.

functions as an adjunct to the payroll system." *Feeman*, 2026 WL 880508, at *14.

The CFPB's four-pronged list does not demarcate the outer bound of which EWA products are not credit. The second prong—that the transaction involves a payroll deduction—merely restates the 2025 Advisory Opinion's limited definitional scope. In contrast to the lower court's assertion, *see id.* at 15, under the three substantive prongs of the CFPB's analysis, each one logically extends to direct-to-consumer EWA products lacking the payroll process deduction feature.

First, direct-to-consumer EWA products typically require users to link their primary bank account to the service, allowing the EWA provider to see and analyze when a user gets paid and how much the user receives in wages. This is not an underwriting process or credit risk assessment in the traditional credit-underwriting sense. From this data and other information (e.g., geolocation data and uploaded timesheets), EWA providers reliably ensure that EWA transactions do not exceed wages earned. Second, direct-to-consumer EWA providers also clearly and conspicuously advise users of the non-recourse nature of the service. *See, e.g.*, JA070 (reflecting Brigit's terms of service: "Brigit warrants that

it has no legal or contractual claim against you based on a failure to repay an Advance.").[10]  Finally, direct-to-consumer EWA providers do not obtain credit reports as a prerequisite to an EWA transaction.

The 2025 Advisory Opinion attempts to find meaning in the fact that, through employer-based EWA, the worker's funds used to repay the EWA provider "never touch the consumer's regular transaction account, and accordingly the consumer makes no deferred payment." 90 Fed. Reg. at 60071.  Again, this merely restates the main factual difference between the two EWA types.  A worker who repays an EWA company through a payroll deduction would hardly believe that he made no "payment" just because his employer facilitated it.  In the case of direct-to-consumer EWA, a worker's pre-authorization to repay EWA transactions from a linked bank account can be canceled without

---

[10] EarnIn's own Terms of Service similarly make clear: "You do not have an obligation to repay any of the Cash Out Services, and EarnIn will have no legal or contractual claim or remedy against you based on your failure to repay any of the Cash Out Services." https://www.earnin.com/privacyandterms/cash-out/terms-of-service (last accessed June 16, 2026).

recourse, which is functionally no different than a worker cancelling repayment through a payroll process.

Direct-to-consumer EWA products do not create "debt," and therefore are not "credit," under the MLA, TILA, or any other legal authority, for all the same reasons that employer-based EWA products are not credit.[11]  Policymakers, recognizing EWA's consumer benefits regardless of channel, have not accorded special status to one type of EWA over another, as described in Section II below.

## II.     Access to EWA Products Benefits Consumers, as Policymakers Have Recognized

Courts addressing these important legal questions should endeavor to treat EWA products with a recognition of their many consumer benefits and the suboptimal outcomes that would result from straining

---

[11] The MLA ban on arbitration applies to "consumer credit" more broadly which requires the presence of "credit" that is "[s]ubject to a finance charge."  32 C.F.R. § 232.3(f)(1).  While not this brief's focus, the voluntary nature of fees associated with Brigit's EWA product (see Brigit Br. at 43) puts them outside the definition of a "finance charge," according to the CFPB.  *See* 90 Fed. Reg. at 60074-76.  The lack of a finance charge here is another independent reason for reversal.  While the lower court extensively discusses the Advisory Opinion's analysis of the "credit" issue, it does not mention—let alone give credit to—the CFPB's conclusion that these fees generally are *not* finance charges, which would support appellant's position.

27

to fit these novel products into circumscribed and aging bodies of laws and regulations. The points that follow reinforce why the opinion below, if affirmed, would harm the very consumers the MLA and TILA were designed to protect.

### a. EWA is an Innovative Product Benefiting Millions of Consumers

EWA products benefit consumers in a multitude of ways. Judicial interpretations that have the effect of reducing access to EWA products would hinder consumer choice, ignore consumer preferences, and diverge from broader innovation in financial services.

First, EWA products are objectively less costly than payday loans, as well as bank overdrafts, pawn loans, car title loans, and other small-dollar liquidity solutions. In its 2024 report, "Data Spotlight: Developments in the Paycheck Advance Market" ("CFPB 2024 Spotlight"), the CFPB found that (1) the average worker accessed $3,000 in EWA transaction funds per year, (2) workers paid an average of $68.88 per year in EWA transaction fees, with the average fee size being approximately $3.18, and (3) workers averaged 27 EWA transactions annually. CFPB, *Data Spotlight: Developments in the Paycheck Advance Market* (July 18, 2024), https://www.consumerfinance.gov/data-

28

research/research-reports/data-spotlight-developments-in-the-paycheck-advance-market/#executive-summary (last accessed June 17, 2026). Conversely, with payday loans, a common charge is $15.00 per $100.00 in principal. CFPB, *What are the Costs and Fees for a Payday Loan?,* https://www.consumerfinance.gov/ask-cfpb/what-are-the-costs-and-fees-for-a-payday-loan-en-1589/ (last visited June 16, 2026). Rollover fees only increase the borrowing costs, rendering a circumstance in which the consumer, for example, pays $90.00 in fees for a $300.00 payday loan that is rolled over just once. The data is crystal clear that the economics of EWA transactions are *orders of magnitude* more favorable to consumers.

