# 26-959

## In the United States Court of Appeals for the Second Circuit

ROBERT FEEMAN, GUSTAVO GILLY, AND MICHAEL COLLINS,
INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

*Plaintiffs-Appellees,*

v.

BRIDGE IT, INC. D/B/A BRIGIT,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK, NO. 1:25-CV-03806
HON. LEWIS J. LIMAN

**REPLY BRIEF OF DEFENDANT-APPELLANT BRIGIT**

JAMES KIM
KAITLAND KENNELLY
HUGH HAMILTON
COOLEY LLP
55 Hudson Yards
New York, NY 10001
(212) 479-6256

EPHRAIM A. MCDOWELL
*Counsel of Record*
COOLEY LLP
1299 Pennsylvania Avenue NW
Suite 700
Washington, DC 20004
(202) 842-7800
emcdowell@cooley.com

*Counsel for Defendant-Appellant*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .......... ii

INTRODUCTION .......... 1

ARGUMENT .......... 2

I. Plaintiffs' Claims Are Arbitrable Because They Do Not Involve The Extension Of Credit .......... 3

A. Plaintiffs' Amorphous Reading Of "Debt" Disregards Text And Context. .......... 4

B. Users Incur No Debt To Brigit Because They Have No Obligation To Repay Any Advance. .......... 9

1. A revocable debit authorization does not create a repayment obligation. .......... 10

2. Brigit has no recourse if a user chooses not to repay an advance. .......... 15

3. Instant Cash is a no-recourse, no-obligation service in both form and substance. .......... 17

C. Agency Interpretations And Analogies To Other Products Confirm That Instant Cash Is Not Credit. .......... 18

II. Plaintiffs' Claims Are Also Arbitrable Because Advances Are Not Subject To A Finance Charge .......... 22

A. Optional Express Delivery Fees Are Not "Imposed" By Brigit On Users. .......... 23

B. Plaintiffs Misconstrue The Phrase "Incident To" .......... 26

C. Other Interpretive Tools Confirm That Express Delivery Fees Are Not Finance Charges. .......... 30

CONCLUSION .......... 35

CERTIFICATE OF COMPLIANCE .......... 37

CERTIFICATE OF SERVICE .......... 38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adar Bays, LLC v. GeneSYS ID, Inc.*,
179 N.E.3d 612 (N.Y. 2021) .......... 18

*Alexander v. Carrington Mortg. Servs., LLC*,
23 F.4th 370 (4th Cir. 2022) .......... 30

*Analytical Survs., Inc. v. Tonga Partners, L.P.*,
684 F.3d 36 (2d Cir. 2012) .......... 8

*Beal Sav. Bank v. Sommer*,
865 N.E.2d 1210 (N.Y. 2007) .......... 13

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 16

*Coinbase, Inc. v. Bielski*,
599 U.S. 736 (2023) .......... 3

*Dir., Off. of Workers' Comp. Programs v. Newport News Shipbuilding & Dry Dock Co.*,
514 U.S. 122 (1995) .......... 17

*Dolan v. U.S.P.S.*,
546 U.S. 481 (2006) .......... 4

*Glover v. Ocwen Loan Servicing, LLC*,
127 F.4th 1278 (11th Cir. 2025) .......... 30

*Goodwin v. Mass. Mut. Life Ins. Co.*,
73 N.Y. 480 (1878) .......... 12

*Household Credit Servs., Inc. v. Pfennig*,
541 U.S. 232 (2004) .......... 27-28, 34

*Kisor v. Wilkie*,
588 U.S. 558 (2019) .......... 18

## TABLE OF AUTHORITIES
## (continued)

Page(s)

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ........ 20

*Orubo v. Activehours, Inc.*,
780 F. Supp. 3d 927 (N.D. Cal. 2025) ........ 35

*Pa. Dep't of Pub. Welfare v. Davenport*,
495 U.S. 552 (1990) ........ 7-8

*Revell v. Grant Money, LLC*,
808 F. Supp. 3d 1036 (N.D. Cal. 2025) ........ 9

*Roberts v. Sea-Land Servs., Inc.*,
566 U.S. 93 (2012) ........ 7

*Russell v. Dave Inc.*,
812 F. Supp. 3d 998 (C.D. Cal. 2025) ........ 9

*Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*,
999 F.3d 828 (2d Cir. 2021) ........ 3-4

*Turner v. E-Z Check Cashing of Cookeville, TN, Inc.*,
35 F. Supp. 2d 1042 (M.D. Tenn. 1999) ........ 20-21

*United States v. Martin*,
974 F.3d 124 (2d Cir. 2020) ........ 23

*United States v. Mead Corp.*,
533 U.S. 218 (2001) ........ 20

*Util. Air Regul. Grp. v. EPA*,
573 U.S. 302 (2014) ........ 29

*Vangorden v. Second Round, Ltd. P'ship*,
897 F.3d 433 (2d Cir. 2018) ........ 5-6

*Veale v. Citibank, F.S.B.*,
85 F.3d 577 (11th Cir. 1996) ........ 33-35

## TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*West Va. Univ. Hosp. v. Casey*,
499 U.S. 83 (1991) ... 17

**Statutes**

9 U.S.C.
§ 2 ... 2
§ 16(a) ... 3

10 U.S.C. § 987(f)(4) ... 2-3

15 U.S.C.
§ 1605(a) ... 22, 24, 27, 29-30
§ 1605(a)(1) ... 28
§ 1605(a)(5) ... 28
§ 1692a(5) ... 5
§ 1692e(2)(A) ... 5
§ 1692f(1) ... 29-30
§ 1692k(a)(2) ... 6

Ark. Code Ann. § 23-52-202(7)(A) ... 25

Kan. Stat. Ann. § 9-2402(i) ... 25

Nev. Rev. Stat. § 604D.100(1)(a) ... 25

S.C. Code Ann. § 39-5-820(7)(a) ... 25

Utah Code Ann. § 13-78-101(4)(a) ... 25

## TABLE OF AUTHORITIES (continued)

**Page(s)**

### Regulations

12 C.F.R.
pt. 1026, Supp. I, Para. 2(a)(14) ¶ 2 .... 20
§ 1026.2(a)(13) .... 5
§ 1026.4(a) .... 29
§ 1026.4(a)(1)(ii) .... 34
§ 1026.4(b) .... 27
§ 1026.4(d)(1) .... 31
§ 1026.4(d)(1)(i) .... 31
§ 1026.17(c)(1) .... 5