Second, EWA products have an extremely low number of consumer complaints, both as raw numbers and relative to payday loans and other high-cost lending products. The CFPB's most recent annual report on consumer complaints vividly illustrates this point. *See* Consumer Financial Protection Bureau, Consumer Response Annual Report, March 2026 (the "2025 CFPB Complaint Report"), https://files.consumerfinance.gov/f/documents/cfpb_2025-cr-annual-report_2026-03.pdf (last accessed June 15, 2026). The CFPB received a total of 6,635,400 complaints in 2025, the vast majority relating to credit

29

reporting, and of these, 5,416,600 were closed with explanation or relief. *See id.* at 5. Payday loan complaints totaled approximately 3,500; approximately 2,100 were closed with explanation or relief. Vehicle title loan complaints totaled approximately 1,100; approximately 721 were closed with explanation or relief. *See id.* at 67-68, 70-71. In sharp contrast, only *100 complaints* closed with explanation or relief were designated as EWA complaints. *See id.* at 73. Therefore, as a percentage of total CFPB complaints closed with explanation or relief in 2025, EWA complaints were *infinitesimally low* (0.001507 percent). Moreover, the number of payday loan complaints closed was 21 times higher than EWA, and the number of auto title loan complaints closed was 7.2 times higher than EWA. Market size differences cannot possibly explain the variance, as the CFPB itself has characterized EWA as a $32 billion-and-growing industry. *See* 90 Fed. Reg. at 60070. Consumers not only demand EWA products, but they are overwhelmingly satisfied with them, evidencing a lack of consumer harm in connection with EWA.

Third, EWA alleviates timing mismatches between when bills come due and when income is paid. Nearly 15 years ago, the Financial Health Network ("FHN") (previously called the Center for Financial Services

30

Innovation) published a seminal report identifying the most common consumer use cases for small-dollar, high-cost loan products. *See* Rob Levy & Joshua Sledge, "A Complex Portrait: An Examination of Small-Dollar Credit Consumers" (Ctr. for Fin. Servs. Innovation, 2012), *available at*: https://downloads.regulations.gov/CFPB-2016-0025-143313/attachment_9.pdf (last accessed June 15, 2026). The report found that a sizable number of consumers surveyed had neither chronic income shortfalls, nor emergency expenses, nor excessive spending (three oft-cited use cases for those products). Instead, these consumers used these products to ameliorate a common and persistent need: misalignment between the timing of their paycheck and when their bills were due. In the survey, the most common reason given for very-short-term borrowing (approximately 37 percent of respondents) was "I had a bill or payment due before my paycheck arrived." *Id.* at 12. The CFPB's 2017 Payday Rule cited FHN's research multiple times. *See, e.g.*, 82 Fed. Reg. at 54558 n. 491. This timing mismatch remains the lodestar of EarnIn's and other EWA providers' use case for consumers. If access to EWA transactions

31

were curtailed, millions of consumers would have to revert to the high-cost products discussed in FHN's research for the same use case.

Fourth, the direct-to-consumer channel expands EWA access beyond W2 employees at larger corporations to gig economy workers, freelancers, part-time employees, and workers at small and medium-size businesses.[12] Not every employer is willing or able to offer an employer-based EWA program. Not every worker is a W2 employee. And the direct-to-consumer model provides workers with the flexibility to change jobs even if a new employer does not offer an EWA program. Favoring one model over another is arbitrary, reduces access, and harms consumers.

Fifth, younger workers are especially driving the demand for early access to wages. According to the Kansas City Federal Reserve Bank, surveys demonstrate that an overwhelming majority of Millennial (82 percent) and Generation Z (91 percent) workers felt it was important to have EWA access, in contrast to Generation X and Baby Boomer workers

---

[12] *See* Marshall Lux & Cherie Chung, Earned Wage Access: An Innovation in Financial Inclusion?, at 11 (Harv. Kennedy Sch. June 2023), https://www.hks.harvard.edu/sites/default/files/centers/mrcbg/214_AWP _final_2.pdf (last accessed June 15, 2026).

(57 percent).[13] Restricting access to EWA products will only marginalize and frustrate the workers who will catalyze U.S. economic growth in the coming decades. These workers are not resigned to the rigidity of the current payroll systems and will continue to demand EWA products.

Sixth, expanding the scope of what is considered "debt" through judicial interpretation of TILA and the MLA could backfire to consumers' detriment. If "debt" were such a malleable concept as to include non-legal or non-contractual "obligations," the mere *expectation* of repayment, or consumer election of auto-pay mechanisms, then businesses and others that typically rely on recurring debit authorizations may ultimately have greater rights against consumers than are generally perceived.