32 C.F.R.
§ 232.3(f)(1) .... 2
§ 232.3(f)(1)(i) .... 2, 22
§ 232.3(h) .... 3

Federal Register
61 Fed. Reg. 49237 (Sept. 19, 1996) .... 32-33
65 Fed. Reg. 17129 (Mar. 31, 2000) .... 20
68 Fed. Reg. 16185 (Apr. 3, 2003) .... 32
80 Fed. Reg. 43560 (July 22, 2015) .... 22
90 Fed. Reg. 60069 (Dec. 23, 2025) .... 18-19, 24, 31, 33

### Other Authorities

CFPB, *Payday Loans and Deposit Advance Products* (Apr. 24, 2013) .... 22

Black's Law Dictionary (4th rev. ed. 1968)
*Debt* .... 6
*Legal debts* .... 7

Fifth Third, *Terms & Conditions Applicable to Fifth Third MyAdvance* (Aug. 10, 2026) .... 22

## TABLE OF AUTHORITIES
## (continued)

**Page(s)**

Merriam-Webster Online
*Owe* .......... 19

Webster's Seventh New Collegiate Dictionary (1967)
*Impose* .......... 23, 30

# INTRODUCTION

A consumer incurs "debt" if he receives money in exchange for an enforceable promise to repay. And a creditor "imposes" a "finance charge" incident to an extension of credit if the creditor requires the consumer to pay the charge to obtain the credit. Neither of these descriptions applies to earned wage access (EWA). With EWA, users can obtain a cash advance, decline to repay, and walk away with no strings attached. While some users pay a small fee for expedited delivery of the advance, that fee is entirely optional—users can receive the same advance in the same amount without paying any fee. EWA users therefore incur no "debt" and face no "finance charges."

In arguing to the contrary, plaintiffs ignore the ordinary meaning of "debt" and "impose." They instead fixate on peripheral definitions, which are untethered from the context of consumer lending. And they rest on inapposite agency interpretations that have now been superseded by the Consumer Financial Protection Bureau's persuasive 2025 Advisory Opinion (AO). Ultimately, plaintiffs' position is that (1) users are in "debt" to Brigit, even though they control whether to repay an advance and face no financial consequences if they choose not to repay;

and (2) Brigit "imposes" express delivery fees on users, even though users need not pay those fees to obtain an advance. That position defies statutory text, caselaw, and common sense. This Court should reverse.

## ARGUMENT

The parties agreed to arbitration, and the Federal Arbitration Act (FAA) makes that agreement "valid, irrevocable, and enforceable." 9 U.S.C. § 2. To avoid that result, plaintiffs cite 10 U.S.C. § 987(f)(4) of the Military Lending Act (MLA), which bars arbitration of "any dispute involving the extension of consumer credit" to a covered servicemember. But that provision has no application here for two reasons. First, Instant Cash advances do not extend "credit." 32 C.F.R. § 232.3(f)(1). Second, even if they did, that extension of credit would not be "[s]ubject to a finance charge." *Id.* § 232.3(f)(1)(i). Thus, Section 987(f)(4) provides no valid defense to arbitration of plaintiffs' claims.

Plaintiffs ask the Court to "dismiss this appeal for lack of jurisdiction or, in the alternative, affirm the district court's order." Response Brief (RB) 20. But this Court has appellate jurisdiction under the FAA, which grants parties an automatic right to file an interlocutory appeal following the denial of a motion to compel arbitration. *See*

*Coinbase, Inc. v. Bielski*, 599 U.S. 736, 740 (2023); 9 U.S.C. § 16(a). Plaintiffs' only argument against appellate jurisdiction is that Section 987(f)(4) of the MLA "displaces the FAA." RB21. Accordingly, plaintiffs' entire case—whether framed as a jurisdictional argument or an MLA argument—turns on whether Instant Cash "involve[s] the extension of consumer credit." 10 U.S.C. § 987(f)(4).

## I. PLAINTIFFS' CLAIMS ARE ARBITRABLE BECAUSE THEY DO NOT INVOLVE THE EXTENSION OF CREDIT

Instant Cash advances are not extensions of "credit." "Credit" means "the right granted to a consumer by a creditor to defer payment of *debt* or to incur *debt* and defer its payment." 32 C.F.R. § 232.3(h) (emphases added). Brigit users incur no debt because they have no obligation to repay advances. Plaintiffs' contrary arguments flout the statutory text and context.

As a threshold matter, plaintiffs incorrectly suggest (at 4) that the question is simply whether they "plausibly alleged that Instant Cash advances" are "credit." "Courts deciding motions to compel arbitration 'apply a standard similar to that applicable for a motion for summary judgment,'" in which they "'consider[] all relevant, admissible evidence submitted by the parties.'" *Soliman v. Subway Franchisee Advert. Fund*

*Tr., Ltd.*, 999 F.3d 828, 833-34 (2d Cir. 2021) (citations omitted). The "plausible allegation" standard governing motions to dismiss does not apply here.

### A. Plaintiffs' Amorphous Reading Of "Debt" Disregards Text And Context.

In the context of consumer contracts, "debt" means a legal or contractual obligation to pay a sum of money. Opening Brief (OB) 21-26. Plaintiffs agree that "debt" means "a state of being under obligation to pay or repay someone." RB25 (citation omitted). Yet they assert that an "obligation" can include not only a "duty imposed by law" and "contract," but also one imposed by "relations of society, courtesy, [or] kindness." RB26 (citation omitted). Because Brigit users might subjectively feel—based on societal expectations, courtesy, or kindness—that they "took on an obligation" to repay advances, plaintiffs contend they are in debt to Brigit. RB30.