Lastly, the explosive popularity of EWA products since the COVID pandemic and through the recent "affordability crisis" will only accelerate as the United States continues to move toward real-time

---

[13] *See* Terri Bradford, KCFed Payment System Research Briefing, "As Earned Wage Access Grows, Oversight Tries to Catch Up" ("KC Fed Research Briefing), at 2 (May 15, 2024), available at: https://www.kansascityfed.org/documents/10170/PaymentsSystemResearchBriefing24Bradford0515.pdf (last accessed June 15, 2026).

33

payment systems. The Federal Reserve Bank of Kansas City found that "EWA services are poised to become more widely available and more quickly accessible as more financial institutions adopt instant payments, including the Federal Reserve's FedNow service and The Clearing House's (TCH's) Real-Time Payments (RTP)" and that "[i]nstant payroll and EWA are already the fastest growing uses of RTP." KC Fed Research Briefing, at 2.

### b. The Status of EWA Products is Better Left to Ongoing Legislative Development.

Congress and state legislatures are weighing in on how best to tailor new regulatory solutions for EWA that encourage innovation, maintain a competitive landscape for businesses, and ensure fair treatment for workers. Court decisions like the one below, however, short-circuit these democratic processes.

Legislation that is currently under consideration in Congress would provide for distinct treatment of EWA products.[14] The federal bill would ensure the availability of no-fee EWA options and require providers to

---

[14] Earned Wage Access Consumer Protection Act, H.R. 9330, 119th Cong. (2026), https://www.congress.gov/119/bills/hr9330/BILLS-119hr9330ih.pdf (last accessed June 21, 2026).

disclose certain terms to their users. Critically, the bill would clarify that EWA—whether employer-based or direct-to-consumer—stands outside the existing rubric of TILA "credit" and broadly would exempt EWA products from TILA definitions and disclosure requirements.[15]

Most state legislatures that have addressed EWA likewise have declined to bucket EWA into older definitions of "credit." To date, at least twelve states have passed statutes or issued regulations directly regulating EWA products.[16] Of those twelve, nine have clarified that qualified EWA products are not loans, and all twelve states have excluded optional tips and fees paid to the EWA provider from the

---

[15] *See generally* Congressional Research Service, Earned Wage Access Products (July 31, 2024), https://www.congress.gov/crs_external_products/IF/PDF/IF12727/IF127 27.1.pdf (last accessed June 15, 2026).

[16] *See* Brief for Appellant at 36-38, *Vickory v. Empower Finance, Inc.*, Case No. 25-6377.

definition of interest.[17]   These state laws also typically make no distinction between EWA product types.

Finally, several state attorneys general have determined that EWA products are not credit, particularly where there is no contractual right to repayment.  There is broad consensus at the state level that where there is no recourse, there is no "credit" under existing statutory definitions.[18]

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's order denying Brigit's motion to compel arbitration.

Respectfully submitted,

---

[17] California, Maryland, and Connecticut define most EWA products as a loan, but they exclude tips and fees from the definition of interest, in some cases under particular caps.

[18] *See, e.g.*, Jeff Weninger, Ariz. Op. Atty. Gen. No. I22-005 (Ariz.A.G., 2022) (where the EWA provider obtains "no legal or contractual right to repayment against the employee," engage in debt collection, or report to credit agencies, the EWA product is not a "consumer loan" under Arizona law).

Andrew W. Lester, Esq.  
SPENCER FANE LLP  
9400 N. Broadway Ext., Suite 600  
Oklahoma City, OK 73114  
Tele: 405-844-9900  
Fax: 405-844-9958  

Mark E. Rooney, Esq.  
Michael G. Silver, Esq.  
Jonathan E. Cornfield, Esq.  
SPENCER FANE LLP  
1233 20th Street, NW, Suite 600  
Washington, D.C. 20036  
Tele: 202-293-0444  
Fax: 202-293-0445  

**Counsel for *Amicus Curiae***

## CERTIFICATE OF COMPLIANCE

Pursuant to Second Circuit Local Rule 29.1(c) and 32.1(a)(4)(A), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 6,792 words.

I further certify that this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in a 14-point Century Schoolbook font.

Dated:      June 22, 2026                    /s/ *Jonathan E. Cornfield*
                                             Attorney for EarnIn

## CERTIFICATE OF SERVICE

I hereby certify that on June 22, 2026, I electronically filed the foregoing brief of EarnIn as *Amicus Curiae* in support of reversal with the Clerk of the Court using the CM/ECF System. Counsel for all parties are registered CM/ECF users and will be served with the foregoing document by the Court's CM/ECF System.

Dated:     June 22, 2026                    /s/ *Jonathan E. Cornfield*
                                            Attorney for EarnIn

## CERTIFICATE OF SERVICE FOR PAPER BRIEFS

I, Jonathan E. Cornfield, hereby certify that I caused paper copies

of the foregoing to be delivered to the following:

Clerk of the Court
Thurgood Marshall United States
Courthouse
40 Foley Square
New York, New York 10007


*/s/ Jonathan Cornfield*
Counsel for EarnIn