That argument disregards basic interpretive principles. "A word in a statute may or may not extend to the outer limits of its definitional possibilities." *Dolan v. U.S.P.S.*, 546 U.S. 481, 486 (2006). Whether it does so "depends upon reading the whole statutory text" in "context." *Id.* Here, the relevant context is laws governing consumer-lending contracts

(the Truth in Lending Act and MLA). Given that context, Congress would have used "debt" to mean legal or contractual obligations—not social or moral ones. No one would think that "debt" in a bankruptcy or tax statute encompasses a moral duty to return a favor. The same is true here—particularly since the applicable regulations expressly refer to "contractual[]" and "legal obligation[s]." 12 C.F.R. §§ 1026.2(a)(13), 1026.17(c)(1).

Plaintiffs' understanding of debt would be indeterminate and unmanageable. Would all duties arising from "relations of society, courtesy, [or] kindness" create debt, even despite a written contract? RB26 (citation omitted). Or only some? What if one user viewed their moral obligations differently than another? Plaintiffs never explain how courts, creditors, or debt collectors would answer such questions.

The Fair Debt Collection Practices Act (FDCPA) illustrates why plaintiffs' reading would be unworkable. That statute defines "debt" as an "*obligation* . . . to pay money," 15 U.S.C. § 1692a(5) (emphasis added), and makes debt collectors strictly liable for misrepresenting "the character, amount, or legal status of any debt," *id.* § 1692e(2)(A); *see Vangorden v. Second Round, Ltd. P'ship*, 897 F.3d 433, 437-38 (2d Cir.

2018). Under plaintiffs' amorphous view of "debt," debt collectors would lack fair notice about whether debt exists—and face strict liability and statutory damages if they make a mistake. *See* 15 U.S.C. § 1692k(a)(2).

Plaintiffs accuse (at 40) Brigit of selectively citing definitions of "debt" from *Black's Law Dictionary*. But many of those definitions expressly support Brigit. *E.g.*, *Debt*, Black's Law Dictionary (4th rev. ed. 1968) (Black's) ("The word 'debt' carries with it the requirement of certainty, the foundation of promise by express contract, and necessarily implies legality."). Others are at worst neutral because they do not expressly reference a legal or contractual obligation to repay. *E.g.*, *id.* ("A sum of money due by certain and express agreement."). But none support plaintiffs' view that "debt," as used in legal parlance, can mean "a promise" with no binding enforcement mechanism at all. RB40. Indeed, while plaintiffs elsewhere admit that an "obligation" describes "something one is bound to do," *id.*, they never explain where that binding effect would come from absent some legal enforcement mechanism.

Plaintiffs claim (at 41 n.12) that if Congress had wished to adopt Brigit's reading, it would have referred to "[l]egal debts" rather than "debt." *Black's* defines "[l]egal debts" as "[t]hose that are recoverable in

a court of common law, as debt on … a simple contract." *Legal debts*, Black's, *supra*. But in statutes governing consumer-lending law and contracts—which address legal rights, requirements, and remedies—Congress had no need to include that "legal" qualifier because the implication of legally enforceable debt is unmistakable from context. Such a construction does not "write 'a limitation into the statute that does not exist,'" RB35 (citation omitted); rather, it reads the statute in "context and with a view to [its] place in the overall statutory scheme," *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012) (citation omitted).

Contrary to plaintiffs' assertion (at 41), the Supreme Court's decision in *Pennsylvania Department of Public Welfare v. Davenport*, 495 U.S. 552 (1990), does not support their reading of "debt." In *Davenport*, the Court held "that restitution obligations are 'debt[s]' as defined by" the Bankruptcy Code. *Id.* at 555 (alteration in original). The Court reasoned that "debt" means "an enforceable obligation," and explained that restitution obligations are "enforceable by the substantial threat of revocation of probation and incarceration." *Id.* at 559. Plaintiffs emphasize that the restitution obligations in *Davenport* "were 'debt' notwithstanding they were not enforceable 'in civil proceedings.'" RB41

(quoting 495 U.S. at 559). But they ignore that those obligations were still "enforceable in court" through *criminal* proceedings. *Id. Davenport* thus undermines plaintiffs' suggestion that "debt" can encompass an empty statement of intent to repay with no "enforcement mechanism" at all. 495 U.S. at 559.

Plaintiffs attack Brigit for citing cases (at 42) from outside "the consumer contract context." *See* OB24-25. But those cases underscore that, across a variety of financial regulatory schemes, "debt" means "an obligation to pay a fixed sum certainly and at all events." *Analytical Survs., Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 43-44 (2d Cir. 2012) (citation omitted). What is true under the securities laws, the Employee Retirement Income Security Act, the Bankruptcy Code, and the Tax Code should be true under TILA and the MLA as well.

Tellingly, the only cases that plaintiffs cite to support their novel understanding of "debt" are the recent district court decisions addressing EWA. RB32. But plaintiffs' overwhelming reliance on those cases highlights the weakness of their position: If statutory references to "debt" can include anything that a person subjectively feels a duty to pay—even

absent an enforcement mechanism—then presumably some court would have said so before 2025.

In any event, the cited district court decisions are nonbinding and unpersuasive. Some of those decisions do not even analyze the ordinary meaning of "debt." *See, e.g.*, *Russell v. Dave Inc.*, 812 F. Supp. 3d 998, 1007-08 (C.D. Cal. 2025). And the ones that do so incorrectly posit—like plaintiffs here—that "debt" in TILA and the MLA may include amorphous obligations that are neither legal nor contractual in nature. *See, e.g.*, *Revell v. Grant Money, LLC*, 808 F. Supp. 3d 1036, 1050 (N.D. Cal. 2025).

### B. Users Incur No Debt To Brigit Because They Have No Obligation To Repay Any Advance.

Under the correct understanding of "debt," this case is straightforward: Brigit users incur no debt because they have no legal or contractual obligation to repay advances. OB26-28. Brigit's Terms unambiguously state that Brigit "has no legal or contractual claim against [any user] based on a failure to repay an Advance." JA177. And Brigit promises not to "engage in any debt collection activities" and not to refer an unpaid advance to any "third party." *Id.* The only effect of nonpayment is that Brigit "will suspend [the user's] access to future

Advances until [they] repay the outstanding Advance." *Id.* Those Terms create no obligation to repay—and thus no "debt."

Plaintiffs' contrary argument rests on flawed premises. First, they mistake a revocable debit authorization for a repayment obligation. Second, they assert that Brigit retains recourse even though its Terms unambiguously say otherwise. Third, plaintiffs' invocation of the "economic substance" doctrine fails because Instant Cash is a no-obligation, no-recourse service in both form and substance.

#### 1. A revocable debit authorization does not create a repayment obligation.

Plaintiffs contend that they incurred debt to Brigit because they supposedly made "a 'certain written promise to pay money' to Brigit on the repayment date." RB30 (citation omitted). That is wrong. As the opening brief explains (at 35), the Terms simply require users to *initially* "authorize Brigit . . . to electronically debit [their] Payment Method for" Instant Cash payments. JA173. But users may then "revoke this authorization" at any time to avoid repaying an advance. *Id.* And doing so does not give rise to a "legal or contractual claim," JA177—confirming that such revocation is consistent with, not a breach of, the parties' contract.

Plaintiffs misrepresent the Terms by referencing "mandatory pre-authorized debits." RB53. As just explained, the repayment debit is not mandatory—it is freely revocable. And allowing users to pay through a revocable automatic debit is just a convenient way to accomplish voluntary payment. After all, if users revoke the authorization, Brigit cannot recover the payment amount.

Plaintiffs note (at 6) that Brigit may "make repeated collection attempts should the pre-authorized payday repayment debit fail." But Brigit may reattempt collection only if the user has authorized it—and the user may revoke that authorization at any time, at no cost. JA173. Reattempting an authorized debit is simply voluntary payment processing the user can end unilaterally. And if payment never comes, Brigit has only one response: declining further advances. JA177.

According to plaintiffs, it does not matter that "debit authorizations are 'freely revocable'" because users "take[] on a 'binding legal obligation' when [they] accept[] an Instant Cash advance and promise[] repayment." RB34 (citation omitted). But it is wrong to read the Terms as creating a threshold repayment obligation that may later be revoked. Instead, users have no obligation to repay in the first place because they may

always withdraw the debit authorization without facing *any* "legal or contractual claim" or other recourse. JA177. Thus, this is not an instance in which there is "a 'promise for breach of which the law'" gives no "remedy." RB52 (citation omitted). There is simply no promise to repay or breach at all.[1]

Plaintiffs try to conjure a repayment obligation by cherry-picking isolated provisions of the Terms. They first fixate on the phrase "payment to Brigit is required." RB30 (quoting JA145). But in full, the relevant provision states: "If you enroll in a Brigit Subscription, use Instant Cash, Credit Builder or use any of the Services for which payment to Brigit is required, including use of the Advance Service, you authorize Brigit … to electronically debit your Payment Method for the applicable amounts." JA145. That general provision addresses multiple Brigit services, some of which are loans and have required payments. In

[1] Although plaintiffs now seek to defend (at 52) the district court's reliance on principles of "void and voidable contracts," plaintiffs notably never relied on those principles below. Plaintiffs' initial instinct—that such principles are inapposite—was the correct one. And plaintiffs' newfound affinity for state-law contract principles is inconsistent with their own claim that reliance on state law here is "misplaced." RB53 n.17. Ultimately, the only relevant state-law principle is New York's rule that debt requires an "unqualified[] and absolute[]" obligation to pay. *Goodwin v. Mass. Mut. Life Ins. Co.*, 73 N.Y. 480, 487 (1878).

the Instant Cash context, that general provision is clarified by the specific provisions stating that users may "revoke [their debit] authorization," decline to repay an Instant Cash advance, and face "no legal or contractual claim … based on [the] failure to repay an Advance." JA173, JA177. Thus, when "read as a whole," *Beal Sav. Bank v. Sommer*, 865 N.E.2d 1210, 1213-14 (N.Y. 2007) (citation omitted), the Terms leave no doubt that users need not repay advances.

Next, plaintiffs emphasize that the Terms refer to "payments due." RB30 (quoting JA174). But that phrase is found in a generic provision addressing "Electronic Payment Authorization," JA173, which states in full that users "warrant and represent to Brigit that [they] have the right to authorize us to charge and debit [their] Bank Account or debit card … for payments due to us under the Terms," JA174. Again, because that provision applies to *all* of Brigit's services, the term "due" does not refer to Instant Cash payments specifically. Even if "due" could refer to Instant Cash, it would most naturally mean "scheduled"—not required. OB30-31. And in all events, the other Instant Cash-specific provisions

quoted above refute any suggestion that Instant Cash payments are required.[2]

Although plaintiffs suggest otherwise (at 47), their interpretation would create an impermissible "conflict" in the Terms. They claim that users "take[] on a 'binding legal obligation' when [they] accept[] an Instant Cash advance." RB34 (citation omitted). But a provision creating such an obligation would clash with the other provisions allowing users to revoke their debit authorization without cost or consequence. The only coherent interpretation of the entire Terms is Brigit's: debit authorization is revocable, and repayment is optional.

Even if some hypothetical Brigit users misconstrued the Terms by reading certain provisions in isolation, plaintiffs never allege that *they* misread the Terms or were deceived by them. And such a subjective allegation would not support their argument that Instant Cash is "debt" in any event. The "debt" analysis is objective and turns on whether the

---

[2] Plaintiffs rely (at 31) on "statements from Brigit's website" and "screenshots from its app." But each plaintiff consented to Brigit's Terms, which "represent the entire understanding and agreement between [users] and Brigit regarding the subject matter of the same." JA196.

Terms, when read as a whole, create a legal or contractual obligation to repay. While allegations that Brigit's Terms were misleading might theoretically support a deception claim, plaintiffs assert no such claim here (nor could they, because the Terms are clear).

Plaintiffs also argue (at 33-34) that they must have been "obligated to repay" because otherwise Brigit would have had no "right" "to debit [their] account[s]" and "would [have been] committing theft." But Brigit had a right to debit plaintiffs' accounts so long as they authorized such debits. If they revoked their authorization, Brigit would no longer have that right or any recourse to collect the unpaid advance. Instead, the *only* action Brigit could take is declining to provide "future Advances until [the user] repay[s] the outstanding Advance." JA177. Plaintiffs do not contend that Brigit deviates from those contractual commitments. Nothing about those Terms creates a repayment obligation.

#### 2. Brigit has no recourse if a user chooses not to repay an advance.

Even though the Terms contain a bold-faced provision entitled "No Recourse In the Event of Non-Payment," JA177, plaintiffs insist (at 36) that Brigit "retains" recourse. None of plaintiffs' asserted "layers of repayment enforcement" exist. *Id.* First, as explained above, there are

no "mandatory pre-authorized debits." *Id.* Second, every "re-attempt collection debit[]" likewise operates exclusively through user consent. *Id.*; *see supra* at 11. Third, Brigit does not "enforce[]" repayment by disallowing further advances until a user repays a current one. RB36. That policy simply reflects Brigit's wish to limit its losses precisely because unpaid advances are uncollectible.

Lacking support in the Terms, plaintiffs ask the Court to assume that "recourse" exists based on the high repayment rate alleged in the Complaint. RB36 n.11. But just because many users choose to repay does not mean they *must* do so. Even under a motion-to-dismiss standard, there would be an "obvious alternative explanation," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007), for that high repayment rate: Customers want to keep using Instant Cash and know that repayment is necessary to obtain another advance. If 95% of Netflix subscribers choose not to revoke their automatic payments each month, no one would assume that is because Netflix has recourse against subscribers if they choose to revoke. Instead, the natural inference is that they want to continue using the service. So too here.

### 3. Instant Cash is a no-recourse, no-obligation service in both form and substance.

Plaintiffs assert that "[c]ourts must liberally construe TILA to protect consumers and 'look[] past the form of the transactions to their economic substance.'" RB37 (citation omitted) (alterations in original). But arguing that a statute "should be liberally construed to achieve its purposes" is the "last redoubt of losing causes." *Dir., Off. of Workers' Comp. Programs v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 135 (1995). And "[t]he best evidence of [congressional] purpose is the statutory text." *West Va. Univ. Hosp. v. Casey*, 499 U.S. 83, 98 (1991).

In any event, plaintiffs offer no reason why their interpretation would better "protect consumers" than Brigit's. RB37. EWA provides a consumer-friendly alternative to riskier payday loans. Unlike payday loans, EWA does not create debt traps because users have no obligation to repay, no ability to roll over advances, and can incur no penalties. Amicus Br. for Am. Fintech Council et al. 12-16.

Ultimately, EWA is not credit in either "form" or "substance." RB37 (citation omitted). In cases invoking the economic-substance doctrine, the lender attempts to mislabel "a traditional loan instrument" under which the borrower must "repay the loaned principal, plus interest, in

some form, by a maturity date." *Adar Bays, LLC v. GeneSYS ID, Inc.*, 179 N.E.3d 612, 622 (N.Y. 2021). Here, by contrast, plaintiffs never allege that Brigit's Terms are a sham or that Brigit actually seeks to collect unpaid advances. The service comes exactly as it is described: a cash advance with no obligation to repay.

### C. Agency Interpretations And Analogies To Other Products Confirm That Instant Cash Is Not Credit.

Because the text unambiguously shows that Instant Cash is not credit, this Court need not consider agency interpretations. *See Kisor v. Wilkie*, 588 U.S. 558, 573 (2019). Regardless, the only relevant agency interpretation confirms the conclusion. The CFPB's 2025 AO determines that EWA is not credit because it creates no "financial liability or obligation" to repay, and providers "reserve no recourse." 90 Fed. Reg. 60069, 60071-72 (Dec. 23, 2025). Plaintiffs observe that the AO formally addresses only "Covered EWA," where "[r]epayment occurs through 'a payroll process deduction.'" RB43-44 (quoting 90 Fed. Reg. at 60071). But the AO's "primary reason" for deeming Covered EWA non-credit is that it entails no "financial liability or obligation" to repay, 90 Fed. Reg. at 60071—a rationale that applies equally to Instant Cash.

As plaintiffs note (at 45), the AO also states that "the defining element of 'credit' is a consumer's repayment—at some point in the future—of the amount owed." 90 Fed. Reg. at 60072. But absent contrary indications, the ordinary meaning of "owe" is "to be under obligation to pay or repay in return for something received." *Owe*, Merriam-Webster Online, https://perma.cc/LN25-GHVH. Thus, plaintiffs' favorite line of the AO only reinforces that "credit" entails an obligation to repay.

Plaintiffs misconstrue the AO as suggesting that the existence of "debt" hinges on whether voluntary repayment is made "through 'a payroll process deduction'" or through "the consumer's regular transaction accounts." RB43-44 (citation omitted). In fact, the ordinary meaning of "debt" turns not on *how* payments are made, but on whether an obligation to pay exists. *See* Amicus Br. of EarnIn 21-27.

Rather than the AO, plaintiffs invoke (at 27-29, 38-40) interpretations by the Federal Reserve Board (FRB) and Department of Defense (DoD) addressing *different* financial products. But plaintiffs never explain why those interpretations override the CFPB's recent analysis of the very service at issue. Nor do plaintiffs explain how a court could give "deference" to the FRB's staff commentary. RB27 n.9 (citation

omitted). Even before *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), nonbinding, informal commentary carried little weight. *See United States v. Mead Corp.*, 533 U.S. 218, 231 (2001). And the cited commentary does not grapple with the key statutory term: "debt." *See* 12 C.F.R. pt. 1026, Supp. I, Para. 2(a)(14) ¶ 2.

Plaintiffs' regulatory authorities are also inapposite on their own terms. The FRB commentary addresses agreements, "however they are described," that share the fundamental characteristics of "payday loans" or "deferred presentment transactions." 65 Fed. Reg. 17129, 17130 (Mar. 31, 2000). EWA does not fall into that category: unlike payday loans, it comes with no obligation to repay, no interest, no penalty fees, and no debt collection.

Nor is EWA analogous to deferred-presentment transactions. OB33-34. Unlike EWA users, deferred-presentment borrowers cannot rescind their post-dated check and walk away without paying anything. In *Turner v. E-Z Check Cashing of Cookeville, TN, Inc.*, 35 F. Supp. 2d 1042 (M.D. Tenn. 1999), for instance, deferred-presentment borrowers "were required to sign Agreements providing that [they] would repay" the amount borrowed. *Id.* at 1046. Nothing suggests that the agreement

also contained provisions—like the Terms here—disclaiming all recourse and stating that failure to pay gives rise to no legal or contractual claim. Thus, when the plaintiff's post-dated check bounced, she breached the agreement, and the lender could have sued her to recover the unpaid sum. While the lender also impermissibly threatened the plaintiff with criminal prosecution, *see id.* at 1051, that is beside the point. *Contra* RB50.

Plaintiffs likewise err in analogizing (at 48) to secured transactions, such as mortgages, pawn transactions, and title loans. Those transactions involve an obligation to repay and an enforcement mechanism—seizure of the collateral—upon nonpayment. OB32-33. So while there is no recourse against the "*person*[]," RB49, there is recourse against the property. After all, homeowners cannot cancel their mortgage company's outstanding security interest and keep their home. Here, by contrast, users can cancel their debit authorization, keep an advance, and face no financial consequences.

Equally inapposite is DoD's treatment of "'deposit advance' products," which involve "credit extended" and then "repaid" with a "fee or charge … from funds available in the borrower's asset account held by

that creditor." 80 Fed. Reg. 43560, 43579 (July 22, 2015); *see* RB28-29. Unlike EWA, deposit-advance products involve an express agreement to repay and recourse in the event of default. For instance, one deposit-advance agreement requires that consumers "Promise to Pay" and authorizes the lender to pursue any method "permitted by law to collect any outstanding debts." Fifth Third, *Terms & Conditions Applicable to Fifth Third MyAdvance* 6-7 (Aug. 10, 2026), https://perma.cc/95HZ-8FWS. Moreover, as plaintiffs' own cited source explains, if a deposit-advance customer fails to repay, the creditor may "execute a *forced repayment* from the consumer's deposit account for the amount due, even if this causes the account to become overdrawn." CFPB, *Payday Loans and Deposit Advance Products* 12 (Apr. 24, 2013), https://perma.cc/6BX8-JKBV (emphasis added).

## II. PLAINTIFFS' CLAIMS ARE ALSO ARBITRABLE BECAUSE ADVANCES ARE NOT SUBJECT TO A FINANCE CHARGE

The MLA's arbitration bar does not apply here for another reason: Brigit's advances are not "[s]ubject to a finance charge." 32 C.F.R. § 232.3(f)(1)(i). A finance charge is a charge "imposed directly or indirectly by the creditor as an incident to the extension of credit." 15 U.S.C. § 1605(a). Brigit does not "impose" express delivery fees on users

because express delivery is entirely optional; nor are such fees "incident to" advances. Plaintiffs' contrary arguments lack merit.

### A. Optional Express Delivery Fees Are Not "Imposed" By Brigit On Users.

As common dictionaries, legal dictionaries, and caselaw show, "imposed" means "appli[ed] as compulsory." *Impose*, Webster's Seventh New Collegiate Dictionary 420 (1967); *see* OB44-45. Thus, a charge is "imposed" by a creditor on a consumer only if the creditor requires the consumer to pay it to obtain the credit.

Plaintiffs do not dispute the ordinary meaning of "imposed." Rather, they maintain that in the "context" here, "imposed" merely "identifies the party conducting the charging" and "establish[es] a counterpoint" to the phrase "*payable* by the borrower." RB54 (citation omitted). But even if the term "imposed" helps identify the party levying the charge, that would not provide an excuse for disregarding the term's ordinary meaning. If Congress's only objective had been identification, it could have used the term "charged" or simply omitted any reference to the creditor. OB53. Instead, it deliberately chose a term—"imposed"—that "connotes the affirmative placement of a burden or a restriction." *United States v. Martin*, 974 F.3d 124, 138 (2d Cir. 2020).

Plaintiffs also contend (at 54) that express delivery fees are "imposed" because they must be "paid to obtain the instant-use feature of Instant Cash." That contention is circular: Brigit of course imposes express delivery fees incident to the express-delivery feature. But the relevant question is whether Brigit "impose[s]" express delivery fees "as an incident to *the extension of credit*." 15 U.S.C. § 1605(a) (emphasis added). And the putative "extension of credit" here is an advance on a portion of already-earned wages, which a user can obtain within 1-3 business days without paying any fee. The "instant-use feature," RB54, simply changes the *speed* of delivery—but the amount of the advance and other terms remain identical.

Plaintiffs insist that Brigit provides two different "credit offering[s]": one express-delivery advance and a separate "slower, fee-free advance." RB56-57. But as the CFPB has explained, that view is "facially implausible" because it would mean that "any fee for anything connected to a credit transaction can be transformed into a finance charge" simply by deeming "each 'feature'" a "separate credit product." 90 Fed. Reg. at 60075 (citation omitted). Under the correct analysis, the Court must focus on the (putative) extension of credit itself—here, the

advance of already-earned wages before a user's ordinary payday. An advance that arrives within minutes and an advance that arrives within 1-3 days are the same extension of credit. In both cases, users receive the same amount of funds well before their ordinary payday—the marginal difference between an hour and a day does not create an entirely distinct "credit offering." RB57.

Plaintiffs' reliance (at 57 n.19) on "[s]tate statutes" using the term "imposed" is misplaced. Those laws describe express delivery fees as being "imposed" for the delivery, not "as an incident to the extension of credit." *See* Ark. Code Ann. § 23-52-202(7)(A) ("'Fee' means a charge imposed by a provider for delivery or expedited delivery of proceeds to a consumer.").[3] If a user has chosen to expedite delivery, the putative creditor may be described as "impos[ing]" a fee for that delivery, because the borrower cannot receive the faster delivery without paying the fee. But the putative creditor has not "imposed" the fee for "the extension of credit" because the user was not required to expedite delivery in the first place.

[3] *See* Kan. Stat. Ann. § 9-2402(i) (similar); S.C. Code Ann. § 39-5-820(7)(a) (similar); Utah Code Ann. § 13-78-101(4)(a) (similar); Nev. Rev. Stat. § 604D.100(1)(a) (similar).

Plaintiffs' "HBO Max" example (at 57) fails for the same reason. A "cable provider" may "impose" a fee for a premium channel if a customer chooses to access that channel. *Id.* But the cable provider does not "impose" that fee as an incident to the cable service itself because customers need not pay the fee to access basic cable. The same logic applies here.

### B. Plaintiffs Misconstrue The Phrase "Incident To."

Brigit's express delivery fees are also not imposed "incident to" an extension of credit. OB55-57. Plaintiffs admit that the phrase "incident to" "implies some *necessary* connection" between the relevant charge and the extension of credit. RB58 (quoting *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 241 (2004)). Here, there is no necessary connection between an express delivery fee and an advance because users can obtain the same advance in the same amount by selecting free standard delivery. And even if users choose express delivery, they can still receive the advance on an expedited timeframe without paying any fee by revoking the debit authorization and cancelling the entire repayment (both the advance *and* the express delivery fee). *See* JA178, JA180.

Plaintiffs nonetheless insist that a "necessary connection" exists because "[n]o user pays an Express Fee without taking an Instant Cash advance." RB58 (citation omitted). But that reading conflicts with *Pfennig*. There, no consumer would have paid the relevant over-limit fee without taking an extension of credit—and yet the Court held that "the best interpretation of the term 'finance charge' may exclude over-limit fees." *Pfennig*, 541 U.S. at 242.

Recognizing that they cannot satisfy the "necessary connection" standard, plaintiffs argue (at 58-61) that *Pfennig* did not actually mean "necessary." Instead, they posit (at 59) that "necessary connection" merely implies that "a *connection* between the fee and the extension of credit must exist." But if every fee with "a connection" to the extension of credit were a finance charge, *id.* (emphasis omitted), then the meaning of finance charge would be boundless. Such a reading cannot be squared with the terms of TILA and Regulation Z—which enumerate examples of both finance charges and fees that are not finance charges. *See* 15 U.S.C. § 1605(a); 12 C.F.R. § 1026.4(b). On plaintiffs' view, that meticulous drafting would have been unnecessary. Nor is that capacious understanding of "finance charge" consistent with *Pfennig*: in that case,

"there [was] at least some connection between the over-limit fee and an extension of credit," 541 U.S. at 240, and the Court held that the fee could reasonably be excluded from the "finance charge" definition.

Plaintiffs spill much ink arguing (at 61) that express delivery fees "are readily distinguishable" from the "over-limit fees" in *Pfennig*. But fees can fall outside the "finance charge" definition for different reasons. In *Pfennig*, the over-limit fees were reasonably viewed as "a penalty for violating the credit agreement" rather than "as a charge imposed for obtaining an extension of credit." 541 U.S. at 240. Here, the express delivery fees are sums voluntarily paid for faster delivery of advances, not fees imposed for receiving advances. In both cases, the key point is that the fees need not be paid to "obtain[] an extension of credit." *Id.*

It is true that some finance charges have a "substantial" connection to the extension of credit, whereas others have a more "remote" connection. RB59 (quoting *Pfennig*, 541 U.S. at 241). After all, some required fees are essentially bound up in the credit itself (*e.g.*, "[i]nterest," 15 U.S.C. § 1605(a)(1)), while others are more attenuated (*e.g.*, required "[p]remium[s]" for "insurance protecting the creditor," *id.* § 1605(a)(5)). But the variety of required fees that may be covered does not suggest that

"finance charge" can also include *optional* fees that affect only the speed at which credit is delivered.

Plaintiffs also err (at 63) in emphasizing the "disjunctive" nature of Regulation Z's finance charge definition, which references charges that are "imposed … as an incident to *or* a condition of the extension of credit." 12 C.F.R. § 1026.4(a) (emphasis added). As the opening brief explains (at 56), only the regulation—not the statute—uses the disjunctive formulation. The statute references charges "imposed … by the creditor as an incident to the extension of credit." 15 U.S.C. § 1605(a). Plaintiffs ignore this point. As a result, they impermissibly read Regulation Z's addition of the phrase "or a condition of" to "rewrite" the "clear statutory" language of "incident to." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014). Read properly, Regulation Z's addition of "or a condition of" reinforces that "incident to" captures only fees that must be paid as a condition of obtaining the extension of credit.

Plaintiffs' reliance (at 65) on the FDCPA is misplaced because the relevant provision there is textually distinct from Section 1605(a). *See* 15 U.S.C. § 1692f(1) (referencing fees "incidental to the principal obligation"). Unlike Section 1605(a), the FDCPA does not use the term

"imposed," which (as explained above) means "apply as compulsory." *Impose*, Webster's Seventh, *supra*, at 420. Thus, even if an optional fee could be "incidental to" an extension of credit, 15 U.S.C. § 1692f(1), that does not suggest it can be "*imposed* … as an incident to [an] extension of credit," 15 U.S.C. § 1605(a) (emphasis added). In any event, plaintiffs' two cited court of appeals decisions interpret "incidental to" only in passing dicta contained in footnotes; they offer no meaningful textual analysis of the phrase. *See Glover v. Ocwen Loan Servicing, LLC*, 127 F.4th 1278, 1290-91 n.13 (11th Cir. 2025); *Alexander v. Carrington Mortg. Servs., LLC*, 23 F.4th 370, 377 n.2 (4th Cir. 2022).

Plaintiffs' emphasis (at 66) on Brigit's "promot[ions]" fares no better. The quoted marketing materials advertise speed, and speed is all the express delivery fee buys. Regardless, as noted above, Brigit's Terms—to which plaintiffs agreed—supersede any other representations Brigit has made to customers. *See supra* at 14 n.2.

### C. Other Interpretive Tools Confirm That Express Delivery Fees Are Not Finance Charges.

The other interpretive tools likewise refute plaintiffs' position. To start, the statutory structure reinforces that express delivery fees are not finance charges. OB58-59. None of the finance charges listed in TILA or

Regulation Z resemble optional fees paid to expedite delivery of credit. Plaintiffs cite "[c]redit life and disability insurance premiums." RB55 (citation omitted). But as the opening brief explains (at 62-63), those premiums "may be *excluded* from the finance charge" when they are "[v]oluntary" and "[t]he insurance coverage is not required by the creditor." 12 C.F.R. § 1026.4(d)(1), (d)(1)(i) (emphasis added). Thus, making the premiums voluntary is precisely what allows a creditor to remove them from the category of "finance charges."

The CFPB's AO is in accord. The AO concludes that optional express delivery fees "are not 'directly or indirectly imposed' by the provider," and so cannot qualify as a "finance charge." 90 Fed. Reg. at 60075. And that conclusion applies even to "EWA products other than [payroll-based] Covered EWA." *Id.* at 60074. Plaintiffs insist (at 66) that the AO is inconsistent with "the allegations here." But the AO specifically considers EWA services that "offer consumers the option of receiving their earned wages via regular ACH and/or by instant transfer" for a fee "ranging from $2.50 to $5.99." 90 Fed. Reg. at 60074-75. That precisely describes Brigit's service. JA178.

Nor do plaintiffs offer any persuasive response to the FRB's rule finding that "a fee for expedited delivery of a credit card is not incidental to the extension of credit and thus is not a finance charge." 68 Fed. Reg. 16185, 16187 (Apr. 3, 2003). Plaintiffs seek to distinguish (at 67) between "shipping a physical credit card via express mail" and electronically transferring cash via express delivery. But in both circumstances, users can pay an optional fee to access funds more quickly. Plaintiffs note that "[w]hether a consumer receives a physical credit card in two days or two weeks does not alter any term of the credit extended after the borrower receives and then uses the card." RB67. The same is true here: regardless of whether users opt for standard or express delivery, they receive the same advance in the same amount and may defer or decline repayment with no consequence.

Rather than these on-point authorities, plaintiffs again rest on agency interpretations addressing distinct products. RB61-62. First, they analogize to debt-cancellation agreements, under which a creditor charges a fee to "cancel all or part of any remaining debt in the event of an occurrence, such as the death, disability, or unemployment of the borrower." 61 Fed. Reg. 49237, 49240 (Sept. 19, 1996). But as the AO

explains, those fees involve "a very different fact pattern" because paying them "potentially reduces the principal amount the consumer owes the creditor." 90 Fed. Reg. at 60075. In contrast, the base "amount [an EWA] provider deducts" from a user's bank account (if the user chooses to repay) "is unaffected by the [user's] opting for expedited delivery" or "instead for free ACH delivery." *Id.*

Second, plaintiffs analogize to "variable-rate loans," RB62 (citation omitted), where the borrower can pay a fee "to convert the loan to a fixed interest rate at a subsequent date," 61 Fed. Reg. at 49239. But paying such fees allows borrowers to "alter[] the fundamental nature of [their] repayment obligation." *Id.* So even if they are properly considered finance charges, they are nothing like express delivery fees—which do not affect users' repayment obligations. With express delivery or standard delivery, users have no repayment obligation at all.[4]

Plaintiffs also cannot reconcile their position with *Veale v. Citibank, F.S.B.*, 85 F.3d 577 (11th Cir. 1996). They incorrectly suggest that

---

[4] Contrary to plaintiffs' suggestion (at 64), Brigit's opening brief does not "acknowledge[]" that fees for variable-rate loans are "properly considered" finance charges. Rather, the opening brief explains (at 62) that even if that were the case, such fees are critically distinct from express delivery fees.

*Pfennig* abrogates *Veale* by "requir[ing] only a 'connection'" of any kind between the fee charged and credit extended. RB68 (quoting *Pfennig*, 541 U.S. at 241). But in fact, *Pfennig* requires a "*necessary* connection between" the two. 541 U.S. at 240-41. And *Veale* tracks the necessary-connection standard by holding that an optional express delivery fee that "the borrower can choose to avoid" is not a finance charge. 85 F.3d at 579.

Nor is *Veale* "distinguishable." RB68. Plaintiffs assert (*id.*) that the fee in *Veale* "was a pass-through charge for a third-party's services" and therefore fell under an express exemption in Regulation Z. *See* 12 C.F.R. § 1026.4(a)(1)(ii). Even assuming that is true, *Veale* did not rely on that exemption. Instead, it held that the "finance charge" definition did not apply in the first place because the express delivery fee "was not imposed as an incident to the extension of credit." *Veale*, 85 F.3d at 579.

Plaintiffs also claim that *Veale* is distinct because the consumers there paid a fee for funds to be delivered "to some other creditor to whom [they] owed money." RB69 (quoting SPA-40). But there, as here, payment of the optional fee accelerated access to the use or value of money—whether through direct receipt of funds or a transfer of funds to

pay off an existing debt. And because in both cases, the consumer "could have chosen not to pay the [express delivery] fee and the [putative creditor] did not require it," the fees are not finance charges. *Veale*, 85 F.3d at 579.

Finally, plaintiffs fall back (at 61) on district court decisions from the EWA context finding optional express delivery fees to be finance charges. Those decisions are nonbinding and squarely conflict with the CFPB's AO. They also rest on the same flaws as plaintiffs' own response brief: ignoring the ordinary meaning of the term "imposed," and construing "incident to" as meaning "connected to," even though *Pfennig* plainly requires a *necessary* connection. *Orubo v. Activehours, Inc.*, 780 F. Supp. 3d 927, 937 (N.D. Cal. 2025). Accordingly, plaintiffs' consistent refrain about "every other court" adopting their interpretation falls flat. RB61. Those courts have reached that result only by disregarding the ordinary meaning of the statutory text. *De novo* appellate review exists precisely so that this Court can correct such legal errors.

## CONCLUSION

This Court should reverse the district court's order denying Brigit's motion to compel arbitration.

Dated: August 14, 2026

Respectfully submitted,

*/s/ Ephraim A. McDowell*
EPHRAIM A. MCDOWELL
COOLEY LLP
1299 Pennsylvania Avenue NW
Suite 700
Washington, DC 20004
(202) 842-7800
emcdowell@cooley.com

JAMES KIM
KAITLAND M. KENNELLY
HUGH B. HAMILTON
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
(212) 479-6000

*Counsel for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation set forth in Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,978 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

Dated: August 14, 2026

*/s/ Ephraim A. McDowell*
Ephraim A. McDowell

## CERTIFICATE OF SERVICE

I hereby certify that, on August 14, 2026, I electronically filed the foregoing Brief of Defendant-Appellant with the United States Court of Appeals for the Second Circuit using the Court's electronic filing system, which will serve copies on all registered counsel.

Dated: August 14, 2026

*<u>/s/ Ephraim A. McDowell</u>*
Ephraim A. McDowell